# U.S. District Court
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: 1:15–cr–00029–PAB–1

Case title: USA v. Petty

Date Filed: 01/27/2015
Date Terminated: 11/02/2015

---

Assigned to: Judge Philip A. Brimmer

Appeals court case number: 15–1421 USCA

**Defendant (1)**

**Ishmael Petty**
*TERMINATED: 11/02/2015*

represented by **Gail Kathryn Johnson**
Johnson Brennan &Klein, PLLC
1470 Walnut Street
Suite 101
Boulder, CO 80302
303–444–1885
Fax: 866–340–8286
Email: gjohnson@jbk–law.com
*ATTORNEY TO BE NOTICED*

**Scott Thomas Varholak**
Office of the Federal Public Defender
633 Seventeenth Street
Suite 1000
Denver, CO 80202
303–294–7002
Fax: 303–294–1192
Email: Scott_varholak@fd.org
*Designation: Public Defender or Community Defender Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 111(a)(1) and (b)ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES (1) | 240 months imprisonment, consecutive to counts 2 and 3. 3 years supervised release, concurrent with counts 2 and 3. $100.00 special assessment. |
| 18 U.S.C. § 111(a)(1) and (b)ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES (2) | 240 months imprisonment, consecutive to counts 1 and 3. 3 years supervised release, concurrent with counts 1 and 3. $100.00 special assessment. |
| 18 U.S.C. § 111(a)(1) and (b)ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES (3) | 240 months imprisonment, consecutive to counts 1 and 2. 3 years supervised release, concurrent with counts 1 and 2. $100.00 special assessment. |

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                          **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                                **Disposition**

None

**Plaintiff**

**USA**                                   represented by   **Colleen Covell**
                                                          U.S. Attorney's Office–Denver
                                                          1225 17th Street
                                                          Suite 700
                                                          Denver, CO 80202
                                                          303–454–0215
                                                          Email: colleen.covell@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Federal Agency Attorney*

                                                          **Rebecca Susan Weber**
                                                          U.S. Attorney's Office–Denver
                                                          1225 17th Street
                                                          Suite 700
                                                          Denver, CO 80202
                                                          303–454–0332
                                                          Email: Rebecca.Weber@usdoj.gov
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Federal Agency Attorney*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/06/2016 | 73 | 4 | VOIR DIRE TRANSCRIPT of proceedings held on July 13, 2015 before Judge Philip A. Brimmer. Pages: 1–87. (jcopp, ) (Entered: 01/06/2016) |
| 01/06/2016 | 74 | 91 | TRANSCRIPT of Trial to Jury, Vol. 1 as to Ishmael Petty held on July 13, 2015 before Judge Philip A. Brimmer. Pages: 1–147. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made** |

| | | | |
|---|---|---|---|
| | | | **electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br><br>**<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (jcopp, ) (Entered: 01/06/2016) |
| 01/06/2016 | 75 | 238 | TRANSCRIPT of Trial to Jury, Vol. 2 as to Ishmael Petty held on July 14, 2015 before Judge Philip A. Brimmer. Pages: 148–181. <br>**<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (jcopp, ) (Entered: 01/06/2016) |
| 01/06/2016 | 76 | 272 | TRANSCRIPT of Sentencing as to Ishmael Petty held on October 30, 2015 before Judge Philip A. Brimmer. Pages: 1–49. <br>**<br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (jcopp, ) (Entered: 01/06/2016) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 15-CR-00029-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ISHMAEL PETTY,

    Defendant.

_____

REPORTER'S TRANSCRIPT
Jury Selection (Sealed)

_____

    Proceedings before the HONORABLE PHILIP A. BRIMMER,

Judge, United States District Court for the District of

Colorado, commencing at 8:51 a.m., on the 13th day of July,

2015, in Courtroom A701, United States Courthouse, Denver,

Colorado.

APPEARANCES

    Colleen Covell and Rebecca Weber, U.S. Attorney's

Office, 1225 17th Street East, Suite 700, Denver, CO 80202,

appearing for the plaintiff.

    Scott Varholak, Office of the Federal Public Defender,

633 17th Street, Suite 1000, Denver, CO 80202, appearing for

the defendant.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                          PROCEEDINGS

2                     VOIR DIRE EXAMINATION

3    BY THE COURT:

4    Q.   All right.  So this set of questions pertains to everyone,

5    those in the back, those of you in the front as well, and they

6    relate to your legal qualifications to serve as jurors.  If the

7    answer to any one of these questions is yes, could you please

8    raise your hand and then leave your hand up until I have

9    acknowledged you and then put your hand down.

10          First of all, is there anyone who is not at least 18

11   years old or who has not resided in the state of Colorado for

12   at least one year?

13          And no one has raised a hand in response to that

14   question.

15          Is there anyone who cannot read, write or understand

16   the English language?

17          No one has raised a hand in response to that.

18          Is there anyone who has a mental or physical infirmity

19   that would prevent you from serving on the jury?

20          No one has raised a hand in response to that question.

21          Is there anyone who is barred from jury service

22   because he or she has been convicted of a crime punishable by

23   more than one year in imprisonment?

24          No one raised a hand in response to that.

25          Anyone charged with a crime punishable by more than
```

1    one year imprisonment, currently being charged?

2            All right.  No one has raised a hand in response to

3    that question either.

4            All right.  Now I am going to direct the next set of

5    questions, in fact, all the rest of the questions to those of

6    you who are in the front of the courtroom.  So those of you in

7    the back of the courtroom, has Ms. Preuitt-Parks given you a

8    legal pad and something to write with?  That's great.

9            Okay.  Here is what I would like for you to do, and

10   that is listen carefully to the questions that I ask those

11   people in the front of the courtroom.  And if there is a

12   question that you would provide some type of affirmative

13   response to, you know, you would answer yes in some way, write

14   the question down and then your answer as well because in the

15   event that one of the people in the front of the courtroom is

16   excused, then Ms. Preuitt-Parks will call the next person on

17   the list, which will be one of you.  And instead of having to

18   ask all those questions again, instead we can just cut to the

19   chase and have you indicate what the question was and what your

20   answer was, all right?  So I appreciate your doing that.

21           All right.  So now those of you in the front, I will

22   be asking these questions of you and we are going to be trying

23   to remember to pass around the cordless microphone.  Do we have

24   the microphones up there?

25           So Mr. Neumeyer, you are on the end there.  Can you

1    kind of be -- do you see a microphone?  There you go.  So if

2    you can help me, Mr. Neumeyer, in the event that the microphone

3    kind of ends up back on your end to get it passed back and

4    forth.

5           And similarly, Ms. Golden, you at the other end, is

6    there a microphone over there near you?  So if you can maybe be

7    in charge of your end.  So we will try to pass those

8    microphones around just so when a prospective juror is

9    speaking, we amplify his or her voice.

10          All right.  So the first question, ladies and

11   gentlemen, is the issue of whether you should be excused for

12   hardship.  A hardship excusal could be something like you have

13   got nonrefundable airline tickets or some other reason that

14   would prevent you from serving as a juror.  Excusals for

15   hardship are rare because I can't excuse you just because jury

16   service may be inconvenient to you.  It's oftentimes, of

17   course, inconvenient dragging you in whereas you normally would

18   be showing up for work today, for instance.

19          But let me ask you now, do any of you think that you

20   should be excused because of hardship?

21          Let's pass -- can you pass that microphone right on up

22   to Ms. Cordovano.  Is that how you pronounce your name?

23   A.   Yes, it is.

24   Q.   Go ahead, Ms. Cordovano.

25   A.   I have two reasons why I prefer not to be on jury duty this

1    week.   One is I am working a contract for the United States

2    Antarctic program.   And if I am not at work, I don't get paid.

3    And I have a limited amount of time to complete my contract, so

4    it will cost me -- well, it's about 80 percent reduction in May

5    to be here.   The second reason is my step-mom is coming for a

6    three-and-a-half-day visit and she is coming Thursday.   And so

7    she is only coming for the weekend, so I would prefer not to be

8    in a -- indisposed for those two days if this trial was to go

9    longer.

10   Q.   Yeah, even though, as I said, the deliberations can go on

11   as long as necessary, probably unlikely that jury service would

12   interfere with that visit by your mother-in-law.

13          Let me ask you about that contract.   You are paid by

14   the contract upon completion of the contract?

15   A.   No, I am paid hourly.   And so because I am an hourly

16   employee I can't work overtime.   So if I am not there, I can't

17   make up the time.   And I have to be completed with the contract

18   by -- well, I am given one extension for a family trip, so I

19   really have to be done by August 24th.   So it's just a matter

20   of trying to get the hours in and not taking a big loss in pay.

21   Q.   Okay.   Have you talked to them, whoever grants extensions,

22   about the fact that you were called for jury duty today?

23   A.   I haven't because I found out that I was called in today

24   over the weekend.   I texted my boss and she said, "Okay, I will

25   tell HR," but I haven't spoken about anything else.

1   *Q.*  At the break can you make a phone call and check on that

2   because I would think that jury service would constitute some

3   type of an excuse, especially -- it's a Federal Government

4   contract you said?

5   *A.*  Well, the United States Antarctic Program is the

6   government, but I work for a contractor.  I work for Lockheed

7   Martin -- well, PAD, actually.

8   *Q.*  Can you check on that?  So we will find out and that may

9   constitute an excuse, but on the other hand, perhaps they will

10  understand as they should that jury service is an important

11  obligation and may be able to make sure that there is no

12  adverse consequence from you serving on a jury, okay?

13  *A.*  If I could make up the hours, I am not opposed to being on

14  the jury.

15  *Q.*  Okay, great.  I appreciate that.

16          Anyone else?  Let's hand the microphone straight ahead

17  to -- is it Rasmussen?

18  *A.*  Rasmussen.

19  *Q.*  Ms. Rasmussen, go ahead.

20  *A.*  I am not sure it constitutes a hardship, but I do have a

21  job interview on Wednesday morning and another one all day on

22  Friday.  And I have been out of work since March.

23  *Q.*  Since March, right.  Okay.  And would it be awkward for you

24  to attempt to reschedule those interviews?

25  *A.*  Not so much the Friday one, but the Wednesday one I am not

1   sure.  I am willing to call and ask them.

2   *Q.*  Especially job interviews these days, I wouldn't want you

3   to in any way adversely affect your chances even by the

4   request.  On the other hand, if you thought that there wouldn't

5   be any problem with the request, then perhaps you could do it.

6   It's really what you think sitting there right now.

7   *A.*  It's a second interview, so it's a decision maker.  And I

8   am willing to ask, but I don't know.

9   *Q.*  Would you prefer not to just because you are kind of

10  worried about what that -- whether it might hurt your chances

11  or something?

12  *A.*  It's with a college, so it seems like they would

13  understand.  I would just be concerned about them having to

14  reschedule all the people involved.

15  *Q.*  Because it's -- since it's a second interview, other people

16  may be timed to come in on Wednesday too, you think?

17  *A.*  Yeah.

18         *THE COURT:*  Okay.  Any objection to excusing

19  Ms. Rasmussen?

20         *MS. COVELL:*  No.

21         *THE COURT:*  Mr. Varholak?

22         *MR. VARHOLAK:*  No.  I would hate to see her lose the

23  opportunity.  No objection.

24         *THE COURT:*  Ms. Rasmussen, I am going to excuse you.

25  I am worried that could potentially hurt your chances in that

1    particular interview.

2            Thank you for coming in today.

3            *THE COURT DEPUTY:*  She needs to continue to call

4    throughout the month.

5            *THE COURT:*  Okay.  You understand?  Thank you,

6    Ms. Rasmussen.

7            Let's call the next person on the list.

8            *THE COURT DEPUTY:*  Linda Louise Maes.

9    *BY THE COURT:*

10   *Q.*  Ms. Maes, how are you doing?

11   *A.*  Well, thank you.

12   *Q.*  Great.  Did you answer any of the questions that I asked of

13   everyone else yes?

14   *A.*  No, sir.

15   *Q.*  You didn't?  Okay.  Great.

16           Anyone else that they believe they have a hardship?

17           All right.  No one else has raised a hand.

18           I only told you a very little amount of information

19   about the nature of the charge in this case.  Does anybody

20   because of the nature of the charge make anyone think that he

21   or she cannot be fair and impartial in this matter?

22           No one has raised a hand in response.

23           Does anyone know any of the people that were

24   introduced to you in the courtroom, either on my staff or any

25   of the attorneys or Mr. Petty?

1        No one has raised a hand in response to that.

2        Now let me read, ladies and gentlemen, a list of those

3   people who may testify in this case.  The question will become

4   whether you think based upon the name that you may know one or

5   more of those people.  You have already been introduced to

6   Ms. Cronan.  Also Dee Dee McEvoy, Brianne Smith, Ralph Smith,

7   Gyniferr Sandusky, anybody think that they may know any of

8   those people?

9        No one has raised a hand in response to that.

10       Do any of the prospective jurors know each other

11  looking around?

12       No one has raised a hand.

13       Now let me ask you this.  Has anyone had prior jury

14  service before?  Lots of people.  Okay.  So let's get our

15  microphones going.  Mr. Neumeyer, do you mind handing that

16  straight behind you to Mr. Cheever.  Great.

17       Mr. Cheever, you have had prior jury service?

18  A.  I have.

19  Q.  Tell me about that.  What county was it in?

20  A.  Douglas County.

21  Q.  How long ago, approximately?

22  A.  At least five, six years ago.

23  Q.  Okay.  Do you remember, was it a criminal case or a civil

24  case?

25  A.  Criminal.

1    *Q.*  And do you remember the nature of the charge or charges?

2    *A.*  It was a rape case.

3    *Q.*  And did -- I don't want you to tell me what the verdict

4    was, but did the jury reach a verdict?

5    *A.*  Yes, they did.

6    *Q.*  And were you the foreperson?

7    *A.*  No.

8    *Q.*  All right.  Anything about that particular case and your

9    service on the jury in that case that would cause you to be

10   unfair or biased in this case?

11   *A.*  I don't think so, no.

12   *Q.*  Have you had any other jury service, Mr. Cheever?

13   *A.*  No.  That's the only one.

14   *Q.*  Thank you very much, Mr. Cheever.

15           Ms. Ball, did you have jury service too?  Let's hand

16   the microphone to Ms. Ball.  Ms. Ball, tell me about that case.

17   *A.*  It was for Denver.

18   *Q.*  Denver?

19   *A.*  And I don't remember the time frame, but it would have to

20   have been at least three or four years ago.

21   *Q.*  Was it a civil or criminal case?

22   *A.*  Criminal.

23   *Q.*  Do you recall the charge or charges?

24   *A.*  Yes.  It was second-degree kidnapping and second-degree

25   murder.

```
 1    Q.   Did the jury reach a verdict?

 2    A.   Yes.

 3    Q.   And were you the foreperson?

 4    A.   No, I was not.

 5    Q.   Anything about that particular case or jury service,

 6    Ms. Ball, that would cause you to be unable to be fair and

 7    impartial in this case?

 8    A.   No.

 9    Q.   Have you had any other jury service?

10    A.   No, I haven't.

11    Q.   Thanks, Ms. Ball.

12              Let's see, who is next?  Let's hand the microphone

13    down to Mr. Martin.

14    A.   Actually, Your Honor, I was called for jury service

15    previously, but did not participate, so . . .

16    Q.   Because you got called, but were you called into a

17    courtroom?

18    A.   Yes, I was.

19    Q.   But you didn't end up on the jury?

20    A.   I did not end up on the jury.

21    Q.   Okay.  Anything about that experience, Mr. Martin, that

22    would cause you to be unfair or biased in this case?

23    A.   No, sir.

24    Q.   Great.  Thank you, Mr. Martin.

25              Who else do we have?  Mr. Coors, go ahead.
```

1    *A.*  I was called more than 25 years ago.

2    *Q.*  Where?

3    *A.*  In Jefferson County.

4    *Q.*  It was a civil case or a criminal case?

5    *A.*  It was a DUI.  I am not sure which.

6    *Q.*  Criminal in that regard, yeah.  And did the jury reach a

7    verdict?

8    *A.*  Yes.

9    *Q.*  And were you the foreperson?

10    *A.*  No.

11    *Q.*  Anything about that experience, Mr. Coors, that would cause

12    you to be unfair or biased in this case?

13    *A.*  No.

14    *Q.*  Thank you, Mr. Coors.

15         Let's go down to the next row, then.  And who do we

16    have?  We will start off with Ms. Maes, then.

17    *A.*  10 years ago for Denver County and it was a sexual assault

18    case.

19    *Q.*  Okay.  And were you the foreperson?

20    *A.*  No, sir.

21    *Q.*  Did the jury reach a verdict?

22    *A.*  Yes, they did.

23    *Q.*  Anything about that jury service experience that would

24    cause you to be unfair or biased in this case?

25    *A.*  No, sir.

1   *Q.*  All right.  Thank you, Ms. Maes.  You haven't had any other

2   jury service?

3   *A.*  No.

4   *Q.*  All right.  Thank you.

5          Let's keep going down the row.  Who do we have?  We

6   will hand the microphone all the way up to Mr. Collier.

7   *A.*  Yes.

8   *Q.*  Mr. Collier, tell us about your jury service.

9   *A.*  It was about seven or eight years ago.  It was an assault

10  case and I was impaneled.

11  *Q.*  You were impaneled.  Did you serve on the jury?

12  *A.*  I did.

13  *Q.*  What county was it in?

14  *A.*  In Denver.

15  *Q.*  Were you the foreperson of the jury?

16  *A.*  No.

17  *Q.*  Did the jury reach a verdict?

18  *A.*  No.  It was a mistrial.  Probably the third day it was a

19  mistrial, so we were dispensed.

20  *Q.*  Anything about that experience, Mr. Collier, that would

21  cause you to be unfair or biased in this case?

22  *A.*  No.

23  *Q.*  Any other prior jury service, Mr. Collier?

24  *A.*  No.

25  *Q.*  Thank you.

1          Let's see who else in the first row had a hand up.

2   Anyone else?  Let's hand the microphone down -- is it

3   Ms. Manzanares?

4   A.   No, Parrish.

5   Q.   Ms. Parrish, go ahead.

6   A.   I was called in 2002 here.

7   Q.   In federal court?

8   A.   Yes.

9   Q.   Got it.  And what type of case was it?

10  A.   It was a criminal.

11  Q.   Criminal case?

12  A.   Yes.

13  Q.   Do you recall what the charge was?

14  A.   No, I don't.

15  Q.   Or do you remember any of the facts that might indicate the

16  nature of the case?

17  A.   No.

18  Q.   Were you the foreperson of the jury?

19  A.   No.

20  Q.   Did the jury reach a verdict?

21  A.   Yes.

22  Q.   Anything about that experience, Ms. Parrish, that would

23  cause you to be unfair or biased in this case?

24  A.   No.

25  Q.   Thank you very much, Ms. Parrish.

1      Anyone else front row?  No one, all right.

2      Next question, and that is has anyone been a party,

3  meaning either a plaintiff or a defendant, in a lawsuit?  And

4  let's exclude divorce cases, all right?  So if you have been a

5  plaintiff or a defendant in a lawsuit, and that would

6  include -- why don't we include -- let's just stick with civil

7  cases.  I will ask you about criminal cases later, but so just

8  a civil case, anyone?  Anyone at all?  No one.  That's pretty

9  good.

10      Let's hand the microphone back to Mr. Coors.

11  A.  My company had been and I was a witness to that.

12  Q.  I was going to ask that next.  Why don't we hold off on

13  that now.

14      Anyone been a plaintiff or defendant?

15      Mr. Coors, you might as well take the microphone.

16  Next question is whether you have been a witness in some type

17  of a lawsuit.  Mr. Coors, so you said that you have; is that

18  correct?

19  A.  Yes.

20  Q.  And you have testified before; is that correct?

21  A.  Yes.

22  Q.  When you testified, was that by way of a deposition or did

23  you testify at a hearing or a trial?

24  A.  Both.

25  Q.  And in how many cases have you given testimony by your

1    estimation?

2    *A.*   Two.

3    *Q.*   Have you given trial testimony --

4    *A.*   Yes.

5    *Q.*   -- in both of those?

6    *A.*   One that I can remember.

7    *Q.*   When you gave testimony, were you testifying as a fact

8    witness, in other words, testifying about something you

9    observed or were aware of or did you testify as an expert

10   witness?

11   *A.*   Fact.

12   *Q.*   Fact witness, okay.  What was the nature of your testimony?

13   Was it -- what type of case did you testify in?

14   *A.*   Well, it was a case against the company for shareholder --

15   it was a shareholder lawsuit, so I was representing the company

16   in that.

17   *Q.*   Got it.  Anyone else?  Let's hand the microphone straight

18   ahead to Mr. Benjamin.

19   *A.*   Yes, sir.

20   *Q.*   Go ahead.

21   *A.*   I was a fact witness in a case back in about 2002, 2001.

22   *Q.*   And was your testimony related to the fact that you

23   happened to be an employee of a company?

24   *A.*   Yes, sir.

25   *Q.*   And were you testifying on behalf of or as a witness for

1    the company as opposed to suing the company, for instance, or

2    someone who is suing the company?

3    *A.*   Yeah, I was testifying for the company.

4    *Q.*   Okay.  What was the nature of that particular case?

5    *A.*   Oh, we had a small incident on a power plant project and

6    the customer wanted to collect money as a result of that.  And

7    so we ended up in court talking about that.

8    *Q.*   Did you testify by way of deposition or at a hearing or

9    trial?

10   *A.*   Deposition.

11   *Q.*   But not at any hearing?

12   *A.*   No, sir.

13   *Q.*   Anything about that experience that would cause you to be

14   unfair or biased in this case?

15   *A.*   No, sir.

16   *Q.*   Mr. Coors, I forgot to ask you that same question.

17   Anything about that experience of testifying in those two cases

18   that would cause you to be unfair or biased here?

19   *A.*   No, sir.

20   *Q.*   Okay.  Anyone else?

21          No one else has raised a hand.

22          Anyone have a close family member or close friend who

23   has been a party to a lawsuit that you have either followed

24   closely or perhaps attended the proceedings in?

25          Let's hand the microphone back to Mr. Benjamin.  Go

1   ahead, Mr. Benjamin.

2   *A.*   It was about 2005 maybe.   One of our friends, they were in

3   a home for caregivers for adults with disabilities and one of

4   the adults in their care got hurt.   So they ended up going to

5   trial for that.   And so we were -- we put up bond for him.

6   *Q.*   Okay.   This is a friend of yours?

7   *A.*   Yes, sir.

8   *Q.*   So you helped put the bond up?

9   *A.*   Yes, sir.

10   *Q.*   And was that a criminal charge?

11   *A.*   It ended up -- I think so.   It ended up being --

12   *Q.*   Was the purpose of the bond to keep him from being in jail?

13   *A.*   Yes, sir.

14   *Q.*   Okay.   It sounds like a criminal case, then.   Okay.   Got

15   it.   And did you attend any of the proceedings in that case?

16   *A.*   Two of them.

17   *Q.*   Okay.   All right.   Anything about that experience that

18   might cause you to be biased or unfair in this case?

19   *A.*   Not that I can think of, no.

20   *Q.*   Thank you, Mr. Benjamin.

21           Anyone else?   No?   Thank you.

22           Has anyone had prior military service or is currently

23   in the military?   Mr. Benjamin, we will keep the microphone

24   with you.   Go ahead.

25   *A.*   Yes, sir, from 1978 to 1984.

1   Q.   And what service were you in?

2   A.   Navy.

3   Q.   What was your highest rank upon discharge?

4   A.   I was a first class petty officer, E-6.

5   Q.   Were you honorably discharged?

6   A.   Yes, sir.

7   Q.   Thank you, Mr. Benjamin.

8            Let's hand the microphone down.  I saw someone else

9   raise a hand.

10  A.   I am retired from the Air Force.

11  Q.   Let me just make sure by my -- is it Mr. Cary?

12  A.   Yes.

13  Q.   When did you retire from the Air Force, Mr. Cary?

14  A.   1984.

15  Q.   And when did you go into the service?

16  A.   '64.

17  Q.   Okay.  And where are some of the places that you were

18  stationed over the course of your military career?

19  A.   Germany, Vietnam, Thailand, Omaha, Denver and

20  Massachusetts.

21  Q.   What was your highest rank upon discharge?

22  A.   Lieutenant.

23  Q.   And are you working now?

24  A.   No, sir.

25  Q.   Got it.  Thank you very much Mr. Cary.

```
 1              Anyone else military service?  No one else has raised
 2    a hand.
 3              Is anyone employed or has anyone been employed by a
 4    law enforcement agency?
 5              No one has raised a hand.
 6              Anyone have a close -- well, not necessarily close but
 7    not distant either, but a family member or a close friend who
 8    is employed or has been employed by a law enforcement agency?
 9              We have got a number of hands.  Mr. Cary, go ahead.
10    A.  I have a cousin who is a retired police officer.
11    Q.  And where does your cousin live?
12    A.  Michigan.
13    Q.  Is that where he did his law enforcement?
14    A.  Yes, sir.
15    Q.  And where did he work?
16    A.  Mostly for the Jackson Police Department and a little bit
17    of time at the Jackson Prison.
18    Q.  And part -- sometime at the prison as well?  And he is no
19    longer doing that job now; is that correct?
20    A.  He is associated.  I don't know exactly what he is doing
21    right now.
22    Q.  When he was working there or maybe even since, would you
23    talk to him about his job duties?
24    A.  Very little.
25    Q.  Very little?  Okay.  Anything about that association or
```

1   conversations with him that might cause you to be unfair or

2   biased in this case?

3   *A.*   No, sir.

4   *Q.*   Okay.  Ms. Golden, did you raise your hand as well?  Okay.

5   Tell us about that.

6   *A.*   I have a somewhat close person at my church who works for

7   the JeffCo K-9 unit, so he is a deputy, but he works in the K-9

8   unit.

9   *Q.*   Does he work for the Jefferson County Sheriff's Department?

10  *A.*   I think so, yes.

11  *Q.*   And do you talk to that person -- did you say it was a him?

12  *A.*   Yes.

13  *Q.*   -- about your job duties?

14  *A.*   No.

15  *Q.*   Does he bring the dog to church?

16  *A.*   I have seen the dog before, yes.

17  *Q.*   Has that been a topic of conversation?

18  *A.*   No.  He recently lost his old dog, so there was on the news

19  and stuff, his dog was on the news, aspects of the dog's

20  funeral, but other than that, no.

21  *Q.*   Anything about your friendship with him that would cause

22  you to be fair or biased in this case?

23  *A.*   I don't think so.

24  *Q.*   Thank you.

25          Anyone else?  Yes.  Ms. Manzanares, right?

1   A.   Yeah.

2   Q.   Got it.

3   A.   My aunt worked for Denver City Jail in the booking

4   department.

5   Q.   Was she a civilian employee?

6   A.   I don't know.

7   Q.   Does she work there now?

8   A.   No.  She is retired.

9   Q.   How long did she work there, do you know?

10  A.   I want to say probably about 10 years.

11  Q.   Have you had conversations with her about any of her job

12  duties?

13  A.   No.

14  Q.   Anything about your aunt's former job in the booking

15  department at the jail that may cause you to be unfair or

16  biased in this case?

17  A.   No.

18  Q.   Anyone else?  Let's hand the microphone -- go ahead.

19  A.   I was on the board of directors with Steve Reams, the

20  current Weld County sheriff, three years ago, and prior to that

21  with John Cooke, the previous sheriff as well.  So I haven't

22  invited him over for dinner, but we have had occasions to do

23  things in social settings as well.

24  Q.   Were those social settings more in connection with some of

25  the board duties as opposed to --

1  *A.*  Yeah, more of the board duties, more of a commercial-type

2  nature than a family get-together.

3  *Q.*  Sure.  Mr. Benjamin, anything about those associations that

4  you may have had with those two individuals that would cause

5  you to be -- for instance, does that make you really pro law

6  enforcement such that you couldn't be fair in this case?

7  *A.*  I don't think so.  I think I could be fair in it.

8  *Q.*  Thank you, Mr. Benjamin.

9       I saw another hand raised.  Yes.  Is it Ms. Brown?

10  *A.*  Uh-huh.

11  *Q.*  Go ahead.

12  *A.*  My best friend's step-dad is I think a Denver County

13  sheriff.

14  *Q.*  Okay.

15  *A.*  I am not sure.

16  *Q.*  Have you ever talked to that person?

17  *A.*  No.

18  *Q.*  Anything about that, his possible job, that may cause you

19  to be unfair or biased here?

20  *A.*  No.

21  *Q.*  Thanks, Ms. Brown.

22       Anyone else?  Let's hand the microphone over to -- is

23  it Ms. Coon?

24  *A.*  Yes.

25  *Q.*  Go ahead.

A.   Well, I have several parents at my school that are
officers.   I don't know which ones they work for.   We never
talk about it.

Q.   Have you talked to them about their job duties?

A.   No.

Q.   Do they occasionally show up to pick up the kids in
uniform?

A.   Yes.

Q.   That's how you know?

A.   Uh-huh.

Q.   You have to answer yes or no.

A.   Yes.

Q.   All right.   So anything about that that would cause you to
be unfair or biased here?

A.   No.

Q.   Thank you, Ms. Coon.

        Anyone else?   Let's hand the microphone down, so is it
Mr. Lautenschlager?   No?

A.   Lehn.

Q.   Sorry, Mr -- what's you're name?

A.   Lehn.

Q.   Is it pronounced Lehn?

A.   Yes.

Q.   Go ahead.

A.   I have a niece whose husband is a Boulder Police Department

 1   officer.  He is still serving.

 2   *Q.*  Have you had any conversations with him about his job

 3   duties?

 4   *A.*  Yeah, some.

 5   *Q.*  And anything about those conversations that may cause you

 6   to be unfair or biased in this case?

 7   *A.*  I don't believe so, no.

 8   *Q.*  Have you had any -- did you say it was your niece's

 9   husband?

10   *A.*  Yes.

11   *Q.*  Any conversation you've had with your niece about the fact

12   that he is working in that capacity that would cause you to be

13   unfair or biased here?

14   *A.*  No.

15   *Q.*  All right.  Thank you very much, Mr. Lehn.

16          And then finally we have got Ms. Gruben.  Ms. Gruben,

17   tell us about your situation.

18   *A.*  I am a city board member and we have sheriff reports done

19   monthly, so that's --

20   *Q.*  And what type of report is it?

21   *A.*  Just activity that has gone on in the community.

22   *Q.*  Okay.  And is that a report that you review each month?

23   *A.*  Yes.

24   *Q.*  Okay.  And it's prepared by the sheriff's department?

25   *A.*  Yes.

26

1    Q.   Anything about the fact that you look over those reports on

2    a monthly basis that would cause you to be unfair or biased

3    here?

4    A.   No.

5    Q.   And what type of incidents do those reports typically

6    cover?

7    A.   It varies.   Just traffic, domestic violence, just anything.

8    Q.   Okay.   Just a variety of different --

9    A.   Right.

10   Q.   Is that within the city of Denver?

11   A.   Yuma County.

12   Q.   Got it.   Thank you, Ms. Gruben.

13            Anyone else?

14            No one else has raised a hand.

15            Has anyone had a particularly good or a particularly

16   bad experience with either the FBI or the Federal Bureau of

17   Prisons?   The FBI helped you get your cat out of a tree or

18   something like that?

19            No one has raised a hand.

20            How about just law enforcement in general?   Has anyone

21   had a particularly good or particularly bad experience with the

22   police or sheriff's department somewhere?

23            No one has raised a hand in response to that.

24            Has anyone ever worked in a prison or in a jail?

25            Anyone have a -- we have heard someone mention the

1    fact that someone that he knows worked for a time in a prison,

2    I think.   Anyone know someone who has worked in a prison or a

3    jail?

4           Mr. Lehn?

5    A.  My sister upon graduating nursing school worked for the

6    City and County of Denver as a nurse in the city jail.

7    Q.  How long did she work there?

8    A.  I think about three or four years.

9    Q.  How long ago was that?

10   A.  25, 30 years ago.

11   Q.  Okay, some time ago.  Anything about her having worked

12   there at one point in time that would cause you to be unfair or

13   biased here?

14   A.  No.

15   Q.  All right.  Thank you, Mr. Lehn.

16          Anyone else?

17          No one else has raised a hand.

18          Has anyone been charged with a criminal matter

19   including -- why don't we exclude minor traffic offenses, but

20   including something that may be just like a misdemeanor type

21   offense?  Anyone been charged whether or not convicted?

22   A.  Charged and not convicted.

23   Q.  Charged and not convicted.  Let's get you a microphone.

24   Ms. Brown, go ahead.

25   A.  DUI.

1    Q.   Okay.  And anything about that -- how long ago was that?

2    A.   Well, I had two.  One was in '99 and the other one was in

3    2004.

4    Q.   Anything about that experience of having been charged with

5    those two offenses that would keep you from being fair and

6    impartial in this particular case?  For instance, did you -- do

7    you not like prosecutors or, on the other hand, did you think

8    you were treated so fairly that you really like prosecutors,

9    something one way or the other?

10   A.   No.

11   Q.   So it wouldn't interfere with your ability to be fair and

12   impartial here.

13   A.   No.

14   Q.   Thank you, Ms. Brown.

15          Let's go back to Mr. Benjamin.

16   A.   Would it include my minor daughter as well?

17   Q.   Well, it could if that was kind of a big deal, you know,

18   which I imagine it might have been.

19   A.   Yeah.  She was -- she got caught shoplifting.  And we went

20   to the DA's office and she is now in a diversion program for

21   youth.

22   Q.   Is this fairly recently?

23   A.   Last week.

24   Q.   So she got in the diversion program.  Anything about that

25   particular experience with your daughter that would cause you

1  to be unfair or biased in this case?

2  *A.*  No, sir.

3  *Q.*  Are you so happy that she is in the diversion program that

4  you may be enamored with law enforcement to such an extent that

5  you couldn't be fair to Mr. Petty here?

6  *A.*  I don't think so because we had a little problem with it

7  when she first got in the diversion program and had to go talk

8  to the DA about it, so no, I think I could be fair about that.

9  *Q.*  I think I saw some -- actually, Mr. Neumeyer, could you

10  hand the microphone straight ahead to Ms. Gruben.

11         Ms. Gruben, go ahead.

12  *A.*  I got a DWAI 2001 New Year's Eve.

13  *Q.*  And in that particular case, did you think that you were

14  treated fairly?

15  *A.*  Yeah.

16  *Q.*  Anything about that particular experience that would cause

17  you to be biased one way or the other here?

18  *A.*  No.

19  *Q.*  Thank you, Ms. Gruben.

20         Anyone else front row?  No?

21         Let's hand the microphone down the row to Mr. Montoya.

22  Go ahead, Mr. Montoya.

23  *A.*  I was charged with two DUIs, too, back years ago like

24  '94 -- I am sorry, '99.

25  *Q.*  Mr. Montoya, anything about those experiences -- first of

1   all, did you think that you were treated fairly in those two

2   matters?

3   A.   Yeah, yes.

4   Q.   Anything about those two matters that would cause you to be

5   unfair or biased for one side or the other in this case?

6   A.   No, sir.

7   Q.   Thank you, Mr. Montoya.

8        Anyone else front row?  No?  Middle row?

9        Let's hand the microphone back.  Ms. Carper?

10  A.   Yes.

11  Q.   Tell us about that, Ms. Carper.

12  A.   I was charged with a DUI in 2007, maybe.

13  Q.   Did you think that you were treated fairly in that

14  particular matter?

15  A.   Yes.

16  Q.   Anything about that experience, Ms. Carper, that would

17  cause you to be unfair or biased here?

18  A.   No.

19  Q.   Thank you, Ms. Carper.

20       Anyone else middle row?  Let's get the microphone

21  down.  Is your name pronounced Dickehage?

22  A.   No.

23  Q.   Sorry, got it wrong.  Ms. Smith, that's an easy one.  Go

24  ahead, Ms. Smith.

25  A.   I was arrested for domestic violence back in like 2010, but

1    it was a deferred sentence.

2    *Q.*   Deferred sentence, okay.   Did you think that you were

3    treated fairly as to that particular charge?   Whatever you

4    think.

5    *A.*   I didn't really, but I guess what the law is -- I guess it

6    was fair.

7    *Q.*   What county?

8    *A.*   It turned out good and I am glad it happened.

9    *Q.*   What county did it occur in?

10   *A.*   It was in Larimer.

11   *Q.*   How many proceedings did you have or hearings did you have

12   to attend, just one?

13   *A.*   Just one.

14   *Q.*   All right.   And do you think that in this particular case

15   you can be fair and impartial to both sides?

16   *A.*   Yeah.

17   *Q.*   Thank you, Ms. Smith.

18          Anyone else middle row?   How about back row?

19          Let's hand the microphone over to Ms. Archer.   Go

20   ahead, Ms. Archer.

21   *A.*   I got an underaged drinking ticket in 2007.

22   *Q.*   Anything about that experience that would cause you to be

23   unfair or biased here?

24   *A.*   No.

25   *Q.*   Anyone else back row?   No?

1        All right.  How about legal training, has anyone had

2   any legal training?  Why don't we include in that a college

3   course that you may have taken in business law.

4        We have got some hands up.  Why don't we go -- let's

5   see.  Anyone back row?  It doesn't look like it.  Why don't we

6   go to Ms. Carper.

7   A.  I took a media law class as part of my journalism program

8   in college.

9   Q.  This is a criminal case and I don't think you would have

10  had any exposure to things there, but just in case some legal

11  concept that you learned in that class bubbled up and you are

12  on the jury, could you apply the law as I give it to you as

13  opposed to remembering something that you may have learned in

14  that class?

15  A.  Yes.

16  Q.  Thank you.  Anyone else middle row?

17       Let's talk to Ms. Dixon.

18  A.  For about 10 years I worked in a law firm for a period of

19  time.

20  Q.  Which law firm?

21  A.  Holland & Hart.

22  Q.  What did you do for Holland & Hart?

23  A.  I worked as a legal secretary for four or five different

24  attorneys.

25  Q.  Okay.  And did those four or five different attorneys have

1   a particular type of practice or did their practices vary?

2   A.   It varied, mostly oil and gas, some contract.

3   Q.   Okay.  Did any of them do any criminal work?

4   A.   One or two did, but I wasn't directly involved in any of

5   those matters.

6   Q.   Sitting here today can you think about any criminal law

7   principles or subject matter that you dealt with while you were

8   working for Holland & Hart?

9   A.   Nothing that I dealt with, no, that's coming to mind.

10   Q.   Okay.  In terms of your experience of working for Holland &

11   Hart, do you really like attorneys or really not like

12   attorneys?

13   A.   I like individuals.  I don't know that it has to do with

14   what they do.

15   Q.   Anything about your Holland & Hart experience that would

16   cause you to be unfair or biased here?

17   A.   No.

18   Q.   Thank you, Ms. Dixon.

19          Anyone else middle row?  We have got some people in

20   the -- here we go.  Mr. Hinman?

21   A.   Yes, sir.

22   Q.   Go ahead.

23   A.   For my undergraduate work I had a business law class, and

24   also as an elective I took a criminal justice course.

25   Q.   You did.  Okay.  Talking about both but focusing more on

1   the criminal justice class that you took, how long ago was

2   that?

3   A.  Probably 17 years ago.

4   Q.  If you are on the jury in this case, can you apply the law

5   as I give it to you instead of relying upon something that you

6   may recall from your criminal justice class?

7   A.  Yes, sir.

8   Q.  Okay.  Thank you, Mr. Hinman.

9           Anyone else front row?  Mr. Lehn?

10  A.  Yes.  I also took business and criminal law in college 25

11  years ago or so.

12  Q.  Same question.  Can you apply the law as I give it to you

13  as opposed to something that you may recall from those classes?

14  A.  Yes, I believe I can.

15  Q.  Thank you, Mr. Lehn.

16          Anyone else, front row?  No one else.

17          MR. VARHOLAK:  Your Honor, I apologize to interrupt.

18  May we side bar for just one minute?

19          THE COURT:  Yeah, absolutely.

20      (At the bench:)

21          MR. VARHOLAK:  Mr. Petty has to use the restroom.

22          THE COURT:  All right.  We will take a break.

23      (In open court:)

24          Ladies and gentlemen, using our court clock, it's now

25  quarter to 10:00.  Why don't we go ahead and take a 15-minute

1    break, all right?  What I would like you to do for those of you

2    in the front is to when you return, sit in the same seat, all

3    right?  So kind of look at the person next to you and try to

4    sit in the same seat.

5          Also, another piece of advice, and that is we have got

6    bathrooms on this floor, but there are also bathrooms on the

7    other floors, too.  So if for some reason there is a line or

8    something and you want to go to another floor, you are

9    perfectly welcome to do that.  You can take the elevators or,

10   if you want, when you go out the courtroom, you can turn to the

11   left and go down the stairs, so you can use the stairs too.

12         While you are on that relatively brief break because

13   we will just take 15 minutes, make sure not to discuss the case

14   amongst yourselves in any way.  Don't look up any information.

15         And another thing is that if you happen to pass one of

16   the attorneys or parties in the hallway, they are going to

17   basically avoid you.  It's not because they aren't friendly

18   people.  They are friendly.  It's just I have instructed them

19   not to have any contact like that with you just because it

20   might give an impression to someone that they are trying to

21   lobby you or do something of that nature, all right?

22         So we will be in recess, then, ladies and gentlemen,

23   until 10:00 a.m.

24         The Court will be in recess.  Thank you.

25         (Recess at 9:47 a.m.)

1    (Reconvened at 10:02 a.m.)

2         THE COURT:  All right, ladies and gentlemen.  At this

3    time I am going to begin the process of asking each of you some

4    questions.  So Mr. Neumeyer, if you don't mind, can you hand

5    the microphone straight back from you to Mr. Cheever?

6    BY THE COURT:

7    Q.  Mr. Cheever, are you working at the present time?

8    A.  Yes, I am.

9    Q.  What do you do?

10   A.  I am an engineering manager for an engineering and

11   construction company.

12   Q.  What's the name of the company?

13   A.  Tech-Tech.

14   Q.  How long have you performed that job?

15   A.  That type of job for different companies, almost 30 years.

16   Q.  Tell us about your educational background.

17   A.  I have a bachelor of arts in mechanical engineering.

18   Graduated in 1980.

19   Q.  Where did you graduate from?

20   A.  Texas Tech University.  I went to work for Eastern Lighting

21   Power Company in the utility industry and came to Colorado in

22   1992 for a consulting company.  And I have worked for a couple

23   of different consulting companies over the last 23 years.

24   Q.  Okay.  What's your marital status?

25   A.  I am married for 33 years.

1    Q.   Do you have any children?

2    A.   Yes.   They are both grown.

3    Q.   Are they working?

4    A.   My older son is working and he is teaching at a high

5    school.   My younger son just got out of college.

6    Q.   Okay.   Does he have a job?

7    A.   Not yet.   We are working on it.

8    Q.   Does your spouse work?

9    A.   Yes.

10   Q.   What does she do?

11   A.   She teaches.

12   Q.   What level of -- what grade level?

13   A.   Elementary school and gifted and talented.

14   Q.   What school does she work at?

15   A.   Pine Grove Elementary in Parker.

16   Q.   And what are your hobbies?

17   A.   Sports, skiing, jogging, mountain biking a little bit.

18   Nothing intense.

19   Q.   Thank you, Mr. Cheever.   If you could hand the microphone

20   to Ms. Ball.

21        Are you working at the present time?

22   A.   Yes, I am.

23   Q.   What do you do?

24   A.   I am a claims analyst for pet insurance.

25   Q.   Okay.   How long have you done that?

1    *A.*   I have been there a little over a year.

2    *Q.*   What did you do before that?

3    *A.*   I was a vet tech at an animal hospital.

4    *Q.*   How long did you do that?

5    *A.*   Seven years.

6    *Q.*   And tell us about your educational background.

7    *A.*   Well, I got a bachelor's of science in dietetics and then

8    decided to go back to school and got my associate's in animal

9    science.

10    *Q.*   Where did you do that?

11    *A.*   Well, I got my bachelor's at Harding University in Arkansas

12    and then got my associate's at Bel-Rea here in Denver.

13    *Q.*   And what's your marital status?

14    *A.*   I am divorced.

15    *Q.*   Do you have any children?

16    *A.*   No.

17    *Q.*   What are your hobbies?

18    *A.*   Running, reading, not a whole lot.

19    *Q.*   What do you like to read?

20    *A.*   I pretty much read anything.  I like suspense and some

21    nonfiction, depends on what it's about.

22    *Q.*   All right.  Thank you very much, Ms. Ball.  If you could

23    hand the microphone to Ms. Archer.

24          Are you working?

25    *A.*   I am.

1    Q.   What do you do?

2    A.   I work in biomedical research.

3    Q.   What's your position?

4    A.   Veterinary tech.

5    Q.   And do you focus on any particular type of research?

6    A.   Mostly cancer and cardiac.

7    Q.   How long have you done that?

8    A.   Since December when I graduated.

9    Q.   Where did you graduate from?

10   A.   Metro.

11   Q.   What did you get your degree in?

12   A.   Biology and chemistry.

13   Q.   And what's your marital status?

14   A.   Single.

15   Q.   Do you have any children?

16   A.   I don't.

17   Q.   What are your hobbies?

18   A.   Camping, reading, just outdoor stuff, I guess.

19   Q.   Great.  Thank you very much.

20        Mr. Capper, are you working?

21   A.   Yes.

22   Q.   What do you do?

23   A.   I own a brewery here in Denver.

24   Q.   A micro-brewery, then?

25   A.   Yes.

1   Q.   How long have you done that?

2   A.   We turned four years next month.

3   Q.   And how is that business organized?   Is it like a

4   partnership, corporation?

5   A.   Right now it was just started by principal investors.

6   Q.   Are you one of them?

7   A.   No, no.

8   Q.   Got it.   And what did you do before that?

9   A.   I did web design, label design within the beverage industry

10  for a number of years, and then automotive mechanic before

11  that.

12  Q.   What's your educational background?

13  A.   I went to high school, when I went to Denver Automotive

14  Diesel College and obtained a job at Mercedes Benz over in

15  Cherry Creek and dropped out to work full-time.

16  Q.   What's your marital status?

17  A.   Engaged.

18  Q.   What does your fiancee do?

19  A.   She is a PT.

20  Q.   Okay.

21  A.   So she works at Craig Hospital.

22  Q.   Do you have any children?

23  A.   No.

24  Q.   What are your hobbies?

25  A.   Skate boarding, camping, snowboarding, anything outdoor.

```
 1   Q.  Got it.  Thank you, Mr. Capper.
 2           Mr. Martin, are you working?
 3   A.  Yes, I am.
 4   Q.  What do you do?
 5   A.  I am a manager for Hertz Rent A Car in northern Colorado.
 6   Q.  How long have you done that?
 7   A.  I have been in the car rental business most of my life.  I
 8   have been with Hertz about four and a half years.
 9   Q.  Were you with other car rental companies before that?
10   A.  I started in high school in Boulder with the Hertz
11   franchisee there, had Hertz national agencies myself.  And then
12   I started my own car rental company, which I had for about a
13   dozen years.
14   Q.  What's your educational background?
15   A.  Went to CU Boulder.
16   Q.  Uh-huh.
17   A.  Did not graduate.  Started my own businesses.
18   Q.  What's your marital status?
19   A.  Married 32 years.
20   Q.  Does your spouse work?
21   A.  She does.  She is a hairstylist.
22   Q.  Do you have any children?
23   A.  We do.
24   Q.  Are any of them adults?
25   A.  They both are, yes.
```

1    *Q.*   And are they working?

2    *A.*   They are.

3    *Q.*   What do they do?

4    *A.*   My son works for Intrado.

5    *Q.*   What's that?

6    *A.*   They do the 911 service for cellphones.  And my daughter

7    works for Fresh Produce, which is a woman's clothing line.

8    *Q.*   What are your hobbies?

9    *A.*   Golf and then more golf and fishing, anything outdoors,

10   travel.

11   *Q.*   Thank you, Mr. Martin.  If you could hand the microphone to

12   Ms. Anderson.

13           Are you working?

14   *A.*   I am.

15   *Q.*   What do you do?

16   *A.*   I am a graphic designer in-house for a company in

17   Englewood.

18   *Q.*   What's the name of the company?

19   *A.*   ISM.

20   *Q.*   How long have you worked there?

21   *A.*   It will be four years this November.

22   *Q.*   How about before then?

23   *A.*   Marketing coordinator at a xerox company.

24   *Q.*   How long did you do that?

25   *A.*   Three years.

43

```
 1   Q.  Tell us about your educational background.

 2   A.  Went to the Institute of Arts and Multimedia in California.

 3   Finished most of my art there.  And then here I have been

 4   working on chipping away on my general education and night

 5   classes after work.

 6   Q.  Where do you take your night classes?

 7   A.  I am currently enrolled to go to Metro this fall.  I have

 8   been going to Arapahoe before that.

 9   Q.  Got it.  And what's your marital status?

10   A.  I am married.

11   Q.  Do you have any children?

12   A.  I do not have any children.

13   Q.  And does your spouse work?

14   A.  He does, yes.

15   Q.  What does he do?

16   A.  He is an attorney.

17   Q.  Where does he work?

18   A.  He works at Poulson, Odell & Peterson.

19   Q.  What type of law does he practice?

20   A.  He practices oil and gas.  He does title opinions.

21   Q.  Got it.  And do you have a lot of attorney friends?

22   A.  Some.

23   Q.  Do any of them practice criminal law?

24   A.  No.

25   Q.  Okay.  What are your hobbies?
```

1   *A.*   With the limited amount of time I have going to night

2   school, I spend most of my free time out in the garden or

3   cleaning the house.

4   *Q.*   Thank you very much, Ms. Anderson.  Let's hand the

5   microphone over to Ms. Cordovano.

6            Ms. Cordovano, did you have a chance to make the phone

7   call we talked about?

8   *A.*   I did, and I am good to go, good to stay.

9   *Q.*   Thanks for the clarification.  Okay, great.  Thank you for

10  making that phone call.

11           All right.  So Ms. Cordovano, we know what you are

12  doing.  And I take it that that contract, that's a full-time

13  job essentially; is that correct?

14  *A.*   Yes.  Generally I am in Antarctica four to eight months a

15  year, but I am working in the office this summer to do some

16  extra projects and it is full-time.

17  *Q.*   So you actually go to Antarctica?

18  *A.*   Yeah.

19  *Q.*   How long have you been doing that?

20  *A.*   Since 2001.

21  *Q.*   And when you deploy there, what are you doing?

22  *A.*   I work for the logistics department in database management.

23  *Q.*   And when you go there, are you deployed at one of the U.S.

24  stations?

25  *A.*   Yes.  I work at the McMurdo station.

1    Q.  And tell us about your educational background.

2    A.  I have a bachelor's degree in history.

3    Q.  Where did you get that from?

4    A.  From Metro.

5    Q.  And what's your marital status?

6    A.  I am engaged.

7    Q.  Does your fiancee work?

8    A.  He does.  He also works for the Antarctica program.

9    Q.  Tell us about your hobbies.

10   A.  I like to do anything cultural.  I enjoy concerts and

11   plays.  And I like to play cards, work out, travel.

12   Q.  Thank you.  Hand the microphone to Mr. Coors.

13            Mr. Coors, are you working?

14   A.  Not for a salary.

15   Q.  Okay.  Just for the sheer joy of it?

16   A.  Yes.

17   Q.  What do you do?

18   A.  Well, the family has a lot of investments and trusts and

19   various things.  I am on some corporate boards.

20   Q.  Okay.  And so is the family the famous brewing family?

21   A.  Yes.

22   Q.  Got it.  What's your educational background?

23   A.  I had a master's in chemical engineering.

24   Q.  And did you work in that field after graduating --

25   A.  Yes.

1    *Q.*   -- or obtaining those degrees?

2    *A.*   Yes.

3    *Q.*   Tell us about your educational background.  I guess that

4    was --

5    *A.*   Master's in chemical engineering.

6    *Q.*   And what's your marital status?

7    *A.*   Married.

8    *Q.*   Does your spouse work?

9    *A.*   No.

10   *Q.*   Do you have children?

11   *A.*   Yes.

12   *Q.*   How many?

13   *A.*   Six.

14   *Q.*   And are they of adult age now?

15   *A.*   Yes.

16   *Q.*   And what do they do?

17   *A.*   Well, let's see.  The first is a stay-at-home mom.  The

18   second is a stay-at-home mom.  The third works for a foundation

19   in Amarillo, Texas.  Fourth is an executive with one of our

20   family businesses, Coors Tech.  The fifth is a doctor, a

21   medical doctor down in Houston.  And the sixth is a nurse in

22   Houston.

23   *Q.*   Okay.  What are your hobbies, Mr. Coors?

24   *A.*   Backpacking, hiking, fishing, skiing.

25   *Q.*   Great.  Thank you very much.

```
 1              Why don't you hand the microphone straightforward to
 2    Ms. Golden there.  Are you working?
 3    A.  Yes, I am.
 4    Q.  What do you do?
 5    A.  I am a preschool teacher.
 6    Q.  And what school do you teach at?
 7    A.  Vista Peak Exploratory.  It's in Aurora Public School
 8    District.
 9    Q.  How long have you done that?
10    A.  Five years.
11    Q.  Did you work at another school before that?
12    A.  Yes, I did.
13    Q.  Which one?
14    A.  I have worked at Summit Elementary and Cimarron Elementary.
15    Q.  Tell us about your educational background.
16    A.  I have an associate's degree in early childhood education,
17    and I am currently working on a psychology degree.
18    Q.  Where are you working on your psychology degree through?
19    A.  Columbia College.
20    Q.  What's your marital status?
21    A.  Single.
22    Q.  And do you have any children?
23    A.  No.
24    Q.  What are your hobbies?
25    A.  Read, watch TV, relax.
```

1    Q.   Great.   Thank you very much.   I t if you want to hand the

2    microphone to Ms. Maes.

3              Are you working?

4    A.   Yes, I am.

5    Q.   What do you do?

6    A.   I am a corporate real estate analyst that handles the real

7    property for the North Americas, Canada and the U.S.

8    Q.   What's the name of your company?

9    A.   Orica USA.

10   Q.   How long have you done that?

11   A.   Eight years.

12   Q.   What did you do before that?

13   A.   I was in the real property group with Qwest and with US

14   West.

15   Q.   How long did you do that?

16   A.   Combination, 20 years.

17   Q.   Tell us about your educational background.

18   A.   I didn't finish college, but went to the Colorado Real

19   Estate College until my late husband was terminally ill and

20   have just never gone back.

21   Q.   Do you have any children?

22   A.   I do.

23   Q.   How many?

24   A.   Two.

25   Q.   And are they adults?

1    *A.*   They are.

2    *Q.*   Are they working?

3    *A.*   They both are.

4    *Q.*   What do they do?

5    *A.*   One is in IT operations and the other is an associate

6    pastor.

7    *Q.*   Thank you very much.   What are your hobbies?

8    *A.*   Hiking, backpacking, camping.

9    *Q.*   Thank you very much.

10           So is it Dickehage?

11   *A.*   That's close.

12   *Q.*   What do you usually say?

13   *A.*   Dickehage.

14   *Q.*   Got it.   So Ms. Dickehage, are you working?

15   *A.*   Yes.

16   *Q.*   What do you do?

17   *A.*   It's a family-owned business.   It's called Chrome-Art.   We

18   make poster making kits for schools throughout the United

19   States.

20   *Q.*   How long have you done that?

21   *A.*   Pretty much all my life.   It's been in business for 50

22   years.   It was my grandpa's.

23   *Q.*   Do you have a formal title or position now?

24   *A.*   Not really.   It's just three of us working there, so we

25   just kind of do work like ship out stuff.

1    Q.   Sure.   Okay.   What's your educational background?

2    A.   High school.

3    Q.   What's your marital status?

4    A.   Engaged.

5    Q.   Does your fiancee work?

6    A.   Yes.

7    Q.   What does he do?

8    A.   He works for Flat Irons Subaru in Boulder and he is also a

9    scuba diver instructor.

10   Q.   Got it.   Do you scuba dive?

11   A.   I tried it.   It's not for me.

12   Q.   It's not a deal breaker, I guess.

13   A.   No.

14   Q.   What are your hobbies?

15   A.   I like to go camping, and I have to take care of my drama

16   queen 16-year-old daughter, so running her around.

17   Q.   Do you have any other children?

18   A.   Yes.   I have a 19-year-old son.

19   Q.   Is he working?

20   A.   At a country club in Longmont.

21   Q.   Ms. Smith, are you working?

22   A.   I am.

23   Q.   What do you do?

24   A.   I am a cosmetologist.

25   Q.   How long have you done that?

1   A.   Like three and a half years.

2   Q.   What did you do before that?

3   A.   I did like sales, clothing.

4   Q.   Got it.   What's your educational background?

5   A.   High school.   Did like a year and a half of community

6   college and then cosmetology school.

7   Q.   What's your marital status?

8   A.   Single.

9   Q.   Do you have any children?

10  A.   No.

11  Q.   And what are your hobbies?

12  A.   Snowboarding, hiking, hanging out with my dog.

13  Q.   Thank you very much.

14       Hand the microphone over to Ms. Dixon.   Are you

15  working?

16  A.   Yes.

17  Q.   What do you do?

18  A.   I am an executive assistant.

19  Q.   What type of company?

20  A.   It's an air medical transport company.

21  Q.   And how long have you worked there?

22  A.   Three years.

23  Q.   What about before that?   I know Holland & Hart.   What's

24  your educational background?

25  A.   Associate's degree in design and website development.

1    Q.   Where did you obtain that degree from?

2    A.   Art Institute of Colorado.

3    Q.   What's your marital status?

4    A.   Married.

5    Q.   Do you have any children?

6    A.   Yes, three.

7    Q.   And what are their ages?

8    A.   19, 16, 13.

9    Q.   Does the 19-year-old work?

10   A.   Kind of, yes.

11   Q.   And kind of doing what?

12   A.   He works at a PGA golf store and he is going to college as

13   well.

14   Q.   What are your hobbies?

15   A.   Whatever my children are doing at the time, I suppose, but

16   being with family and friends, movies.

17   Q.   Does your spouse work?

18   A.   Yes.

19   Q.   What does he do?

20   A.   He is a auto broker.

21   Q.   Okay.  Great. Thank you very much.

22        Hand the microphone over to Ms. Cronin.  This is

23   C-R-O-N-I-N.  You don't know Special Agent Cronan, name spelled

24   differently.

25   A.   No.

1    Q.   Ms. Cronin, are you working?

2    A.   I am a student and a mother.

3    Q.   Where are you a student?

4    A.   I am currently enrolled at Regis and also Front Range

5    Community College.

6    Q.   Will jury service interfere with your classes?

7    A.   No, I don't think so.

8    Q.   You think you are okay?

9    A.   I should be able to reschedule them.

10   Q.   Great.  What are you studying?

11   A.   I am going to complete my degree in elementary ed.

12   Q.   Elementary education, got it.  And you said that you are a

13   mother.  How many children?

14   A.   Two.

15   Q.   What are their ages?

16   A.   10 and 13.

17   Q.   Does your spouse work?

18   A.   Yes, he does.

19   Q.   What does he do?

20   A.   He is a goldsmith.

21   Q.   Does he work for a jewelry store, then?

22   A.   Yes, his own business.

23   Q.   Got it.  And what's your educational background?

24   A.   I have two and a half years at CU Boulder.  And I didn't

25   complete my degree, so that's what I am doing now.

```
 1    Q.   What are your hobbies?

 2    A.   Bird watching, water coloring, painting.

 3    Q.   Thank you very much.

 4              Ms. Carper, are you working?

 5    A.   Yes.

 6    Q.   What do you do?

 7    A.   I am working in technology, manager at Remax Alliance.

 8    Q.   How long have you worked there?

 9    A.   Six years.

10    Q.   What about before that?

11    A.   I worked as a part-time receptionist for another real

12    estate firm.

13    Q.   How long were you there?

14    A.   Three years.

15    Q.   Okay.  What's your educational background?

16    A.   I have a bachelor's in journalism.

17    Q.   Where did you get your degree from?

18    A.   Colorado State University.

19    Q.   What is your marital status?

20    A.   Single.

21    Q.   Do you have any children?

22    A.   No.

23    Q.   And what are your hobbies?

24    A.   Volleyball, reading and net flicking.

25    Q.   What do you like to read?
```

1  *A.*  Mystery novels, fiction, Harry Potter, you name it.

2  *Q.*  Great.  Thank you, Ms. Carper.

3        Mr. Neumeyer, are you working?

4  *A.*  Yes, I am.

5  *Q.*  What do you do?

6  *A.*  I am a mechanic for Furniture Row Racing.

7  *Q.*  That sounds exciting.  How long have you done that?

8  *A.*  I have been there seven years.  I have done it for 23

9  years.

10  *Q.*  And have you always done it in Colorado or did they hire

11  you away?

12  *A.*  No.

13  *Q.*  So did they recruit you out to Denver?

14  *A.*  Pretty much.

15  *Q.*  Tell us about your educational background.

16  *A.*  I have a high school education and one year at Ohio State

17  University.

18  *Q.*  What's your marital status?

19  *A.*  I have been married for 31 years.

20  *Q.*  And does your spouse work?

21  *A.*  Yes, she does.

22  *Q.*  What does she do?

23  *A.*  She is a registered nurse.

24  *Q.*  Got it.  Children?

25  *A.*  Yes.

1    Q.   How many?

2    A.   Three.

3    Q.   What are their ages?   Remember, you are under oath.   Just

4    kidding about that.

5    A.   35, 38 and 40.

6    Q.   And are they working?

7    A.   The son, I am not sure, because he just moved to Washington

8    state and I don't know if he has got a job yet.   He got

9    transferred.

10   Q.   How about the others?

11   A.   My two daughters, I am not sure what they do.

12   Q.   What are your hobbies?

13   A.   Playing poker and racing.

14   Q.   Do you have your own car?

15   A.   No.   I just enjoy racing.

16   Q.   Then you have access to cars.   If you will hand the

17   microphone straight ahead to Mr. Collier.

18        Are you working?

19   A.   Yes.

20   Q.   What do you do?

21   A.   I am a vice-president of operations at a digital media

22   company here in town.

23   Q.   What's the name of the company?

24   A.   Health Grades.

25   Q.   And they have got their name on a big building.

1    A.   Yeah, right across the street.

2    Q.   Is that where you work?

3    A.   Yes.

4    Q.   How long have you been there?

5    A.   Five years.

6    Q.   What did you do before that?

7    A.   I worked for an automotive component company here in town

8    for 13 years.

9    Q.   Tell us about your educational background.

10   A.   I have a bachelor's in mechanical engineering and an MBA.

11   Q.   Where did you get both of those degrees?

12   A.   Flint, Michigan was my bachelor's, and my MBA here at

13   Colorado.

14   Q.   What's your marital status?

15   A.   I am married.

16   Q.   And does your spouse work?

17   A.   She does.  She is a contractor for the Federal Highway

18   Department in Golden.

19   Q.   And do you have children?

20   A.   I do.  I have a 12-year-old and a 10-year-old.

21   Q.   What are your hobbies, Mr. Collier?

22   A.   Basketball, movies, and just hanging out with the kids.

23   Q.   Great.  Thank you very much.  Let me hand the microphone to

24   Ms. Gruben.

25            You mentioned that you were a city board member.  Is

1    that -- I am just guessing, but is that not a full-time job?

2    A.   No.  It's -- no.

3    Q.   Is it essentially a volunteer position?

4    A.   Yes.

5    Q.   Are you working?

6    A.   I am.

7    Q.   What do you do?

8    A.   I am a letter carrier for the Postal Service.

9    Q.   How long have you worked for the Postal Service?

10   A.   27 years.

11   Q.   And tell us about your educational background.

12   A.   Associate's of arts from Northeastern College in

13   accounting, business.

14   Q.   And what's your marital status?

15   A.   Married.

16   Q.   Does your spouse work?

17   A.   Yes.

18   Q.   What does he do?

19   A.   He is an independent contractor, welding, mechanics,

20   plumbing.

21   Q.   And children?

22   A.   Yes, two, two daughters.

23   Q.   What are their ages?

24   A.   24 and 19.

25   Q.   And are they working?

1    A.   My oldest is 24.  Yes, she is.

2    Q.   What does she do?

3    A.   Secretary for a hotel construction company.

4    Q.   What are your hobbies?

5    A.   Crocheting, gardening, hanging out with kids.

6    Q.   Thank you very much, Ms. Gruben.

7             Mr. Hinman, are you working?

8    A.   Yes.

9    Q.   What do you do?

10   A.   I work in program management at Raytheon in aerospace and

11   defense.

12   Q.   Is that in the Denver metropolitan area?

13   A.   Over in Aurora.

14   Q.   How long have you worked for Raytheon?

15   A.   Raytheon has been 10 years.

16   Q.   What about before that?

17   A.   I worked with the nuclear weapons complex out at Rocky

18   Flats.

19   Q.   What's your educational background?

20   A.   I have an associate's degree in electronics technology and

21   then I have a bachelor's of science degree in accounting.

22   Q.   Got it.  What's your marital status?

23   A.   Married.

24   Q.   Does your spouse work?

25   A.   Yes, she does.

1    Q.   What does she do?

2    A.   She is a special needs para with Adams County School

3    District.

4    Q.   How long has she done that?

5    A.   Right at 10 years, I think.

6    Q.   Got it.  Do you have children?

7    A.   We do, two daughters.

8    Q.   How old are they?

9    A.   One is 22 and the other is 19.

10   Q.   Are either of them working?

11   A.   Yeah, they both work, as well as the youngest daughter is a

12   full-time student at CU Denver.

13   Q.   What do they do?

14   A.   The oldest one does childcare and the youngest daughter

15   works with the Adams County School District.  They have a base

16   program like before and after school care.

17   Q.   What are your hobbies?

18   A.   Playing and watching sports and just hanging out with the

19   family.

20   Q.   Thank you, Mr. Hinman.

21        Mr. Lehn, are you working?

22   A.   Yes, I work.

23   Q.   What do you do?

24   A.   I am an usher for the Denver Broncos at Sports Authority

25   Field at Mile High.

1    Q.   And how long have you done that?

2    A.   Seven years.

3    Q.   What about before that?

4    A.   I was a customer service agent for a large satellite

5    broadcast company.

6    Q.   What's your educational background?

7    A.   Well, I couldn't decide what I wanted to be when I grew up,

8    so I have three two-year degrees.  And I think I succeeded

9    because I grew old before I grew up.

10   Q.   What's your marital status?

11   A.   Single.

12   Q.   Do you have any children?

13   A.   Yes.

14   Q.   How many?

15   A.   A daughter, 42.

16   Q.   Does she work?

17   A.   Yes.

18   Q.   What does she do?

19   A.   Healthcare.

20   Q.   What are your hobbies?

21   A.   Just about anything outdoors.  I snow-ski, both alpine and

22   nordic.  I water-ski, play golf.  I garden, ride a lot of

23   bicycles.

24   Q.   Great.  Thank you very much, Mr. Lehn.

25            Ms. Parrish, are you working?

1    A.   Yes.

2    Q.   What do you do?

3    A.   I am in charge of the bakery in Sam's Club, make sure

4    everything is put up for the bread and the baked goods.

5    Q.   How long have you done that?

6    A.   11 years.

7    Q.   Tell us about your educational background.

8    A.   High school graduate.

9    Q.   And what is your marital status?

10   A.   Married.

11   Q.   Do you have any children?

12   A.   Yes, one.

13   Q.   How old?

14   A.   30 years.

15   Q.   Does he or she work?

16   A.   Yes.

17   Q.   Where?

18   A.   Work for a company in Denver.  He his supervising the

19   locksmith department.

20   Q.   And does your spouse work?

21   A.   Yes.

22   Q.   What does he do?

23   A.   He is a cook at Wal-Mart in the deli department.

24   Q.   What are your hobbies?

25   A.   Spending time with my grand baby, gardening.  I sing in the

1   choir at my church.

2   Q.   Thank you very much.

3        Mr. Fong, are you working?

4   A.   Yes.

5   Q.   What do you do?

6   A.   I own a small retail tea shop downtown.

7   Q.   What's the name of it?

8   A.   Tea Cloud.

9   Q.   Good place?

10  A.   Pretty good.   It's off 17th Street.

11  Q.   How long have you had the business?

12  A.   Just about two years now.

13  Q.   What did you do before that?

14  A.   Before that I worked at an engineering company.

15  Q.   What were you doing there?

16  A.   We do like project management for City of Aurora, like the

17  reservoir and stuff prior to my own business.

18  Q.   All right.   What's your educational background?

19  A.   I have a bachelor of science from State University of New

20  York, Albany.

21  Q.   And what's your marital status?

22  A.   Married.

23  Q.   Do you have any children?

24  A.   Yes, three children; seven, six and 15 months.

25  Q.   And does your spouse work?

1    A.   She is a stay-at-home mom and we home school our children.

2    Q.   Got it.   What are your hobbies?

3    A.   Right now it's playing chess or Connect Four with my

4    daughter, sumo wrestling my son.   And my 15-month-old likes to

5    play chase.   I roll out the vacuum cleaner, so I just chase

6    after him.

7    Q.   Thank you, Mr. Fong.

8         Ms. Crosby are you working?

9    A.   I am.

10   Q.   What do you do?

11   A.   I am a flight attendant.

12   Q.   Which airline do you work for?

13   A.   I work for American Airlines.

14   Q.   How long have you worked for American?

15   A.   15 years.

16   Q.   What's your educational background?

17   A.   I have a bachelor of science in marketing from Colorado

18   State.

19   Q.   And how about your marital status?

20   A.   I am single.

21   Q.   Do you have any children?

22   A.   No.

23   Q.   What are your hobbies?

24   A.   Reading, camping, hiking, mostly just Colorado.

25   Q.   Thank you very much.

```
 1   A.   Sure.

 2   Q.   Ms. Coon, are you working?

 3   A.   Yes.

 4   Q.   What do you do?

 5   A.   I am a preschool teacher.

 6   Q.   And what school do you teach at?

 7   A.   Belle's and Beau's Academy.

 8   Q.   Where is that located?

 9   A.   It's in Aurora.

10   Q.   How long have you done that?

11   A.   Nine years.

12   Q.   What's your educational background?

13   A.   Some college.  I didn't get a degree yet.

14   Q.   And what college did you attend?

15   A.   Huh?

16   Q.   What college did you attend?

17   A.   Community College of Denver.

18   Q.   What's your marital status?

19   A.   Married.

20   Q.   Does your spouse work?

21   A.   Yes.

22   Q.   What does he do?

23   A.   He is a mechanic.

24   Q.   And do you have any children?

25   A.   Two.
```

66

1    Q.   How old are they?

2    A.   10 and five.

3    Q.   What are your hobbies?

4    A.   Anything that has to do with my dog.

5    Q.   All right.  Thank you very much.  Hand the microphone over

6    to Mr. Montoya.

7              Mr. Montoya, are you working?

8    A.   Full-time dad right now.

9    Q.   How many kids do you have?

10   A.   I have two.

11   Q.   What are their ages?

12   A.   My son is going to be 21.  And I have a baby, she is two

13   years old.

14   Q.   Before, maybe in the interim there, were you working?

15   A.   Yes.

16   Q.   What were you doing then?

17   A.   I was working at a bait shop.

18   Q.   And tell us about your educational background.

19   A.   High school graduate.

20   Q.   Does your -- are you married?

21   A.   I have a girlfriend.  We have been together for two years.

22   Q.   And what does she do?

23   A.   She works at Mile High United Way.

24   Q.   What are your hobbies, Mr. Montoya?

25   A.   Snowboarding and fishing.

1    Q.   Great.  Thank you very much.

2              Ms. Brown are you working?

3    A.   I do.

4    Q.   What do you do?

5    A.   Today would have been my second week at a company.

6    Q.   When you say would have, it doesn't mean you won't go back

7    there?

8    A.   I will go back.  I am doing loan officer initial stuff at

9    Legacy Mutual Mortgage.

10   Q.   What did you do before that job?

11   A.   I worked in loss mitigation, so kind of the mortgage

12   industry at a company for two years.

13   Q.   How about before that?

14   A.   I worked at a chiropractic place for about two years.  I

15   did some massage and mostly like their marketing and sales.

16   And before that I did more mortgage stuff before the crash.

17   Q.   Tell us about your educational background.

18   A.   I have some college, two years of college.  I didn't

19   graduate.  And then I also got a certification in massage

20   therapy.

21   Q.   All right.  And what's your marital status?

22   A.   I am technically not married, but we bought a house

23   together, so we're stuck.

24   Q.   And what does he do?

25   A.   He is a superintendent electrician for Duro Electric.

1    Q.  Do you have any children?

2    A.  I have one.

3    Q.  How old?

4    A.  She is five.  And he has two.

5    Q.  Great.  And what are your hobbies?

6    A.  Anything outdoors, camping, boating, volleyball.  We like

7    to do the 5K runs as a family, so --

8    Q.  That's great.  Thank you very much.

9            So Mr. Cary, you mentioned that you retired from the

10   Air Force, and I think you mentioned that you are not working;

11   is that correct?

12   A.  Correct.

13   Q.  So what are you doing to stay busy during your retirement?

14   A.  Read, garden, grandkids.

15   Q.  Got it.  What do you like to read?

16   A.  Just about anything.

17   Q.  All right.  And what's your marital status?

18   A.  Married.

19   Q.  Does your spouse work?

20   A.  No.  She is retired.

21   Q.  Retired as well.  And how many children do you have?

22   A.  Two kids.

23   Q.  What are their ages?

24   A.  45 and 40.

25   Q.  Are they working?

1    A.   Yes.

2    Q.   What do they do?

3    A.   My son is an assistant principal over in Highlands Ranch

4    and my daughter is a speech pathologist.

5    Q.   What's your educational background?

6    A.   Bachelor of psychology.

7    Q.   Got it.  Thank you very much.

8         And Mr. Lautenschlager, is that right?

9    A.   Yeah.

10   Q.   Are you working?

11   A.   As of now I am a stay-at-home dad, but I have my Colorado

12   Life Producers license.

13   Q.   What's that?

14   A.   Basically I work with a financial company.  And we

15   basically work from 100 percent referrals getting people from

16   baby boomer generation to help supplement their retirement

17   right now.

18   Q.   Got it.

19        And what's your marital status?

20   A.   Right now I am -- we are common law.

21   Q.   And how many children?

22   A.   One child.  He is five months old now.

23   Q.   Got it.  And were you able to arrange for childcare during

24   the course of jury duty?

25   A.   For today, yeah.

1    Q.   What about for tomorrow?

2    A.   Playing it by ear.

3    Q.   Do you think that you will be able to do that?

4    A.   As far as I know, yeah.

5    Q.   Just because obviously we want to make sure that you have

6    got the childcare in place, but also we want to make sure that,

7    you know, you wouldn't be distracted by worrying about the

8    childcare arrangements.  But you think you will be able to

9    swing that?

10   A.   As of right now, my wife works overnight, so it's kind of

11   hard balancing it in, but we are -- today we have my dad just

12   sitting there watching over him.

13   Q.   Would your father be in a position to watch your child

14   tomorrow?

15   A.   If I asked him, I am sure he would say yes.

16   Q.   I just want to make sure that you are covered and aren't

17   distracted by that.

18           All right.  So I am not sure if I asked you, but

19   what's your educational background?

20   A.   High school graduate, some technical college.  I was an

21   engine maintenance technician for a while.  I went to Good Year

22   for two years, dropped out of Good Year and basically went to

23   Auto Zone, started with people there.  And I actually liked it,

24   so I started changing fields completely.

25   Q.   What are your hobbies, Mr. Lautenschlager?

1    A.   Working from home, hanging out with my five-month-old and

2    just hanging out.

3    Q.   Great.   Thank you very much.

4              Ms. Manzanares, are you working?

5    A.   Yes, I am.

6    Q.   What do you do?

7    A.   Medical assistant.

8    Q.   Where do you work?

9    A.   I work in a family practice for Sisters of Charity.

10   Q.   Where is that located?

11   A.   In Wheat Ridge.

12   Q.   How long have you done that?

13   A.   10 years.

14   Q.   What about before that?

15   A.   I actually delivered tires for Firestone.

16   Q.   Tell us about your educational background.

17   A.   High school and trade school.

18   Q.   And what's your marital status?

19   A.   Common law.

20   Q.   Do you have any children?

21   A.   Three.

22   Q.   How old are they?

23   A.   Eight, nine and 15.

24   Q.   And does your common law husband work?

25   A.   At this time he is between jobs.

1   Q.   What field does he typically work in?

2   A.   Generally, customer service.

3   Q.   Okay.  For a variety of different companies?

4   A.   He does more like telemarketing-type stuff.  He was doing

5   like charity kind of work.

6   Q.   Okay.  What are your hobbies, Ms. Manzanares?

7   A.   Really right at this point anything that revolves around my

8   kids and hiking, camping, fishing.  I have an eight-year-old

9   who was thinking he is an expert fisherman, so yeah, stuff like

10  that.

11  Q.   Thank you very much.

12        Mr. Benjamin, what do you do?

13  A.   I am self-employed.

14  Q.   And in what area?

15  A.   I do business engineering, so other companies figure out

16  why they are not working and I help them put them it back

17  together so they can be more prosperous.

18  Q.   And are you organized in the form of a corporation?

19  A.   Yes.  I am a sole proprietorship, LLC.

20  Q.   How long have you done that?

21  A.   10 years.

22  Q.   Are you based in Denver?

23  A.   Greeley.

24  Q.   In Greeley, okay.  What did you do before that?

25  A.   I was a product manager at GE, so I was responsible for all

1    new product development for gas turbines globally and I was a

2    project management before that in sales.

3    Q.   What is your educational background?

4    A.   I have an associate's in electronics from the University of

5    Hawaii and then a couple credits short from my bachelor's from

6    Colorado Christian College in business leadership.

7    Q.   What is your marital status?

8    A.   We are married.

9    Q.   And do you have any children?

10   A.   Two, 15 and 16.

11   Q.   Does your spouse work?

12   A.   She is a stay-at-home mom.

13   Q.   And what are your hobbies?

14   A.   What the kids are doing.  Right now it's Boy Scouts and

15   church stuff and a little bit of woodworking when I have a

16   chance.

17   Q.   Thank you, Mr. Benjamin.

18           Mr. Butler are you working?

19   A.   Yes.

20   Q.   What do you do?

21   A.   Self-employed doing car reconditioning.

22   Q.   What's the name your company?

23   A.   Redline.

24   Q.   How long have you done that?

25   A.   It's going on my second year.

1    Q.   How about before that, where did you work?

2    A.   Swingle Landscaping.

3    Q.   What did you do for Swingle?

4    A.   Landscaping duties.

5    Q.   How long did you work for Swingle?

6    A.   About six months.

7    Q.   How about before that?

8    A.   Home Depot.

9    Q.   What's your educational background?

10   A.   Made it through high school.

11   Q.   And what's your marital status?

12   A.   Single.

13   Q.   Do you have any children?

14   A.   No.

15   Q.   Okay.  And what are your hobbies?

16   A.   Dirt biking.

17          THE COURT:  Great. Thank you, Mr. Butler.

18          All right, ladies and gentlemen.  At this time I am

19   going to give the attorneys an opportunity to ask some

20   questions of you as well, and we will start off with the United

21   States, Ms. Covell?

22          MS. COVELL:  Thank you, Your Honor.  May I turn the

23   podium, Your Honor?

24          THE COURT:  You may.

25                         VOIR DIRE EXAMINATION

1   *BY MS. COVELL:*

2   *Q.*   Good morning, everybody.   Thank you for being so patient.

3   I just have a few follow-up questions because I know Judge

4   Brimmer has asked you guys a lot of questions and we have

5   gotten some information about who you are.

6          One question I was wondering because it's come up in

7   other trials that I have done is whether anybody feels they

8   have a moral, religious or ethical belief that would prevent

9   them from passing judgment in a trial.   If so, would you just

10  please raise your hand.   You are Mr. Butler, right?

11  *A.*   Yes.

12  *Q.*   Can you tell me, do you feel comfortable saying it in front

13  of me?

14  *A.*   Yeah, that's fine.   As long as it's not a death penalty or

15  anything like that, I won't vote on that, but other than that,

16  I am fine.

17          *MS. COVELL:*   Your Honor, may, we approach just

18  briefly?

19          *THE COURT:*   Yes.

20     (At the bench:)

21          *MS. COVELL:*   Am I permitted to inform them it's not a

22  death penalty case?

23          *THE COURT:*   Yes.

24     (In open court:)

25  *BY MS. COVELL:*

1   *Q.*  Mr. Butler and any other jurors that have that question,

2   this is not a death penalty case, so that shouldn't be a

3   concern for anyone.

4        Does anybody else other than Mr. Butler have anything

5   that would prevent them from passing judgment?

6        This case you haven't heard much about, but the

7   government alleges that the crime took place in the federal

8   prison that is down in Florence, Colorado.  It's called the

9   Administrative Maximum Security Prison.  It's also referred to

10  commonly as the ADX or the Super Max.

11       Does anybody have any information or beliefs about

12  that prison that you think might impact your ability to decide

13  this case fairly and impartially?

14       Yes, ma'am.

15  *A.*  I don't know that it's relevant, but --

16       *THE COURT:*  Let's have each of the jurors who is

17  speaking identify his or herself.  That's Ms. Dixon.  Let's get

18  our microphone as well.  Great.

19  *A.*  I don't know that it's relevant, but I believe I read an

20  article on-line through either CNN or a news station about a

21  month and a half ago.

22  *BY MS. COVELL:*

23  *Q.*  About the Super Max?

24  *A.*  Yes.

25  *Q.*  And there has been some publicity of late regarding Super

1   Max from a variety of situations.  It was referenced in the

2   Boston bomber trial.

3          Is there anything that you read about -- and I will

4   ask you specifically, Ms. Dixon, is there anything that you

5   read in that article that would impact your ability to decide

6   this case fairly and impartially?

7   *A.*  I don't believe so.  I believe the article, though, was

8   about treatment and just facilities in general.

9   *Q.*  And did you come away with either a positive or negative

10  reaction to the prison as a result of that article?

11  *A.*  It wasn't a positive article.

12  *Q.*  Is there anybody else that has read something similar or

13  has any other information whether from the media or otherwise

14  about this specific prison?  You are -- excuse me, Mr. Hinman.

15  *A.*  Yes, ma'am.  Yeah, I think I read the same article on CNN.

16  *Q.*  Was there anything about the information in that article

17  that would negatively or positively influence you such you feel

18  like your ability to decide this case would be imperilled?

19  *A.*  No, I don't believe so.

20  *Q.*  Is there anybody else?

21          Is there anybody who holds such views about the prison

22  system and how we incarcerate or how we manage inmates that you

23  think would affect your ability to decide the case fair or

24  impartially?  If so, please raise your hand.

25          Okay.  Are any of you members of community or civil

1  organizations such as Red Hats or Community Watch, things like

2  that?  If so, would you please raise your hand.

3           And you are Mr. Lautenschlager; is that correct?

4  *A.*  We all take turns in our community for community watch one

5  night once a week.

6  *Q.*  Where do you live, sir?

7  *A.*  Aurora.

8  *Q.*  Is there anyone else?

9           Okay.  I only had one other question.  Is there

10  anybody who has a bumper sticker on their car?  If so, please

11  raise your hands.  And I guess we can pass the microphone and I

12  would just like to know what the bumper sticker or stickers

13  say.

14           Mr. Benjamin, I know your name.

15  *A.*  Thank you, I think.  It says:  Doing the Right Thing.

16  *Q.*  What does that mean other than the obvious?

17  *A.*  Well, it was of a program put on by the Dobson organization

18  down in Colorado Springs about what are the right things to do

19  and can you actually understand what the right thing is and how

20  do we learn that and how do we teach others the right thing.

21  *Q.*  And what's the Dobson Institute?

22  *A.*  Not the Dobson Institute.  It's Focus on the Family.

23  *Q.*  Focus on the Family.  Is that a religious-based bumper

24  sticker, then, would you say?

25  *A.*  Well, it came out from Focus on the Family.  It doesn't say

1    anything religious on it.  It just says Doing the Right Thing.

2    Q.  Who next in that row also raised their hand?  Mr. Cary?

3    A.  Just a Support Your Troops.

4    Q.  I know what that means.  Thank you.  Anybody else in the

5    first row?

6    A.  I have one.  It says ASA, stands for Assisted Suicide

7    Assembly.  It's my husband's metal band.

8    Q.  What does he play?

9    A.  He plays base.

10       THE COURT:  That was Ms. Coon, by the way.

11   BY MS. COVELL:

12   Q.  And I think we need to pass it down to Ms. Gruben.

13   A.  It's actually on my daughter's car.  It says Be Nice To The

14   Earth.  It was on the car when we got it.

15   Q.  And you didn't take it off, correct?

16   A.  No.

17   Q.  How about in the second row, anybody?

18   A.  I have got a sticker that says Lyons Colorado – We've Got a

19   Grip.

20   Q.  I am sorry, I couldn't hear you.  You are Ms. Cronin?

21   A.  Yes.  Lyons Colorado – We've Got a Grip.

22   Q.  And Ms. Carper, did you raise your hand?  Anybody else

23   middle row?  How about the back row?

24       MS. COVELL:  Okay.  Thank you.  That's all I have,

25   ladies and gentlemen.

1          *THE COURT:*  Thank you, Ms. Covell.

2          Mr. Varholak?

3          *MR. VARHOLAK:*  Thank you, Your Honor.

4                    VOIR DIRE EXAMINATION

5    *BY MR. VARHOLAK:*

6    *Q.*  I want to pick up a little bit where Ms. Covell left off

7    about Super Max.  And there is going to be testimony that

8    Mr. Petty was housed at Super Max at the time of the incident,

9    the alleged incident.  Would that affect anybody's decision

10   here as to whether they think he might have some level of guilt

11   or some level of innocence as a result of that?

12          Okay.  Now, the judge is going to instruct you at some

13   point that Mr. Petty is presumed innocent.  Is there anybody

14   that cannot give him that presumption of innocence?

15          Let me follow up on that a little bit.  There also has

16   been no testimony at this point, so if anybody were asked to

17   give a verdict now, is there anybody who would find him guilty

18   based upon what you have heard so far?

19          The converse of that, is there anyone who would find

20   him not guilty based on what you've heard so far?

21          Now, nobody rose their hand on that one.  That was a

22   trick question.  Remember, if he is presumed innocent, then if

23   there is no testimony, then as he sits here today you would

24   have to vote innocent.  Is there anybody who has a problem with

25   that?  No?

1            Okay.  Is there anybody who would have difficulty

2    holding the government to the burden of beyond a reasonable

3    doubt?  So it's not more likely than not.  It's a higher

4    burden.  It's beyond a reasonable doubt.  Is there anybody who

5    would have trouble holding the government to that burden?

6            Does anybody believe that Mr. Petty must prove his

7    innocence to you?

8            Now, is anybody uncomfortable even slightly with the

9    fact that a defendant in a criminal case is not required to

10   testify or to take the stand?

11           Would it disturb anybody, would somebody question if

12   Mr. Petty decides that he doesn't want to testify?  Would

13   anybody question, gee, why wouldn't somebody who is accused of

14   this crime, a serious crime in federal court, not stand up and

15   defend themselves?

16           Does anybody think it would be better if we had rules

17   that were different and that actually required Mr. Petty to

18   take the stand and to tell his version of events?

19           Okay.  Let me flip that a little bit.  Let's say

20   Mr. Petty does testify and he takes the stand.  Is there

21   anybody here who would give his testimony less credibility

22   simply because he is the defendant and charged in a criminal

23   case?

24           You are probably going to hear guards testify here

25   today.  Is there anyone who would give more credence to what

1    the guard would have to say than what Mr. Petty as a criminal

2    defendant would have to say?

3         Is there anybody who has difficulty judging the

4    credibility of witnesses or being asked to judge the

5    credibility of witnesses?

6         The judge has told you a little bit about the case and

7    the allegations in this case.  Has anybody heard anything or

8    read any stories that they believe might relate to this other

9    than the ones that people have discussed already about Super

10   Max in general?

11        Mr. Petty, as you can tell here, is African-American.

12   Ralph Smith, Dee Dee McEvoy, Brianne Smith are all Caucasian.

13   Would anybody have difficulty with that or would that effect

14   anybody's judgment in any way?

15        As I discussed earlier, there is going to be testimony

16   that Mr. Petty was an inmate at Super Max.  Would the fact that

17   he was an inmate affect your ability to judge his testimony?

18        Mr. Petty is charged, and the judge told you this,

19   with assault on three officers.  Would anybody have difficulty

20   judging the case given those allegations?

21        If there is any testimony in this case about serious

22   injuries, would that affect anybody's ability to judge the case

23   or listen to the witnesses or in the end be able to judge

24   Mr. Petty?

25        Is there anything else that either the judge hasn't

1   asked or the government hasn't asked or I haven't asked that as

2   you sit here you say, I am not sure I can be fair in this case?

3          Thank you.

4          THE COURT:  Thank you very much, Mr. Varholak.

5          All right.  Ladies and gentlemen, we are now going to

6   shift into the actual process of narrowing you down.  So first

7   of all, let me have the attorneys approach.  And ladies and

8   gentlemen, Ms. Preuitt-Parks is going to activate the white

9   noise machine.  I want to give you a warning about that.  It's

10  just to kind of help you from being able to or prevent you from

11  being able to overhear what we are doing at the bench.

12          If the attorneys could please approach.

13     (At the bench:)

14          THE COURT:  Any challenges for cause on behalf of the

15  United States?

16          MS. COVELL:  No.

17          THE COURT:  Mr. Varholak, on behalf of Mr. Petty any

18  challenges for cause?

19          MR. VARHOLAK:  No, thank you.

20          THE COURT:  So are both sides ready to exercise their

21  peremptories?

22          MS. COVELL:  Yes.  We are just going to announce them

23  out loud?  There is not a sheet we have to write them on or

24  anything?

25          THE COURT:  Correct.

1        (In open court:)

2             Ladies and gentlemen, at this time we are going to

3    have the attorneys exercise what are called peremptory

4    challenges.  And by so doing, they will be excusing certain

5    people, those of you who were seated at the front of the

6    courtroom.  Some of you may be thinking, oh, I hope I am

7    excused.  However, whether or not you are thinking that or not,

8    in the event that you are excused and as you are walking back

9    to your car or wherever and you start thinking to yourself, you

10   know, why was I excused because I said that I would be fair and

11   I am a fair person and I just don't understand, don't fret

12   about that particular subject.  Who knows why they excused you?

13   Undoubtedly, it doesn't have to do with the fact that they

14   thought you could be fair.  Peremptory challenges can be based

15   on any reason, so just don't worry about that particular thing.

16             All right.  Then the United States may exercise its

17   first peremptory challenge.

18             MS. COVELL:  Your Honor, the United States thanks and

19   excuses Ms. Smith seated in seat 13.

20             THE COURT:  Thank you very much, Ms. Smith.  You are

21   excused.

22             And Ms. Dickehage, I am going to have you move down

23   one seat.  We are going to be playing a bit of musical chairs

24   here.

25             Mr. Petty may exercise his first and second peremptory

1    challenges.

2         *MR. VARHOLAK:*  Thank you, Your Honor.  Mr. Petty

3    thanks and excuses Juror No. 1, David Paul Cheever, and Juror

4    No. 8, Jeffrey H. Coors.  Thank you.

5         *THE COURT:*  Mr. Cheever and Mr. Coors, thank you very

6    much.  By the way, advice to each of you is the same we gave to

7    the jurors we excused earlier, and that is if you could please

8    call in to the juror line over the course of the month, all

9    right?  Thank you, Mr. Cheever.  Thank you, Mr. Coors.

10        And so Ms. Maes, if you could please go and occupy the

11   seat over where Mr. Cheever was just sitting in.  And

12   Ms. Golden, if you could move directly back to where Mr. Coors

13   was just seated.

14        All right.  Great.  The United States may exercise its

15   second peremptory challenge.

16        *MS. COVELL:*  Your Honor, the government passes.

17        *THE COURT:*  Then the defendant may exercise his third

18   and fourth peremptory challenges.

19        *MR. VARHOLAK:*  Thank you, Your Honor.  The defense

20   thanks and excuses Juror No. 2, Kristin Ball.  And the defense

21   thanks and excuses Juror No. 6, Susanna Anderson.

22        *THE COURT:*  Thank you very much Ms. Ball.  You are

23   excused.  And thank you, Ms. Anderson.  You are excused as

24   well.

25        Mr. Collier, could you please then go back to the back

1   row there, the second seat there.  And Ms. Gruben, if you

2   could -- I am not sure, probably equally inconvenient any way,

3   but make your way back to the empty seat in the back row there.

4          Thank you.  Does the United States have any challenges

5   to either Mr. Collier or Ms. Gruben?

6          MS. COVELL:  No, Your Honor.

7          THE COURT:  And Mr. Petty may exercise his fifth and

8   sixth peremptory challenges.

9          MR. VARHOLAK:  Your Honor, the defense passes.  We

10  accept the jury.

11         THE COURT:  All right.  Then ladies and gentlemen, we

12  are finished with jury selection.

13         The United States agree?

14         MS. COVELL:  Yes, Your Honor.

15         THE COURT:  So what that means is the rest of you in

16  the front row and those of you in the back are going to be

17  excused at this time now.

18         Let me just address some comments to those of you in

19  the back.  As you can see with the fact that we replaced one

20  person on the jury who had a conflict, without people in the

21  back like you not really participating by answering questions,

22  but by being available to replace someone who may be excused,

23  you performed just by doing so a valuable jury duty because

24  without having people in the back to replace others, we

25  probably would get stuck and we would have to start all over

1    again.

2          So I thank each of you very much for being so

3    attentive during the course of the process and being willing to

4    step in if need be.  And for those of you in the front row, I

5    very much appreciate the fact that you came in today and for

6    your participation in the process as well.  So I am going to

7    excuse all of you at this point in time.  Keep in mind that if

8    you would call in to the jury line over the course of the

9    month, I would appreciate that, all right?

10          So at this time all of you are excused.

11          Thank you.  Please be seated.  All right, ladies and

12   gentlemen.  So as you have undoubtedly figured out by now, you

13   are the jury in this case, the 13 of you.  So ladies and

14   gentlemen, at this time I am going to have you take an oath as

15   jurors.  So could you please stand, raise your right hand?

16   Ms. Preuitt-Parks will administer that oath to you.

17          (Jury was sworn:)

18          *THE JURY:*  I do.

19                    REPORTER'S CERTIFICATE

20      I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above-entitled matter.  Dated

22   at Denver, Colorado, this 4th day of January, 2016

23

24                         S/Janet M. Coppock____

25

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 15-CR-00029-PAB
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

ISHMAEL PETTY,
7

     Defendant.
8  _____

9                     REPORTER'S TRANSCRIPT
                      Trial to Jury, Vol. 1
10  _____

11        Proceedings before the HONORABLE PHILIP A. BRIMMER,

12  Judge, United States District Court for the District of

13  Colorado, commencing at 8:08 a.m., on the 13th day of July,

14  2015, in Courtroom A701, United States Courthouse, Denver,

15  Colorado.

16                          APPEARANCES

17        Colleen Covell and Rebecca Weber, U.S. Attorney's

18  Office, 1225 17th Street East, Suite 700, Denver, CO 80202,

19  appearing for the plaintiff.

20        Scott Varholak, Office of the Federal Public Defender,

21  633 17th Street, Suite 1000, Denver, CO 80202, appearing for

22  the defendant.

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

1                        PROCEEDINGS

2          THE COURT:  The matter before the Court is United

3   States of America versus Ishmael Petty.  This is Criminal Case

4   15-CR-29.

5          I will take entries of appearance, please.

6          MS. COVELL:  Good morning, Your Honor.  Colleen Covell

7   on behalf of the United States.  And with me is my co-counsel

8   Rebecca Weber and Special Agent Amber Cronan from the FBI.

9          MR. VARHOLAK:  Good morning, Your Honor.  Scott

10  Varholak along with Ishmael Petty in custody.

11         THE COURT:  Good morning to you.

12         We are here today for the first day of jury trial in

13  this matter, so let's go over a few things just to make sure

14  that everything is ready to go.  You can see how the chairs are

15  aligned.  Keep in mind that the alternate will be seated in

16  Seat No. 10.

17         Also, what I intended to do in terms of giving the

18  jury just an overview of the charges is to pretty much track

19  the statement in the introductory jury instruction that I sent

20  out.  The indictment charges Mr. Petty with three counts of

21  assaulting, resisting or impeding officials or employees of the

22  Federal Bureau of Prisons.

23         Any objection to that as the introductory statement?

24         MS. COVELL:  Not from the government.

25         MR. VARHOLAK:  No, Your Honor.

```
 1              THE COURT:  Then in terms of the witnesses, any

 2    changes in the witnesses?  Does the United States potentially

 3    at least intend to call all five of the witnesses that were

 4    listed?

 5              MS. COVELL:  We are going to call four, Your Honor.

 6    At this point we don't believe we will need to call Agent

 7    Cronan, but the other four we listed we intend to call.

 8              THE COURT:  Well, Agent Cronan will be introduced in

 9    any event, so I suppose the United States wouldn't really have

10    to exclude her because she will already be introduced.  So I

11    will go ahead and mention her name.

12              All right.  One thing that does bring up is fairly

13    early on in the voir dire process I will ask both sides to

14    introduce themselves and those at counsel table, so at that

15    time you can introduce everyone.

16              And Mr. Varholak, have you had a chance to check and

17    see whether Mr. Petty can stand up without rattling chains?

18              MR. VARHOLAK:  Why don't we check now.  Yeah, he is

19    fine.

20              THE COURT:  Mr. Varholak, did you have a chance to see

21    how you arranged that skirt in front?

22              MR. VARHOLAK:  I did, Your Honor.

23              THE COURT:  It's pretty unobtrusive too, so that's

24    good.

25              MS. COVELL:  I was wondering if I could move the
```

1   chairs to the end so the jurors who are seated here don't feel

2   like they are --

3           THE COURT:  You can even move them out of the way.

4           MS. COVELL:  I can move this one back here if that

5   would be --

6           THE COURT:  Sure, as long as it's not impeding the --

7   because that's the way the jurors who are excused will be

8   leaving the courtroom.  Ms. Preuitt-Parks can maybe help you

9   with that.

10          All right.  I can't think of too many other things

11  that we didn't already go over.  Anything that -- well, one

12  thing, the voluntariness hearing, if we need one, so

13  Mr. Varholak, at the appropriate point in time if you will just

14  remind me about that.  If it turns out that we anticipate

15  Mr. Petty testifying, then we will go ahead and figure out a

16  time when we will take care of that.  So then the United States

17  to the extent that it intends to -- as far as I can tell,

18  impeaching a defendant with one of his statements, even though

19  the statement is not really being introduced, but rather you

20  are just confronting him with it, I think that it needs -- that

21  statement needs to be voluntary as well.

22          So that means that in the event the United States

23  intended to impeach him with certain statements and there is a

24  question about their voluntariness, we would have to have a

25  voluntariness hearing before the United States would be able to

1   do so.

2          All right.  Anything else that we should take up at

3   this time on behalf of the United States, Ms. Covell?

4          *MS. COVELL:*  No, Your Honor.  Thank you.

5          *THE COURT:*  Mr. Varholak?

6          *MR. VARHOLAK:*  No, Your Honor.

7          *THE COURT:*  Then what will happen is we will take a

8   recess.  In the meantime once the panel is ready, as I said

9   before, Ms. Preuitt-Parks will have them seated in the order

10  that they are listed on the randomized list that she will

11  obtain from the Clerk's Office.  And once everyone is seated,

12  we will be ready to begin, all right?

13         We will be in recess at this time.

14      (Recess at 8:14 a.m.)

15      (Reconvened at 8:50 a.m.)

16         *THE COURT:*  Welcome, ladies and gentlemen, to the

17  United States District Court for the District of Colorado.  I

18  appreciate all of you being here today.  My name is Philip

19  Brimmer and I am the judge who is going to be presiding over

20  this trial.  I know that jury service takes you away from your

21  jobs, from home, from family, so I appreciate the fact that you

22  have all responded to your summons.

23         Of course, jury service is one of the most important

24  obligations that a United States citizen has.  It is intended

25  to have disputes among parties resolved by members of the

1    community instead of some professional judge or someone of that

2    nature.

3          Another way that I think it's good to think about jury

4    service and how important it is and that is this, and that is

5    everyone in this courtroom is just one traffic accident away

6    from either being a plaintiff or a defendant in a lawsuit.

7          And obviously if you were a party and you were going

8    to show up for the first day of the jury trial in your case,

9    you would certainly want those persons who were participating

10   in jury selection to be participating with an eye towards being

11   honest about it, towards participating fully, answering the

12   questions directly and not just trying to get out of jury

13   service.  You would want the trial to be fair in that respect,

14   and that's, of course, what the parties in this particular case

15   are hoping and anticipating as well.

16         We are convened today for a trial in the matter of

17   United States of America versus Ishmael Petty.  This is Case

18   No. 15-CR-29 and this is a criminal case.  The indictment in

19   this particular case charges Mr. Petty with three counts of

20   assaulting, resisting or impeding officials or employees of the

21   Federal Bureau of Prisons.  Please keep in mind, ladies and

22   gentlemen, that these are only charges.  Mr. Petty is presumed

23   innocent unless he is proven guilty.

24         We are going to select 13 persons for the jury in this

25   case, 12 people and then one alternate juror.

1          Before we get going, let me introduce those people,

2    first of all, on my court staff that are going to be assisting

3    with the trial.  Ms. Preuitt-Parks in the yellow there, she is

4    the courtroom deputy and she will be your principal contact in

5    the event that you are selected for the jury in this case.

6          Ms. Janet Coppock sitting right in front of me is the

7    court reporter, and she is taking down everything that's said

8    in the courtroom.  One word about that and that is because she

9    is writing down words, when you are responding to the questions

10   that I am going to ask you or that the attorneys may ask you,

11   you will need to respond verbally, so shaking your head doesn't

12   quite work.  She doesn't have anything to take down.  So I may

13   prompt you if that happens to respond verbally, yes, no, or

14   whatever the case may be.

15         Mr. Kyler Burgi sitting over by Ms. Preuitt-Parks, he

16   is my law clerk and he will be going in and out of the

17   courtroom as he may need to do so.

18         Now, at this time let me have the parties introduce

19   themselves to you.  First of all, I will start with the United

20   States.

21         *MS. COVELL:*  Thank you, Your Honor.

22         Good morning, ladies and gentlemen.  My name is

23   Colleen Covell.  I am a Assistant United States Attorney here

24   in Denver.  With me is my colleague, Rebecca Weber, as well as

25   Special Agent Amber Cronan from the FBI.

1          THE COURT:  Thank you.

2          Then I will have the defense.

3          MR. VARHOLAK:  Good morning, everybody.  My name is

4    Scott Varholak and with me at the table is Ishmael Petty.

5          THE COURT:  Thank you.

6          Ladies and gentlemen, the trial in this matter is

7    scheduled for two days, so keep in mind that even though it's

8    not an overly long trial, that the deliberations don't have any

9    time limit.  So in the event that the jury needed to deliberate

10   over a longer period of time, the jury certainly could do so.

11         The hours of trial are typically 8:00 a.m. -- sorry,

12   8:30 a.m.  8:00 a.m. today is when we first convened outside

13   your presence, but it will be 8:30 until 5:00.  And we will

14   keep that schedule pretty well.  In the event that there is a

15   witness that we needed to wrap up and it was -- it took us a

16   little bit past 5:00, we might do something like that, but I

17   don't anticipate anything of that nature.

18         Also we will be taking a break during a typical day at

19   about 10:15 and then at 3:15.  And during the morning here

20   today if we need to take a break, we can, because this is not

21   an endurance contest.  So if someone really needs to take a

22   break, please just raise your hand and we can go ahead and do

23   so, all right?

24         Nowadays, ladies and gentlemen, it seems like

25   everyone's phone is connected with the internet.  And in the

1    event that you possess such a phone, please keep in mind that

2    you can't look up any information about the topics that we are

3    going to be discussing, the law, the parties, the attorneys,

4    anything like that on your phones in the event that we take a

5    break.

6         Also, you can't contact anyone and ask them to do the

7    same thing.  And you can't basically look up any type of

8    information because we want the trial in the case to be based

9    upon the evidence that is heard and admitted in court because

10   that's been all pursuant to the Federal Rules of Criminal

11   Procedure and the Rules of Evidence as well.

12        So I am going to order you not to try to look up any

13   information, not to try to look in any dictionaries, because

14   you may hear some legal terms that you are unfamiliar with.  To

15   the extent that the -- there is a term that you need to know or

16   we think you need to know the definition of, those terms will

17   be defined in the jury instructions for you.  And then you will

18   be basing your verdict on what evidence has been admitted and

19   the evidence that -- and the facts that you find as part of the

20   deliberations of the jury in this particular case.

21        The purpose of jury selection is to ask questions of

22   the prospective jurors to such an extent that we determine

23   whether or not members of the jury can be fair and impartial in

24   determining the facts and also those people who can take the

25   law as I give it to you and apply that law to the facts that

1   the jury then finds and do so rather than, say, for instance,

2   apply their own personal view of the law or applying -- or not

3   applying facts because of some other reason.

4        In order to accomplish that task, I am going to be

5   asking you a series of questions.  I am also going to give the

6   attorneys an opportunity to ask some questions of you as well.

7   The purpose of those questions is not to embarrass you in any

8   way, but if for some reason the answer to a question would tend

9   to embarrass you and you don't really want to mention it in

10  front of everybody, let me know.  I will have you come up here.

11  I have a microphone up here on the corner.  It's called a bench

12  conference and you can come up and give the answer up at the

13  bench.  I would hear it, the attorneys would hear it, but, you

14  know, not everyone in the courtroom would hear it.

15       All right.  Ladies and gentlemen, before I begin

16  asking those questions that I mentioned, I am going to have you

17  take an oath because like a witness in a case, your answers

18  must be truthful and complete.  So if all of the prospective

19  jurors, those of you who are seated in the front of the

20  courtroom and those of you in the back as well would please

21  stand at this time, raise your right hand, Ms. Preuitt-Parks

22  will administer that oath to you.

23       (Prospective jurors were sworn:)

24       *PROPSECTIVE JURORS:*  I do.

25       *THE COURT:*  Thank you very much.  You may have a seat.

1          (Jury selection was sealed.)

2          THE COURT:  Thank you.  Please be seated.

3          Ladies and gentlemen, let me give you some general

4    instructions and rules for your service on this jury.  And also

5    once I finish those comments, I am going to read to you a

6    preliminary instruction.

7          First of all, from now on when you enter the courtroom

8    or when you leave the courtroom, everyone else in the courtroom

9    is going to stand.  That's out of courtesy to you.  When you

10   come back into the courtroom, if you would please take the same

11   seat that you are seated in right now.  And once you are at

12   your seat, you can just sit down.  We are all standing, but we

13   are standing out of courtesy to you.  So once you are there,

14   you can go ahead and take a seat.  Then once everyone is

15   seated, I will let everyone else in the courtroom know that

16   they can have a seat as well.

17         There is a jury room behind that door right there and

18   that's going to be the place where you will be right before you

19   come into the courtroom and where you can go afterwards.  There

20   is a refrigerator in there, coffee maker, whatever, so you

21   know, if you would like to in the event that you brought lunch

22   today, you can have lunch back there or you can go get lunch,

23   bring it back and have it there.  Whatever you want to do,

24   that's perfectly fine.

25         One thing I would like you not to do and that is to

1    bring into the courtroom anything other than water to drink, so

2    if you have some water you would like to bring into the

3    courtroom, that's fine.  Don't bring anything like a Coke or

4    something like that.  Also no gum chewing for the jury in the

5    course of the trial while you are in court.

6         Also, I recommend you turn your cellphones off if you

7    are going to have them on your person or, if you wish, you can

8    just leave your cellphones if you have one back in the jury

9    room because it's secure.

10        Ms. Preuitt-Parks is going to make sure that each of

11   you is issued a key card so that you can access the secure door

12   off of the hallway that leads back to the jury room, so you

13   could leave your valuables back in the jury room if you would

14   like to do so or you can bring them into the courtroom, up to

15   you.  But I would recommend that you turn your phones off just

16   so that they don't interrupt the proceedings in here.

17        As I said before, make sure that you don't look up any

18   information about this trial in any way.  There was a reference

19   to some articles.  Don't look at those articles.  Don't have

20   anyone look up the articles for you or look up any information

21   whatsoever that you may hear about this particular case.

22        And also in order to avoid your being exposed to

23   something that someone that you know may know, here is what I

24   am going to tell you and limit you in telling other people

25   about your service in this case until you are dismissed as

1    jurors, and that is you can tell them that you were a juror in

2    United States District Court.  It's a criminal case and it's

3    anticipated a two-day trial, but there is no limit on the

4    length of the deliberations.  That's it.

5         That limitation is designed to protect you from

6    having -- starting to tell people about the nature of the

7    charges or something else.  There is always a chance that

8    someone would say, oh, you know Frank down the street, he is --

9    and all of the sudden you might be exposed to some things that

10   you shouldn't be exposed to.  So if you will limit it that way,

11   it's less likely that you will be -- that you might be

12   accidentally exposed to some information.

13        Also, you can't -- I am not sure if any of you would,

14   but you can't blog about your experience during the course of

15   your jury service, anything of that nature.  Once you are done,

16   once you have been excused, then you can write a novel about

17   your experience.  You can blog about your experience.  You can

18   tell people as much or as little information as you want, but

19   during the course of the trial there needs to be those

20   particular types of limitations.

21        I already mentioned to you, ladies and gentlemen, that

22   the attorneys in the event that you pass them in the hallway

23   will not be even saying hi to you.  They will try to basically

24   avoid you to the extent that they can.  There also could

25   potentially be witnesses that are out in the hallways.  They,

1   of course, don't know who you are, but you can help them know

2   to steer clear of you by keeping your yellow juror buttons

3   visibility.

4           So if you would keep those buttons visible even if you

5   happen to go out for lunch, that would be good because there is

6   at least a chance that some of the witnesses may be going to

7   the same restaurant or sandwich place that you may be going to,

8   so if you could keep those visible, that will help them avoid

9   you essentially.

10          Also, don't make any assumptions about where the -- I

11  told you that one of you is an alternate juror.  Don't make any

12  assumptions about where that person is seated.  It's randomly

13  selected, a particular seat, as the alternate seat.

14          All right.  Ladies and gentlemen, at this point in

15  time let me -- well, why don't -- let me talk to the attorneys

16  for just a second if the attorneys could approach.

17      (At the bench:)

18      THE COURT:  What's your preference?  After I read the

19  preliminary instruction, do you want to go into openings or

20  would you prefer we take an early lunch?

21      MS. COVELL:  I would prefer going straight into

22  openings.  When does Your Honor usually break, noon?

23      THE COURT:  Noon, but we could just start the trial

24  and go up until noon.

25      MS. COVELL:  I am fine with doing that, Your Honor.

1        *THE COURT:*  You want to do that.

2        *MR. VARHOLAK:*  That's fine.

3        *THE COURT:*  Okay, great.

4     (In open court:)

5        *THE COURT:*  All right, ladies and gentlemen.  At this

6   time I am going to read that preliminary jury instruction that

7   I mentioned to you.

8        Members of the jury, at the end of the trial I will

9   give you detailed guidance on the law and how you will go about

10  reaching your decision, but now I simply want to generally

11  explain how the trial will proceed.

12       This criminal case has been brought by the United

13  States Government.  I will sometimes refer to the government as

14  the prosecution.  The government is represented by Assistant

15  United States Attorneys Colleen Covell and Rebecca Weber.  The

16  defendant, Ishmael Petty, is represented by his lawyer, Scott

17  Varholak.

18       The indictment charges the defendant with three counts

19  of assaulting, resisting or impeding a federal employee or

20  official in violation of 18, United States Code, Section 111 of

21  the United States Code.  The indictment is simply the

22  description of the charges made by the government against the

23  defendant.  It is not evidence of guilt or anything else.

24       The defendant pleaded not guilty and is presumed

25  innocent.  He may not be found guilty by you unless all 12 of

1    you unanimously find that the government has proved his guilt

2    beyond a reasonable doubt.

3           The first step in the trial will be the opening

4    statements.  The government in its opening statement will tell

5    you about the evidence which it intends to put before you.

6    Just as the indictment is not evidence, neither is the opening

7    statement.  Its purpose is only to help you understand what the

8    evidence will be.  It is a road map to show you what is ahead.

9    After the government's opening statement, the defendant's

10   attorney may make an opening statement.

11          Evidence will be presented from which you will have to

12   determine the facts.  The evidence will consist of the

13   testimony of the witnesses, documents, and other things

14   received into the record as exhibits and any facts about which

15   the lawyers agree or to which they stipulate.

16          The government will offer its evidence.  After the

17   government's evidence, the defendant may present evidence, but

18   he is not required to do so.  I will remind you that the

19   defendant is presumed innocent and it is the government that

20   must prove the defendant's guilt beyond a reasonable doubt.  If

21   the defendant submits evidence, the government may introduce

22   rebuttal evidence.

23          At times during the trial a lawyer may make an

24   objection to a question asked by another lawyer or to an answer

25   by a witness.  This simply means that the lawyer is requesting

1    that I make a decision on a particular rule of law.  Do not

2    draw any conclusion from such objections or from my rulings on

3    the objections.  If I sustain an objection to a question, the

4    witness may not answer it.  Do not attempt to guess what answer

5    might have been given if I had allowed the answer.

6         If I overrule the objection, treat the answer as any

7    other.  If I tell you not to consider a particular statement,

8    you may not refer to that statement in your later

9    deliberations.  Similarly, if I tell you to consider a

10   particular piece of evidence for a specific purpose, you may

11   consider it only for that purpose.

12        During the course of the trial, I may have to

13   interrupt the proceedings to confirm with the attorneys about

14   the rules of law that should apply.  Sometimes we will talk

15   briefly at the bench, but sometimes these conferences may take

16   more time, so I will excuse you from the courtroom.  I will try

17   to avoid such interruptions whenever possible, but please be

18   patient even if the trial seems to be moving slowly because the

19   conferences actually save time in the end.

20        You are to consider all the evidence received in this

21   trial.  It will be up to you to decide what evidence to believe

22   and how much of any witness' testimony to accept or to reject.

23   After you have heard all the evidence on both sides, I will

24   instruct you on the rules of law that you are to use in

25   reaching your verdict.  The government and the defense will

1    then each be given time for their final arguments.

2            Let me give you some information about whether or not

3    you choose to take notes.  If you would like to take notes

4    during the trial, you may.  On the other hand, you are not

5    required to take notes.  If you do decide to take notes, be

6    careful not to get so involved in note-taking that you become

7    distracted.  And remember that your notes will not necessarily

8    reflect exactly what was said, so your notes should be used

9    only as memory aids.

10           Therefore, you should not give your notes precedent

11   over your independent recollection of the evidence.  You should

12   also not be unduly influenced by the notes of other jurors.  If

13   you do take notes, leave them in the jury room at night and do

14   not discuss the contents of your notes until you begin

15   deliberations.

16           I do not permit jurors to ask questions of witnesses

17   or the lawyers.  If you are unable to hear a witness or lawyer,

18   please raise your hand immediately and I will see that that is

19   corrected.

20           During the course of the trial you should not talk

21   with any witness or with the defendant or with any of the

22   lawyers at all.  Also, you should not discuss this case amongst

23   yourselves until I have instructed you on the law and you have

24   gone to the jury room to make your decision at the end of the

25   trial.  It is important that you wait until all the evidence is

1   received and you have heard my instructions on the controlling

2   rules of law before you deliberate amongst yourselves.

3          Let me add that during the course of the trial you

4   will receive all the evidence you properly may consider to

5   decide the case.  Because of this, you should not attempt to

6   gather any information on your own that you think might be

7   helpful.  Do not engage in any outside reading or research on

8   this case, including through the use of the internet,

9   cellphones, smart phones or paper resources.  Do not attempt to

10  visit any places mentioned in the case and do not in any other

11  way try to learn about the case outside the courtroom.

12         Now that the trial has begun, you must not listen to

13  or read about it in the media.  Don't anticipate any publicity,

14  but there is a possibility there could be some.  The reason for

15  this is that your decision in this case must be made solely on

16  the evidence presented at the trial.

17         The court reporter is making stenographic notes of

18  everything that is said.  This is basically to assist in any

19  appeals.  However, a typewritten copy of the testimony will not

20  be available for your use during deliberations.  On the other

21  hand, any exhibits will be available for you during your

22  deliberations assuming that those exhibits have been admitted.

23         With that introduction, then, the United States may

24  present its opening statement.

25         Ms. Weber, go ahead.

1          Let me have you hold up just one second.  Do the

2   jurors have note pads?

3          *THE COURT DEPUTY:*  No, Your Honor.

4          *THE COURT:*  Let's go ahead and give each of them a

5   legal pad if they wish to take notes.

6          Everyone set with either a note pad or a pencil or pen

7   if they wanted?

8          All right.  Go ahead, Ms. Weber.

9                          **OPENING STATEMENT**

10         *MS. WEBER:*  On the morning of September 11, 2013,

11  Ralph Smith reported to his job at the Federal Administrative

12  Maximum Security Prison like he had done countless times before

13  without incident.  But that morning would change his life

14  because that was the morning this man, Ishmael Petty, an inmate

15  at the prison, decided to carry out a brutal assault on Ralph

16  Smith and two female prison employees, Dee Dee McEvoy and

17  Brianne Smith.

18         Ralph Smith and Brianne Smith, who are not related,

19  were educational technicians at the Bureau of Prisons.  They

20  were responsible for tasks such as providing educational

21  programs to inmates, delivering books and reading materials to

22  inmates in their cells and administering the GED test.

23  Wednesdays were their designated day for handing out library

24  books to the inmates at the Administrative Maximum Security

25  Prison, which is also known as ADX.

1        So shortly before 7:00 a.m. on Wednesday,

2    September 11th, 2013, Ralph Smith and Brianne Smith headed to

3    the Delta unit at ADX to hand out books.  Coincidentally,

4    another prison employee case manager, Dee Dee McEvoy, was also

5    making her rounds in Delta unit at the same time.  A case

6    manager is responsible for helping inmates with many aspects of

7    their daily lives at the prison, such as enrolling in

8    educational or religious programming.

9        The defendant's cell was in Delta unit.  Delta unit

10   has three arms, A, B and C, extending from a center control or

11   bubble area.  Each arm has a lower level and an upper level and

12   each level is known as the range.  There are cells on one side

13   of the hallway and recreational areas on the other side of the

14   hallway.

15       Cell No. 106, the defendant's cell, was on the lower

16   level of Delta A.  The defendant's cell, like all of the cells

17   at ADX, has two doors, an outer solid steel door and an inner

18   door with bars often referred to as the grill.  The 3-foot

19   space between that outer steel door and inner grill is known as

20   the sallyport.  A correctional officer who sits at that center

21   control or bubble area at the center of Delta unit controls the

22   opening and closing of both of those cell doors.

23       When the three prison employees got to Delta unit,

24   they started at the far end of the range.  Brianne Smith and

25   Ralph Smith handed out a book to an inmate in cell 107.  Dee

1    Dee McEvoy was a few feet away speaking with another inmate.

2    As Ralph Smith and Brianne Smith approached the defendant's

3    cell, they radioed to the correctional officer in the bubble to

4    open up that outer solid steel door.  They expected to step

5    into the sallyport and hand the defendant his books through

6    that inner grill, that inner door.  But what they didn't know

7    is that the defendant had compromised the security system and

8    was hiding in the space between the two cell doors.

9         When Brianne Smith stepped into his cell, he jumped

10   out and sprayed hot sauce in her eyes temporarily blinding her,

11   then he began attacking Ralph Smith.  He hit Mr. Smith

12   repeatedly, first using his hands and then using a baton he

13   took from Dee Dee McEvoy as she tried to stop the attack.

14        As the defendant relentlessly hit Mr. Smith's head and

15   body over and over again with the baton, Mr. Smith laid on his

16   back in the hallway trying to shimmy away.  Mr. Smith tried to

17   defend himself, kicking and flailing his arms, but he was no

18   match against the defendant.

19        The defendant managed to get Mr. Smith's baton, too.

20   With a baton in each hand he kept hitting Mr. Smith.  He hit

21   both women too, Dee Dee McEvoy on the hand and Brianne Smith on

22   the arm, as they frantically tried to protect Mr. Smith and

23   stop the beating.

24        When another officer was able to enter the range and

25   come to the rescue, Mr. Smith was on the ground, a trail of

1    blood along the hallway and a pool of blood under his body.

2    The evidence will show that the defendant meticulously

3    premeditated this attack donning homemade body armor and arming

4    himself with a homemade knife and sheath to hold it on his

5    pants.  You will have no doubt this happened because it was all

6    recorded on a video which you will see.

7            As a result of this attack, Mr. Smith suffered grave

8    injuries.  He will tell you about the injuries to his head, his

9    brain, his hand, and about the pain and trauma he continues to

10   experience every day.

11           As a result of his actions on December 11, 2013, the

12   defendant is charged with three felony counts of assaulting,

13   resisting or impeding a federal officer.  Count 1 is for the

14   attack on Ralph Smith.  Count 2 is for the attack on Dee Dee

15   McEvoy.  And Count 3 is for the attack on Brianne Smith.

16           At the conclusion of this trial after you have heard

17   all the evidence, you will have no doubt that the defendant is

18   guilty on all three counts.

19           *THE COURT:*  Thank you, Ms. Weber.

20           Mr. Varholak, would the defendant like to present an

21   opening statement at this time?

22           *MR. VARHOLAK:*  I would, thank you.

23                         **OPENING STATEMENT**

24           *MR. VARHOLAK:*  May it please the Court, counsel,

25   members of the jury.  You heard the judge give his preliminary

1     instruction moments ago.  And what did he tell you?  He said

2     the opening statements, statements of the government, the

3     statements of myself, that's not evidence in this case.  That's

4     a road map of what the government intends or claims that they

5     are going to be able to produce, but it's not evidence.

6           I asked you in the very beginning, I asked a trick

7     question in the voir dire.  I said, as you are all standing

8     here today, how many of you if I asked you to vote right now

9     would vote Mr. Petty guilty?  Not one of you raised your hands.

10    That wasn't a surprise.  But then there was the trick question

11    that I asked where I said, okay.  We haven't had any evidence

12    yet.  How many of you sitting here today if I asked you to vote

13    right now would vote Mr. Petty not guilty?  And not one person,

14    and this includes the other 19 of you who were sitting here at

15    the time, not one person raised their hand.

16          And that's why I said, well, that one was a mistake

17    because as we sit here today, Mr. Petty is presumed innocent.

18    That presumption of innocence is critical to the finding.  It's

19    a bedrock principle that protects us, protects individuals like

20    Mr. Petty, protects people charged with criminal offenses.  And

21    I don't remember now if any of you have ever been.  I know

22    there were people on the jury panel who were.  And when you

23    stood there, you were presumed innocent.

24          That means that the mere fact that you are charged

25    with a crime, it doesn't matter.  You are presumed innocent.

1   That means that the fact that Mr. Petty was housed at ADX, at

2   Super Max, and there is going to be a lot of testimony about

3   Super Max and what goes on there and what it means and the

4   level of security and what that means, and what this facility

5   is like.  It's a facility that when you walk in, there is a

6   table there and guard there.  And you meet the guard and then

7   you need certain levels of security clearance in order to go

8   in.

9           And you go in and you immediately go down.  You go

10  underground either by elevator or by stairs one or two levels

11  deep.  And then you have to keep passing various levels of

12  security as you go deeper and deeper into the facility to where

13  individuals like Mr. Petty were held.

14          Well, the fact that Mr. Petty was held there, it's not

15  evidence of guilt.  He is still presumed innocent as we sit

16  here today.  The fact that he is charged with a crime, it's not

17  evidence of guilt.  As he sits here today, he is presumed

18  innocent.

19          The fact that he stands trial in front of 13 jurors,

20  it's not evidence of guilt.  He is presumed innocent.  The fact

21  that the government stood up here and said here is what we are

22  going to show you.  Here is what we are going to prove to you.

23  We are going to prove not just beyond reasonable doubt, but

24  beyond all doubt Mr. Petty's guilt, that statement is not

25  evidence.  He is presumed innocent despite that.  He has

1   entered a not guilty plea to these charges.  This presumption

2   of innocence will remain with him throughout this trial.

3           Now, you are going to hear witnesses who are going to

4   tell you -- I have little doubt that each of the three guards

5   that the government spoke about will take the stand and they

6   will testify.  Listen to their testimony.  Listen to any

7   inconsistencies that may be presented in their testimony.

8   Listen to what they have to say.  Listen to their explanations,

9   if any, about why this alleged incident may have happened.

10          The government said we are going to show you a

11  videotape.  Well, we don't live -- we may live in a YouTube

12  world, but we don't convict people based on a YouTube world.

13  Look not just at the evidence presented, but look also at the

14  lack of evidence.  Look at the things that you would if you

15  were sitting in Mr. Petty's seat and charged in federal court

16  with three felonies offenses.  Listen to what you would want to

17  see as evidence of guilt, what you would expect if the

18  government wanted to convict you of a crime for them to

19  present, basic pieces of evidence that you sitting there would

20  expect.  Because at the end of the day, it's going to be you

21  who decides has the government proven beyond a reasonable doubt

22  these charges.

23          And if you look at the evidence and if you look at the

24  lack of evidence, the things that you would expect in important

25  decisions of your life to be there, you will see that there is

Dee Dee McEvoy – Direct

1  reasonable doubt in this case.  And at the end of the case I

2  will come back and have a chance to speak to you again, and

3  when I come back, I am going to ask you to render the verdict

4  appropriate in this case and that is not guilty.

5          Thank you.

6          THE COURT:  Thank you, Mr. Varholak.

7          All right.  The United States may call its first

8  witness.

9          MS. COVELL:  Thank you, Your Honor.  The United States

10 calls Dee Dee McEvoy.

11     (**Dee Dee McEvoy** was sworn.)

12          THE WITNESS:  Yes, ma'am.

13          THE COURT DEPUTY:  State your full name and spell your

14 last name for the record.

15          THE WITNESS:  Dee Dee McEvoy, M-C-E-V-O-Y.

16                    **DIRECT EXAMINATION**

17 BY MS. COVELL:

18 Q.  Good morning, Ms. McEvoy.

19 A.  Hi.

20 Q.  Could you please tell us how you are employed?

21 A.  Federal Bureau of Prisons.

22 Q.  And how long have you been employed by the Federal Bureau

23 of Prisons?

24 A.  Almost 18 years.

25 Q.  Is the Bureau of Prisons frequently referred to as the

Dee Dee McEvoy – Direct

1  acronym BOP?

2  A.  Yes, ma'am.

3  Q.  And during your almost 18 years with the BOP, what part of

4  the country were you assigned to?

5  A.  The Florence complex in Florence, Colorado.

6  Q.  You are familiar with the complex down there as a result?

7  A.  Yes, ma'am.

8  Q.  Could you please describe for us the layout of the facility

9  down in Florence, Colorado.

10  A.  There is four separate institutions.  There is a federal

11  prison camp.  It's a medium -- or a minimum.

12  Q.  Excuse me for interrupting.  By minimum what do you mean,

13  minimum security?

14  A.  Minimum security level, yes, ma'am.  And there is a medium.

15  It's called the FCI, Federal Correctional Institution.  And

16  there is a USP, United States Penitentiary.  It's high-level,

17  high security.  And there is the United States Penitentiary

18  Administrative Maximum, which is a maximum security facility.

19  Q.  And the last institution that you referenced, is that

20  frequently referred to as the ADX or the Super Max?

21  A.  Yes, ma'am.

22  Q.  Could you briefly describe your career as it progressed

23  through the BOP down at the Florence complex.

24  A.  Yes, ma'am.  I started as an officer at the ADX in 1987.  I

25  was an officer for two years there.  Then I was a secretary for

Dee Dee McEvoy – Direct

1   11 months.  Then I was a case manager down at the camp, the

2   FCI, and back to the ADX for a few months as a case manager.  I

3   did that for a period of about 13 and a half years all

4   together.  And I was a unit manager at the FCI for a year.  And

5   I am presently the deputy case manager coordinator at the ADX

6   since last October.

7   Q.  I would like to show you what's been marked for

8   identification as Government Exhibit 10, which will pop up on

9   your screen or you should also have a exhibit book in front of

10  you if that doesn't appear.

11  A.  Okay.

12          THE COURT:  Ladies and Gentlemen of the Jury,

13  Ms. Preuitt-Parks is going to show you, there is screens that

14  are between most of the seats.  It's going to be a little bit

15  different for you, Mr. Neumeyer.  You will see a monitor that's

16  down on the floor.  If you wouldn't mind, Mr. Neumeyer, picking

17  that up and placing it so that you and Ms. Carper can see that.

18          Ladies and gentlemen, just a word about those

19  monitors, and that is until a piece of evidence has been

20  admitted, you won't be able to see it, okay?  So a witness may

21  be testifying about something that he or she is looking at on

22  the screen and your screen is just blank.  At the time that

23  it's been admitted, assuming that one side or the other

24  requests that the jury look at it, then it should appear on

25  your screen.

Dee Dee McEvoy – Direct

1          If for some reason your screen seems to be having some

2     type of a problem that's unrelated to whether it's been

3     admitted or not, let me know that and we will try to get that

4     technical problem corrected.

5          Go ahead, Ms. Covell.

6          MS. COVELL:  Thank you, Your Honor.

7     BY MS. COVELL:

8     Q.  Ms. McEvoy, directing your attention to what's marked as

9     Government Exhibit 10 for identification, could you please --

10    you have seen this before.

11    A.  Yes, ma'am.

12    Q.  Could you describe what it depicts?

13    A.  It's like looking up down towards the institution like a

14    bird's eye view.

15    Q.  Which institution?

16    A.  I am sorry, the ADX.

17    Q.  So is it fair to say that this is a diagram, a bird's eye

18    view of the ADX layout?

19    A.  Yes, ma'am.

20    Q.  Does it fairly and accurately reflect how the ADX is laid

21    out?

22    A.  Yes, ma'am.

23          MS. COVELL:  Your Honor, we would move Government

24    Exhibit 10 into evidence.

25          THE COURT:  Any objection to the admission of

Dee Dee McEvoy – Direct

1   Exhibit 10?

2           *MR. VARHOLAK:*  None, Your Honor.

3           *THE COURT:*  Government Exhibit 10 will be admitted.

4           *MS. COVELL:*  And we request permission to publish, to

5   the jury, Your Honor.

6           *THE COURT:*  You may.

7   *BY MS. COVELL:*

8   *Q.*  Ms. McEvoy, if you could, starting in the lower right-hand

9   corner, if you could describe for the jury what -- how the

10  layout of the facility is shown in this diagram.

11  *A.*  It starts where F Unit is and it goes F, E and D Unit.

12  Sorry, G Unit is the first in the right-hand corner.  Those are

13  our general population units.  And then you go around where it

14  says C Unit.  That's our special housing unit, plus the

15  overflow of inmates from the control unit.  The control unit is

16  B Unit, bravo unit.

17  *Q.*  Is that reflected on the far left side of the diagram?

18  *A.*  I don't see it on my page.

19  *Q.*  Well, it's cut off, but it's under sort of diagonally in

20  the left-hand -- lower left-hand corner, is that where the full

21  B Unit would be shown?

22  *A.*  Yes, where it says B-B.

23  *Q.*  And that's also referred to as the control unit?

24  *A.*  Yes, ma'am.

25  *Q.*  And then what about on the bottom edge?

Dee Dee McEvoy – Direct

1   A.   K Unit, that unit is vacant right now.  J Unit is our

2   step-down unit.  And H Unit is our special administrative

3   measures unit.

4   Q.   How many prisoners generally are housed within the entire

5   complex of the ADX?

6   A.   At the ADX there is approximately 419 inmates.

7   Q.   419?

8   A.   19, yes.

9   Q.   If you could just lean in a little bit to your microphone

10  or pull the microphone towards you.

11          Now, let's start with the control unit.  How is the

12  control unit run differently than the population units?

13  A.   The control unit has usually more of our violent disruptive

14  and escape risk inmates.  There are also more security measures

15  for that unit.

16  Q.   Is it fair to say that every cell no matter what unit you

17  are in within the ADX is a single cell in other words, you

18  don't have a cellmate?

19  A.   That's correct.

20  Q.   Describe what the special housing unit is about.

21  A.   That's for inmates who commit prohibitive acts.  They would

22  be removed from the general population unit into the special

23  housing unit.

24  Q.   Is that also referred to as the acronym SHU, S-H-U?

25  A.   Yes, ma'am.

Dee Dee McEvoy – Direct

1    Q.   The K Unit is empty, correct?

2    A.   Correct.

3    Q.   You referred to the J Unit as a step-down unit.  Can you

4    explain what a step-down unit is.

5    A.   It's the Bureau's goal to get inmates -- say they were in a

6    general population unit, to get them to step down into a

7    step-down unit where they have, for instance, more rec time,

8    more interactions with other inmates, to progress them through

9    the ADX to open facilities.

10   Q.   By open facilities, you mean a lower security unit than the

11   ADX?

12   A.   Yes, ma'am.

13   Q.   So in other words, the goal is not to house the inmates

14   there permanently, but if they follow certain behavior, codes

15   and programs, they can move out to a different facility; is

16   that correct?

17   A.   Yes, they could.

18   Q.   And then you referred to the H Unit as the Special

19   Administrative Measures Unit.  Is that also referred to as the

20   SAMS unit?

21   A.   Yes, it is.

22   Q.   Could you describe for the jury what that unit is.

23   A.   It's usually inmates that require more restriction like

24   mail monitoring, telephone monitoring.

25   Q.   And that's required by the Attorney General; is that

Dee Dee McEvoy – Direct

1  correct?

2  A.  Yes.

3  Q.  Now, directing your attention to what you referred to as

4  the four general population units, that would be D, E, F and G,

5  correct?

6  A.  Correct.

7  Q.  Is that the lowest security restrictions of any of the

8  units in the ADX?

9  A.  Yes.

10 Q.  Now, looking at -- let's take the D Unit as depicted in the

11 middle uppermost unit on that diagram.  Could you describe how

12 that is laid out for the members of the jury?

13 A.  The first stretch of the unit is where you would come in

14 the unit down towards the bottom I guess if you look at where

15 it says D-C and you go over to the left and you kind of see a

16 long line.

17 Q.  Now, I am going to indicate with my stylus on here, I am

18 going to ask you to identify what that is.

19 A.  Mine is not -- I don't have anything on my screen.

20 Q.  Is it appearing now?

21 A.  Yes.

22 Q.  The red circle I have drawn, could you identify what that

23 is on --

24 A.  They would refer to that as the bubble.  That is where the

25 officer that's in there controls all of the cells, the grill

Dee Dee McEvoy - Direct

1    doors and the cell doors in the unit.

2    *Q.*  And coming from the bubble, as you call it, there are --

3    *A.*  And those are the separate ranges.  The one to my left

4    where it says Delta Alpha, there is an upper and lower tier on

5    each range, so it would be like D1, D2.  And when you go Delta

6    bravo, then it would be B2, B3.  And then on the C range it

7    would be 4 -- I am sorry, yeah, 5 and 6 on C range.

8    *Q.*  So in the D Unit there are -- is it fair to summarize that

9    there are three ranges that each have an upper and lower unit,

10   so there is cells on the upper and lower level of each range.

11   And they are referred to on this diagram as range D-A, range

12   D-B and range D-C?

13   *A.*  Correct.

14   *Q.*  Are there cameras throughout the facility at the ADX?

15   *A.*  Yes, there are.

16   *Q.*  And if you -- now, you have a stylus.

17   *A.*  Okay.

18   *Q.*  If you see it up there.  Looking at the D-A range on that

19   diagram, do you know how many cameras are on the upper and

20   lower range?

21   *A.*  There is two cameras at each end of the range.  Right

22   here -- sorry, right here, and then on the back of the range.

23   *Q.*  Okay.  So I am going to erase your -- is the mark I am

24   making, is that the -- how you enter the range?

25   *A.*  Yes.

Dee Dee McEvoy - Direct

1    Q.   And then this mark, that's what we would refer to as the

2    end of the range?

3    A.   Yes.

4    Q.   And at each end of those there is a camera --

5    A.   Yes.

6    Q.   -- that records all activity?

7    A.   Yes.

8    Q.   Now, could you describe what the cells are like at the ADX.

9    A.   They have a bed, a toilet, a sink, a shelf for a TV, a

10   desk, a shower.

11   Q.   What are the doors like?

12   A.   There is two doors.  Inside towards the cell there is a

13   grill and it has bars on it like metal bars so you can see

14   through it.  It has a food slot.  And we refer to it as a food

15   slot so you can pass food trays or when they cuff inmates, they

16   use those food slots to put hand restraints on inmates.  And

17   then the outer grill door is a metal door, it's a full metal

18   door with a window.  And it also has a food slot that locks and

19   unlocks and it's also metal.

20   Q.   Okay.  Now, I am going to show you what's been marked for

21   identification as Government Exhibit 15.  Have you seen this

22   diagram before?

23   A.   Yes, ma'am.

24   Q.   And could you describe what it depicts?

25   A.   That's an inmate's cell at ADX.

Dee Dee McEvoy – Direct

1   Q.  And that's a typical cell that's found throughout the

2   institution?

3   A.  Yes, ma'am.

4   Q.  Does it fairly and accurately depict how these cells are

5   set up?

6   A.  Yes, ma'am.

7          MS. COVELL:  At this time we would move Government

8   Exhibit 15.

9          THE COURT:  Any objection to the admission of

10  Government Exhibit 15?

11         MR. VARHOLAK:  None, Your Honor.  Thank you.

12         THE COURT:  Exhibit 15 will be admitted.

13         MS. COVELL:  Request permission to publish, Your

14  Honor.

15         THE COURT:  You may.

16  BY MS. COVELL:

17  Q.  Now, Ms. McEvoy, directing your attention to the lower end

18  of the diagram, could you describe what is shown right there in

19  the bottom left corner?

20  A.  The sallyport of the cell.

21  Q.  Okay.  Do you see the word Sallyport?

22  A.  Yes.

23  Q.  Could you describe what that is?

24  A.  That's between the two grills in the cell.

25  Q.  So the sallyport we described in the front -- let's refer

Dee Dee McEvoy – Direct

1   for ease of reference as the first door is the steel door,

2   correct?

3   A.  Correct.

4   Q.  And that doesn't have any bars; is that right?

5   A.  Correct.

6   Q.  Then there is the second door you referred to the grill and

7   that has bars, right?

8   A.  Yes.

9   Q.  The area in between that is what you refer to as the

10  sallyport?

11  A.  Yes, ma'am.

12  Q.  You see the dimensions that are written on that diagram?

13  A.  Yes.

14  Q.  Does that fairly reflect the size?

15  A.  Yes, it does.

16  Q.  And then it appears from this diagram that this diagram is

17  drawn when both doors, the outer steel door and the grill, are

18  open, correct?

19  A.  Yes, ma'am.

20  Q.  And what direction do they open?  In other words, do they

21  slide or do they open like a typical door?

22  A.  No, they slide.

23  Q.  So in this exhibit, and I am looking particularly right

24  here, that is the door of the grill that is slid to the right

25  to open, correct?

39

Dee Dee McEvoy – Direct

1   A.   Yes.

2   Q.   Now, could you identify where the bed is?

3   A.   It's to the back right on the diagram.

4   Q.   And to the left of that is what?

5   A.   The shower.

6   Q.   And then in the right corner when you first walk into the

7   right, would that be the toilet and the sink?

8   A.   Yes, ma'am.

9   Q.   Does each cell also have a desk and a seat?

10  A.   Yes.

11  Q.   And what are those made out of?

12  A.   Concrete.

13  Q.   You will see at the very bottom of the diagram it says Cuff

14  Slots.  Can you describe what those are?

15  A.   Those are what I told you earlier, like the food slot where

16  inmates can put their hands through so that staff can put

17  restraints on the inmates.  And they are also used to put the

18  food tray, give the food tray to the inmate.

19  Q.   And from your experience, are you familiar with how the

20  food trays, the meals are delivered to the inmates in the ADX?

21  A.   Yeah.  At that time they would open the grill, the door

22  closest to the inmate's cell.  They would slide that one.  For

23  instance, this one would slide to the right.  The inmate would

24  come out into the sallyport.  The staff member would unlock the

25  food slot or cuff slot on the full metal door.  The inmate

1   would receive his tray, go back in his cell, and the bubble

2   officer would close the grill.

3   Q.  So when meals are being delivered, the first steel door

4   with only a food slot in it does not open; is that correct?

5   A.  No, not at that time, that's correct.

6   Q.  So the only door that would open, then, would be the grill

7   so that gives the inmate access from his cell to go to the

8   closed steel door, retrieve the tray from the food slot.  And

9   then the idea is that the inmate would go back in and the grill

10  would shut, correct?

11  A.  Yes.

12  Q.  Now, I would like to turn your attention to the events of

13  September 11, 2013.  Were you working that day?

14  A.  Yes, I was.

15  Q.  What was your job title then?

16  A.  Case manager.

17  Q.  Could you describe for us what are the duties of a case

18  manager?

19  A.  We conduct program reviews with inmates usually every six

20  months unless there is posted a release, then it's every three

21  months.  At those reviews you encourage inmates to take

22  programs, pay on their fine.  If they are closer to release,

23  talk to them about release preparation, prepare halfway house

24  packets for them, those sort of things.

25  Q.  As of September 11, 2013, how long had you been a case

Dee Dee McEvoy – Direct

1   manager prior to that?

2   *A.*  I had only been at the ADX for three months.  I had been a

3   case manager for over 13 years at that time.

4   *Q.*  Now, are you familiar with an inmate from the ADX during

5   that time by the name of Ishmael Petty?

6   *A.*  Yes, ma'am.

7   *Q.*  And do you see him in the courtroom today?

8   *A.*  Yes, ma'am.  He is right here to my right in a blue shirt.

9            *MS. COVELL:*  May the Court reflect an in-court

10   identification of the defendant?

11            *THE COURT:*  It shall.

12   *BY MS. COVELL:*

13   *Q.*  Prior to September 11, 2013, had you ever had any

14   interaction with Mr. Petty?

15   *A.*  No, I had not.  I had not even had a conversation with him.

16   *Q.*  What shift were you working that day?

17   *A.*  I was on a compressed schedule, so I was working 6:30 to

18   5:00.

19   *Q.*  6:30 a.m.?

20   *A.*  Yes, ma'am.

21   *Q.*  To 5:00 p.m.?

22   *A.*  Yes, ma'am.

23   *Q.*  And did you start your day right at 6:30?

24   *A.*  Yeah, yes.  I was in my office at that time.

25   *Q.*  And how did you go about starting off your day?

Dee Dee McEvoy – Direct

1   A.  We had a new secretary coming to the institution that day,

2   so I was going to start my rounds early so I could go down and

3   meet her at a morning meeting that we had prior to that.

4   Q.  And what unit did you report to first to do your rounds?

5   A.  Delta Unit, Range D-1.

6   Q.  Was there anyone else you encountered when you went about

7   to do your rounds?

8   A.  Yeah.  When I went down to do my rounds, Mr. Smith and

9   Ms. Smith from education were beginning their rounds at the

10  same time.

11  Q.  And was this shortly after you reported to work at

12  6:30 a.m. on September 11?

13  A.  Approximately, 7:00 a.m.

14  Q.  You said Mr. Smith.  Ralph Smith and Brianne Smith?

15  A.  Yes, ma'am.

16  Q.  And what job did they hold on that day?

17  A.  They were -- they worked for education.

18  Q.  What -- were they called educational techs?

19  A.  Yes.

20  Q.  What do educational techs do within the ADX?

21  A.  They deliver books to the inmates.  That's one of their

22  duties.

23  Q.  Now, as you walked to the D-1 unit, you would refer, then,

24  that would be the lower unit on the D-A range; is that correct?

25  A.  Yes, it is.

Dee Dee McEvoy – Direct

1    Q.   Do you know how many cells were on that --

2    A.   Eight.

3    Q.   -- range?  Eight?  Could you describe layout of that range

4    in terms of how the cells were oriented.

5    A.   When you go down the range, the cells are on your right

6    side of the -- of that range.  And there is recreation cages on

7    the left side and the law library.

8    Q.   So what happened when you met up with Mr. Smith?  I will

9    say Ralph Smith and Brianne Smith.

10   A.   We just started to go walk down the range.

11   Q.   And what's your usual practice when you are doing your

12   rounds on the range?

13   A.   You walk to the end of the range and then walk back and

14   address issues with inmates if they have them.

15   Q.   Is that what you did that day?

16   A.   Yes, ma'am.

17   Q.   Could you tell us what happened after you started to make

18   your rounds on the D-A range?

19   A.   We walked down the range together, went to the end of the

20   range and then started walking back down.

21   Q.   And were you all walking together or at some point did you

22   separate from Ralph Smith and Brianne Smith?

23   A.   Yeah, at some point we separated.  I walked around and

24   continued down the range.

25   Q.   And what were they doing?

Dee Dee McEvoy - Direct

1   A.   Handing out books.

2   Q.   And how is it they were handing out those books, the

3   procedure?

4   A.   One of them would call for the door to be opened and then

5   the other one would hand the inmate his book or set it in the

6   grill.

7           THE COURT:  Ms. Covell, it's almost noon, so do you

8   want to look for an appropriate spot to break for lunch?

9           MS. COVELL:  I think we can break right here, Your

10  Honor.

11          THE COURT:  Okay.  Ladies and gentlemen, then at this

12  time we are going to have our lunch break.  So

13  Ms. Preuitt-Parks will show you the jury room that I mentioned

14  to you before.  We are going to go ahead and take an hour and a

15  half lunch.  That way it will give you time to have her get you

16  those key cards and also that way, assuming that you didn't

17  bring lunch, it will also give you an opportunity to go across

18  the street and find something for lunch and then get back

19  through.

20          It's unlikely that the security line will be -- I am

21  not sure how much of a line that you encountered when you came

22  back in, but there could be some other hearings.  I am not sure

23  if there are any other trials that are going to reconvene at

24  1:30 too.  So you might want to plan on perhaps it taking you a

25  little bit of time to go through security.

Dee Dee McEvoy – Direct

1      You may have a second line open over on the left-hand

2   side when you come back into the courthouse that would be just

3   for jurors that would expedite your ability to get back in, so

4   you might want to look for that just in case there is a line.

5      And otherwise, keep all those admonitions that I gave

6   you in mind.  Keep those juror buttons visible.  And at this

7   time the jury is excused for the lunch break to reconvene at

8   1:30.

9      (Jury excused.)

10      Please be seated.

11      Ms. McEvoy, you can step-down.  Thank you.

12      Mr. Burgi passed out a copy of the Court's draft

13   instructions.  Those -- that's just a draft, so it is kind of

14   what we will be working from at the beginning.  If you have a

15   chance to take a look at them over the lunch hour, why don't we

16   do this.  Why don't we plan on reconvening at 1:25 just for the

17   purposes of seeing how many instructions there may be

18   objections to or that you want to discuss so that we can

19   perhaps better gauge how much time it will take us to go over

20   the instructions, all right?

21      Ms. Covell, anything else on behalf of the United

22   States before we break for lunch?

23      *MS. COVELL:*  No, Your Honor.

24      *THE COURT:*  All right.  Mr. Varholak, anything else on

25   behalf of Mr. Petty?

1          MR. VARHOLAK:  No, thank you, Your Honor.

2          THE COURT:  Then we will be in recess until 1:25.

3    Thank you.

4       (Recess at 12:00 p.m.)

5       (Reconvened at 1:25 p.m.)

6          THE COURT:  We are here today back on the record in

7    the Petty matter.  The jury is not present.  Ms. Covell, did

8    you have an opportunity to take a look at the jury

9    instructions?

10          MS. COVELL:  I have, Your Honor.

11          THE COURT:  Does the government have some instructions

12    that it wants to discuss or to which there is an objection?

13          MS. COVELL:  No, Your Honor.  They look fine to us.

14          THE COURT:  Okay.  And Mr. Varholak, have you had a

15    chance to review the jury instructions as well?

16          MR. VARHOLAK:  I have, Your Honor, yes.

17          THE COURT:  And are there some instructions that you

18    want to discuss, once again not now, but later, and also

19    perhaps which you have an objection to?

20          MR. VARHOLAK:  I think the only one -- I am just

21    double-checking now.  I think the only one would be No. 3,

22    which is the Court's burden of proof, and that's the only one.

23    The remaining I have no objection.

24          THE COURT:  So I think we would be able to do our

25    final jury instruction conference fast.

Dee Dee McEvoy - Direct

1          MR. VARHOLAK:  I agree.

2          THE COURT:  So I just wanted to check on that for

3    purposes of planning.

4          All right.  Ms. Covell, is the United States ready to

5    bring the jury back in?

6          MS. COVELL:  We are, Your Honor.

7          THE COURT:  Mr. Varholak, is Mr. Petty ready for the

8    jury?

9          MR. VARHOLAK:  Yes, Your Honor.

10          THE COURT:  Let's go ahead and bring the jury back in.

11          (Jury present:)

12          THE COURT:  All right, Ms. Covell.  You may continue.

13          MS. COVELL:  Thank you, Your Honor.

14    BY MS. COVELL:

15    Q.  Good afternoon, Ms. McEvoy.

16    A.  Hi.

17    Q.  When we broke, I think you were about to describe how

18    Mr. Smith and Ms. Smith were in the process of handing out the

19    books.  And before we get exactly to that, I think previously

20    you described the procedure for how the food was delivered

21    through the food slots in which the doors opened, correct?

22    A.  Correct.

23    Q.  And I think I neglected to ask you -- you described it --

24    the steel door, outer door, would stay closed, but the inner

25    door would slide open.  The inmate would walk forward, take the

Dee Dee McEvoy – Direct

1   food and then walk back into his cell, correct?

2   A.   Correct.

3   Q.   What point in that process was the inner grill then

4   supposed to be closed?

5   A.   When the inmate went back into his cell.

6   Q.   And how would the officer, the correctional officer who is

7   delivering the food, know that they went back into their cell?

8   A.   They would observe the inmate going back to his cell and

9   then they could signal for the bubble officer to close the

10  grill.

11  Q.   Now, I notice you just held up your right hand sort of as

12  if you were saying hello.  Is that a movement that the officers

13  use to signal to the bubble officer to close the door?

14  A.   Yes, I think they do sometimes.

15  Q.   Now, when the educational techs on Wednesdays are

16  delivering books, do they follow that same procedure?

17  A.   Yes, they do.  They open -- they signal for the outer door

18  to be open and then the inner door would stay closed.  They

19  signal for the outer door to be open and then give the book to

20  the inmate.

21  Q.   Through the food slot in the grill?

22  A.   No.  They would signal for the outer door to be completely

23  open, give the book to the inmate, and then you signal for the

24  door to be closed.

25  Q.   Right.  What I am asking is when they signal for the outer

Dee Dee McEvoy - Direct

1    door to be open, which is different than how the food service

2    worked back then, they would then have to step into the

3    sallyport and stick the books through the slot in the grill,

4    correct?

5    A.   Correct.

6    Q.   And then they would step out and signal for the outer door

7    to be closed again?

8    A.   Correct.

9    Q.   And from your observation on September 11, 2013, is that

10   the procedure that Brianne Smith and Ralph Smith were

11   following?

12   A.   Correct.

13   Q.   Could you describe -- you said you went around them when we

14   broke and walked a little bit ahead of them.  Could you tell us

15   what happened after you did that?

16   A.   We all three walked to the end of the range and then they

17   stopped at the second cell, so I walked around them and I kept

18   going.  And then Inmate Jones -- I looked in Inmate Jones'

19   cell.  He was standing in his cell.  He didn't say anything.  I

20   kept walking.  He called me back and he was telling me about

21   his TV being broke.

22   Q.   Where was Inmate Jones' cell in relation to where Inmate

23   Petty's cell was?

24   A.   It would have been to the right of his cell.

25   Q.   Next door to each other?

Dee Dee McEvoy – Direct

1   A.   Yes, next door.

2   Q.   And then what happened after you spoke to Inmate Jones?

3   A.   When I was speaking to Inmate Jones, I believe I heard

4   Ms. Smith call for a door on the radio or on the radio for the

5   bubble to open the door.   And when I was speaking to Inmate

6   Jones, I heard a bunch of commotion behind me.   So I turned

7   over my right -- turned over to my right shoulder and I saw

8   Inmate Petty out on the range.

9   Q.   Now, did that surprise you?

10  A.   Yeah.  I was shocked.

11  Q.   And I am sorry, I think just to correct the record, I think

12  you testified unless I wrote it down incorrectly that you

13  started at the BOP in 1987?

14  A.   I said '87.  I started in '97, sorry.

15  Q.   So in your almost 18 years, had you ever seen an inmate

16  loose like that on the range?

17  A.   No, never.

18  Q.   If you let me finish just so that we don't talk over each

19  other.

20  A.   Okay.

21  Q.   Had you ever seen an inmate loose on the range like that in

22  your tenure at the ADX?

23  A.   No, ma'am.

24  Q.   What did you do when you saw that?

25  A.   When I saw Inmate Petty, he had something on him that -- it

Dee Dee McEvoy – Direct

 1  was white.  And when I -- the officers used to have vests that

 2  were white and that's what it reminded me of.  So when I turned

 3  around and saw him, he was attacking Mr. Smith and he was just,

 4  you know, striking him in a vigorous aggressive motion.

 5          And when I saw him, I turned around and Mr. Smith's

 6  head was at this end and Inmate Petty was leaning over him, and

 7  he just kept striking him, striking him, striking him.  So I

 8  took my baton, which I had in my hand, and I started hitting

 9  Inmate Petty with it over and over and over to try to get him

10  to stop.  And at that time I was screaming, "Stop it.  Stop it.

11  Stop it."  And I didn't know at that time that Ms. Smith had

12  hot sauce in her eyes because --

13          *MR. VARHOLAK:*  Objection, Your Honor, basis and

14  knowledge.

15          *THE COURT:*  Response?

16          *MS. COVELL:*  I will interrupt right here and ask a

17  question a little more directly.

18  *BY MS. COVELL:*

19  *Q.*  When you turned around and saw the commotion, you said you

20  saw Mr. Smith's head down here.  What are you referring to?  Is

21  he upright or is he on the ground?

22  *A.*  No, he was laying on the ground.

23  *Q.*  Were you able to see where Brianne Smith was?

24  *A.*  No, I could not see her.

25  *Q.*  And were aware of whether Ralph Smith was also equipped

Dee Dee McEvoy – Direct

1    with a baton like you?

2    A.   I believe he did have a baton.

3    Q.   Now, after you are -- you said you are trying to strike

4    Inmate Petty with the baton, correct?

5    A.   Correct.

6    Q.   Was it having any -- seemingly any effect on him?

7    A.   No.

8    Q.   And what happened after that, after you struck Mr. Petty?

9    A.   I kept hitting him, hitting him, and I believe he pushed me

10   down.  And I believe when he pushed me down, I lost my baton.

11   So I got back up and at that time he is leaning over Mr. Smith

12   and I try to pull him off of him.

13   Q.   Pull Inmate Petty off of Ralph Smith?

14   A.   Yes, ma'am.

15   Q.   Were you successful?

16   A.   No, I didn't pull him off.  At that time then, you know, we

17   were a little bit further down the range closer to the end of

18   the range and then he come after me.

19   Q.   And if you don't mind me asking, how tall are you?

20   A.   Five-three.

21   Q.   Were you able to assess the size of Inmate Petty?

22   A.   I would guess five -- or six-three, six-four at least.

23   Q.   And how would you describe his build?

24   A.   Big.

25   Q.   And during the course of this where he knocks you down, you

Dee Dee McEvoy - Direct

1  get back up, you are trying to pull him off, do you ever see

2  Brianne Smith?

3  A.  No, I didn't -- not when I pulled -- tried to pull Inmate

4  Petty off.  I didn't see him, so I was screaming at her.  I was

5  assuming she froze up, so I am yelling at her too, "Call for

6  her.  Call for help.  Call for help."  And then after I pulled

7  him off, Petty faced me and he had -- I don't know if it was my

8  baton or Mr. Smith's baton in his hand.  And he has the baton

9  in his hand and he is waving it towards me.  And I don't know

10  if he strikes me once or twice at that time.

11        And then he kept going after Mr. Smith.  At that time

12  he had the baton and he was striking him, striking him,

13  striking him.  And I just kept trying to engage him to get him

14  off Mr. Smith.

15  Q.  Was Mr. Smith reacting in any way or did he seem -- I am

16  sorry, did he react in any way?

17  A.  Yeah.  At first he was kind of putting his arm up and he

18  was trying to defend himself.  And I think when he was on his

19  back, he was moving, you know, down the range, you know, kind

20  of pushing his feet to move down the range to get away from him

21  and block him.

22  Q.  And as correctional officers, are you armed in a sense of

23  does anybody in ADX carry a firearm?

24  A.  No, ma'am.

25  Q.  What is the only weapon that you have on your person when

Dee Dee McEvoy - Direct

1    you are making your rounds?

2    *A.*  At that time we only had the batons.

3    *Q.*  And you mentioned a radio.  You also care carry a radio?

4    *A.*  Yes, ma'am.

5    *Q.*  What does the radio connect to?

6    *A.*  Depending on what channel you are on, it could connect to

7    the bubble officer or the main control officer which would go

8    over Channel 1.

9    *Q.*  At some point did you use a radio to call for help?

10   *A.*  Yeah.  After -- after it went on for a little bit, me and

11   Ms. Smith ended up by each other.  And I reached around with my

12   right hand -- she had her radio on her right side.  And I

13   reached around and I pulled off her radio and I said, "Staff

14   needs assistance.  Staff needs assistance."And at that time I

15   believe that's when Inmate Petty engaged me again and he hit me

16   with the baton and knocked the radio out of my hand.

17   *Q.*  And are you familiar with the phrase triple deuces?

18   *A.*  Yes.

19   *Q.*  Can you describe to the jury what that means?

20   *A.*  It's a method to call for assistance.  You dial 222 on the

21   phone.  It alerts the main control that you need assistance.

22   *Q.*  Did anyone come to your assistance?

23   *A.*  Yeah.  Finally the two officers in the unit came to the

24   grill.  Officer Cox came to the grill and he yelled at Inmate

25   Petty, "Get in your cell.  Get in your cell."

Dee Dee McEvoy – Direct

1    Q.  And if I can interrupt you, you are referring to the grill.

2    Is this a different grill than the grill that we are

3    referencing in the inmate cells?

4    A.  Yes, ma'am.  It's the grill at the end of the range, but

5    it's like the inner grill in our cells where it has bars on it

6    and you can see through it.

7    Q.  And that's -- was that the same grill that you had to be

8    opened in order for you and Mr. Smith and Ms. Smith to walk

9    onto the range?

10   A.  Yes.

11   Q.  Then it would have been closed behind you?

12   A.  Yes.

13   Q.  Now, you said one of the officers came down the range,

14   correct?

15   A.  Yeah.  At first he was yelling at Inmate Petty waiting for

16   the grill to be opened.

17   Q.  And that would be controlled by the bubble officer?

18   A.  Yes, ma'am.

19   Q.  Did that grill opening to the range ultimately open?

20   A.  Yes.

21   Q.  And what happened then?

22   A.  When Officer Cox told Inmate Petty to go into his cell, he

23   went in his cell.  And Officer Cox came on the range and Inmate

24   Petty ran out of his cell, grabbed something off the floor, and

25   went back in his cell.

Dee Dee McEvoy – Direct

1    Q.   And where did Officer Cox go?

2    A.   Officer Cox put -- because by that time we were at the end

3    of the range, he put himself between us and Inmate Petty and he

4    was at Inmate Petty's door.

5    Q.   Is Officer Cox a relatively young officer?

6    A.   Yes, ma'am.

7    Q.   And could you describe his size in relation to Mr. Petty?

8    A.   I would guess he is six-one, six-two.

9    Q.   So significantly bigger than you?

10   A.   Yes.

11   Q.   Okay.  Then did anyone else come to your assistance?

12   A.   Not at that time.

13   Q.   How much longer before others came to assist you?

14   A.   I don't know exactly what the time frame was.  I mean, they

15   came relatively quickly after Officer Cox got there.

16   Q.   And after you saw Inmate Petty go in the cell and then come

17   back and grab something and go back in the second time, did you

18   ever see him come out of his cell again?

19   A.   No, I did not.

20   Q.   Now, was this assault captured on the video cameras that

21   were on that range that day?

22   A.   Yes, it was.

23   Q.   And I am going to show you what's been marked for

24   identification as Government Exhibit 1, which is the video of

25   that assault from one of the cameras.  Have you reviewed that

Dee Dee McEvoy - Direct

1   Government Exhibit 1?

2   *A.*   Yes, I have.

3   *Q.*   And does this video fairly and accurately portray the

4   events that occurred in the range at approximately 7:00 a.m.

5   that morning?

6   *A.*   Yes, it does.

7   *Q.*   And I am going to play the first -- okay.  If you could

8   just stop it there, please.  Thank you, Ms. Ortiz.

9           Do you see in the bottom left-hand corner a date and

10  time stamp?

11  *A.*   Yes.

12  *Q.*   Could you tell us what they say?

13  *A.*   9/11/2013, 6:59 and 27 seconds a.m.

14  *Q.*   In the upper left corner can you describe what those words

15  mean?

16  *A.*   It's D-1 range, meaning it's the Delta unit range, A range,

17  lower range on the bottom.

18  *Q.*   And it says "far" on that.  Does this reference the camera

19  that's at what I will refer to the end of the range as opposed

20  to the side that opens with the grill?

21  *A.*   Yes, ma'am.

22          *MS. COVELL:*  Your Honor, at this point I would move

23  Government Exhibit 1 into evidence and ask permission to

24  publish to the jury.

25          *THE COURT:*  First of all, in terms of its admission,

Dee Dee McEvoy – Direct

1    any objection to the admission of Government Exhibit 1?

2              MR. VARHOLAK:  May I voir dire on that issue, Your

3    Honor?

4              THE COURT:  You may.

5              MR. VARHOLAK:  Thank you.

6                       VOIR DIRE EXAMINATION

7    BY MR. VARHOLAK:

8    Q.  Good afternoon.  It sounds like this whole event happened

9    quite quickly; is that accurate?

10   A.  Yes it, did.

11   Q.  And when you began, you said you were on the next cell, I

12   believe, speaking to Mr. Jones, correct?

13   A.  Correct.

14   Q.  And the next thing that you hear is you think one of the

15   individuals saying, "Open the door, open the cell door,"

16   something like that, correct?

17   A.  I heard Ms. Smith, I believe, call for the door to be

18   opened.

19   Q.  And then in the next thing after that is a commotion that

20   you hear, right?

21   A.  Yes.

22   Q.  And then you said the next thing is you believe you see

23   Mr. Petty out of his cell at that point; is that right?

24   A.  Yes.

25   Q.  You said you reviewed this video.

Dee Dee McEvoy - Direct

1    A.   Correct.

2    Q.   The video begins before you turn around to see, right?

3    A.   Okay.

4    Q.   Is that true?

5    A.   Yes.

6    Q.   So you can't confirm the beginning of that video because

7    you didn't see that part; is that accurate?

8    A.   Can you -- I don't understand the question.

9    Q.   The beginning, the very beginning of this video, you can't

10   confirm or deny the accuracy of that because you didn't see

11   that part.

12   A.   The accuracy that she called for the door to be opened?

13   Q.   Just if you look at the very beginning of this video, that

14   begins while you are still at Inmate Jones' cell, correct?

15   A.   Correct.

16            MS. COVELL:   Your Honor, that's actually -- that's

17   not -- the video does not start there.   It starts when she gets

18   on the range and shows her walking down range.

19            THE COURT:   Well, you can say that, but you need to

20   lay the foundation for that.

21            Go ahead, Mr. Varholak.

22   BY MR. VARHOLAK:

23   Q.   There is at least a portion of the video that is showing

24   what is happening in this range that you are not watching

25   what's happening in that range, correct?

Dee Dee McEvoy – Direct

1  A.  Correct.

2  Q.  And you weren't involved in the retrieval of this video,

3  were you?

4  A.  No.

5          THE COURT:  Any objection on the admission of

6  Exhibit 1?

7          MR. VARHOLAK:  I do, Your Honor.  She can't confirm

8  the entire accuracy or inaccuracy of the video because she

9  wasn't watching all of it.  She was talking to Mr. Jones during

10 a portion of this, so she can't identify whether or not

11 portions of this video accurately reflect what happened on that

12 day or don't accurately reflect what happened on that day.

13 Since she wasn't the one to retrieve the video or was involved

14 in the recording of the video, I object to its admission.

15         THE COURT:  Response?

16         MS. COVELL:  Your Honor, this video starts slightly

17 before 7:00 a.m. and it shows Ms. McEvoy walking, entering the

18 range and coming down.  The whole time it depicts her movements

19 in there.  She is never off the screen.  There are other things

20 happening that were within a distance of 2 feet from her, so

21 obviously she is not going to have seen everything that

22 happened right the second she turned.

23         However, we have a second witness, Brianne Smith, who

24 is going to be testifying, and she can attest to the accuracy

25 of that portion of the video because she was the one that

Dee Dee McEvoy – Direct

1  experienced it.

2          THE COURT:  Which portion?

3          MS. COVELL:  What happens is Ms. Smith calls for

4  Mr. Petty's door to slide open.  And as she steps in, Mr. Petty

5  throws hot sauce in her face.  And you can see when that's

6  happening that Ms. McEvoy is literally touching distance away

7  from her.  And that's when the commotion starts that directs

8  her attention.

9          So we are talking about a span of a second or two that

10  Ms. McEvoy did not see what occurred.  I would submit that

11  there is nothing to suggest that this is not a reliable copy of

12  the video that was recording at the time and to admit it

13  subject to connecting that part up when Ms. Smith testifies

14  about that 2-second portion that Ms. McEvoy did not see.

15          THE COURT:  Mr. Varholak, anything else?

16          MR. VARHOLAK:  Nothing.

17          THE COURT:  The objection will be overruled.  I will

18  conditionally admit those couple of seconds that Ms. McEvoy may

19  not be able to have observed.  However, given the government's

20  representation that Ms. Smith will be able to lay the

21  appropriate foundation for those few seconds, I will allow in

22  the entirety of Government Exhibit 1 at this time and the

23  United States may have permission to play it at this time.

24          MS. COVELL:  Thank you, Your Honor.

25  BY MS. COVELL:

Dee Dee McEvoy – Direct

1    Q.  Ms. McEvoy, I am going to in a second play this whole video

2    from start to finish.  It takes about four and a half minutes.

3    And then I am going to go back and ask you to identify some

4    individuals in this and some items of things that happened,

5    okay?

6          At this point we will play Government Exhibit 1,

7    please.

8          (Videotape was played.)

9    BY MS. COVELL:

10   Q.  Okay, Ms. McEvoy.  I am going to play this one more time

11   and pause it at a few points for you to explain what was

12   happening and who the individuals pictured are.

13         First I would like to stop it at 6:59 and 49 seconds,

14   please.

15         Okay.  Could you identify -- can you explain to the

16   jury what the little red squares or rectangles that pop up all

17   over the video are?

18   A.  It detects movement.

19   Q.  That was nothing that was put on by us after the event,

20   correct?

21   A.  Correct.

22   Q.  Now, in the lower right-hand corner there is a red

23   rectangle around somebody.  Who is that?

24   A.  That's me.

25   Q.  And what is the item that's sticking out sort of underneath

Dee Dee McEvoy – Direct

1    your left arm?

2    A.   That's my baton.

3    Q.   And could you then identify who the other two individuals

4    are?

5    A.   Ms. Smith is the one closest to me and Mr. Smith is the one

6    in the back with the lighter blue shirt on.

7    Q.   And I think on your earlier testimony you said that the

8    inmate cells were on one side of the range and the rec cage and

9    the law library were on the other side, correct?

10   A.   Correct.

11   Q.   Could you point out which side in the view that we are

12   looking at, on which side are the inmates' cells?

13   A.   The left.

14   Q.   So that would mean the rec and the law library are on the

15   right?

16   A.   Correct.

17   Q.   If you could proceed on and stop, please, at 6:59:57.  You

18   see that one of the doors -- there was a movement.  Could you

19   describe what that was?

20   A.   That was the outer grill opening.

21   Q.   And when you say the outer grill, you mean the outer steel

22   door, correct?

23   A.   The steel door, correct.

24   Q.   Not the door with bars.

25   A.   Correct.

Dee Dee McEvoy – Direct

1   Q.  And in this instance if you are looking at the bottom

2   right-hand corner, this would be the first cell on that range

3   at the far end, correct?

4   A.  Correct.

5   Q.  And then this would be Cell 107, the second cell?

6   A.  Correct.

7   Q.  And the one right next to it would be 106, which was Inmate

8   Petty's cell that day?

9   A.  Correct.

10  Q.  If we could continue on to 7 minutes and 3 seconds.

11          That movement that Ms. Brianne Smith just did, do you

12  know what that is?

13  A.  She was waving her arm at the bubble officer to close the

14  door.

15  Q.  And is it fair so say that the bubble officer is -- you

16  can't see it in this video, but would be situated at the end --

17  on the other side of the grill?

18  A.  Yes.

19          MS. COVELL:  And if we could play to 7 minutes and 18

20  seconds, please.  I am sorry, 7:00 a.m. and 18 seconds.

21  BY MS. COVELL:

22  Q.  And who is the person that came out wearing the white on

23  top and the khaki on the bottom?

24  A.  Inmate Petty.

25          MS. COVELL:  If you could continue for five seconds to

Dee Dee McEvoy – Direct

1   23, please.

2   *BY MS. COVELL:*

3   *Q.*   Now, it looks like there is two individuals on the ground.

4   Could you identify who that is?

5   *A.*   I am to the left and Mr. Smith is to the right on the

6   ground.

7   *Q.*   And is this the point in your testimony where you said that

8   Inmate Petty knocked you down?

9   *A.*   Yes, ma'am.

10          *MS. COVELL:*   And if you could resume to 7, 41 seconds

11   please.

12   *BY MS. COVELL:*

13   *Q.*   Okay, right there.   What was that you were picking up?

14   *A.*   I believe that was my radio.

15   *Q.*   And it's at that point when you -- was it before then or

16   right then that you radioed for assistance?

17   *A.*   It was before then.

18   *Q.*   But that's when you believe that got knocked out of your

19   hand in the assault?

20   *A.*   Yes, I do.

21          *MS. COVELL:*   If we could continue on to 7:01:01.

22   *BY MS. COVELL:*

23   *Q.*   Okay.   The individual that just ran down the range and

24   stepped in front of Inmate Petty's cell, who was that?

25   *A.*   Officer Cox.

Dee Dee McEvoy – Direct

1      MS. COVELL:  If we could continue on to 7:01:53,

2   please.

3   BY MS. COVELL:

4   Q.  Okay.  Now, directing your attention to the grill entrance

5   of the range, do you see that movement up there?  Could you

6   tell us what that is?

7   A.  It's staff responding.

8      MS. COVELL:  And if we continue on to 7:02 and 20

9   seconds, please.

10  BY MS. COVELL:

11  Q.  Are these all correctional officers responding?

12  A.  Not all correctional officers.  It's correctional staff.

13  The captain is right there.

14  Q.  And right there if we stop at 7:02:15, you saw one of the

15  gentlemen took off his BOP blue shirt.  Did you see what they

16  did with that shirt?

17  A.  Yeah.  Ms. Smith was asking for someone to give her a shirt

18  or a jacket to put around Mr. Smith's head because he was

19  bleeding so bad.

20  Q.  And at this point did you know if Mr. Smith was conscious?

21  A.  He was just kind of moaning and kind of moving back and

22  forth.

23     MS. COVELL:  And we will continue on to 7:04 and 30

24  seconds, please.  If you could keep it going until 7:04,

25  please.

Dee Dee McEvoy – Direct

 1   *BY MS. COVELL:*

 2   *Q.*   While we are waiting, were you aware at this point whether

 3   you had been injured?

 4   *A.*   Yes.

 5   *Q.*   Were you also aware at this point that the meals had

 6   already been delivered that morning to the inmates on that

 7   range?

 8   *A.*   Yes.

 9   *Q.*   If we could stop right here.  Can you identify what's

10   happening here?

11   *A.*   Staff are putting Mr. Smith on the stretcher.

12   *Q.*   And the gentleman to the left in the white shirt, the

13   second one in, is that Warden Berkebile?

14   *A.*   Yes.

15   *Q.*   Was he the warden of the whole entire complex?

16   *A.*   Yes.

17        MS. COVELL:  If we could continue on to 7:04 and 38

18   seconds, please.

19   *BY MS. COVELL:*

20   *Q.*   And can you identify what I have circled on the screen in

21   the bottom right-hand corner?

22   *A.*   That's blood.

23   *Q.*   Do you know who that came from?

24   *A.*   From Mr. Smith.

25   *Q.*   And when you were seeing this happen, how badly do you

Dee Dee McEvoy - Direct

1    believe that Mr. Smith was injured?

2    A.   I thought he possibly could have been killed.

3    Q.   I am going to show you what's been marked for

4    identification as Government Exhibit 2, which is another video

5    taken that morning from the -- you said there were two cameras

6    on the range, correct?

7    A.   Correct.

8    Q.   And Government Exhibit 2 is the video from the other end of

9    the range, in other words, what you referred to as the grill,

10   the way you get onto the range, correct?

11   A.   Correct.

12   Q.   And you have reviewed that video?

13   A.   Yes.

14   Q.   And you see the time and date stamp on that?

15   A.   Yes.

16   Q.   Could you tell us what it says?

17   A.   9/11/2013, 6:59 and 30 seconds a.m.

18   Q.   At the top it also says D1- range like the previous one,

19   correct?

20   A.   Correct.

21   Q.   But this one says "Close," correct?

22   A.   Correct.

23   Q.   Is that referring to the closer camera to the bubble?

24   A.   Yes.

25   Q.   Does this video fairly and accurately portray the events

Dee Dee McEvoy – Direct

 1   that occurred on that morning?

 2   A.  Yes.

 3          MS. COVELL:  Your Honor, we would move into evidence

 4   Government Exhibit 2 and ask permission to publish to the jury.

 5          THE COURT:  Any objection to the admission of

 6   Exhibit 2?

 7          MR. VARHOLAK:  Yes, Your Honor.  It's cumulative.

 8          THE COURT:  That objection will be overruled.

 9   Exhibit 2 will be admitted and you may publish it to the jury.

10          MS. COVELL:  Thank you, Your Honor.

11          Since you already described who the individuals are, I

12   am just going to play this straight through, please.

13          (Videotape was played.)

14          MS. COVELL:  We will pause it right there and ask you

15   one question.

16   BY MS. COVELL:

17   Q.  Officer Cox made a hand motion similar to the one we saw

18   Brianne Smith did earlier.  Do you know what he was indicating

19   to the officer in the bubble?

20   A.  To shut the grill.

21   Q.  Now, when you say the grill do you mean --

22   A.  The door.

23   Q.  Of the cell or the range?

24   A.  No, of Inmate Petty's cell.

25          MS. COVELL:  Continue.  Thank you.

Dee Dee McEvoy – Direct

1   *BY MS. COVELL:*

2   *Q.*   Just as a follow-up from that, I think I detected you used

3   the word grill interchangeably to be both the barred steel door

4   and the steel door that doesn't have bars, correct?

5   *A.*   Yes, ma'am.

6   *Q.*   So when he was -- when Officer Cox made that motion, do you

7   know whether he was trying to get the outer door or the inner

8   door closed?

9   *A.*   I don't know.  I am assuming the outer door.

10        *MS. COVELL:*   And I will stop the video at this point

11   because I don't want to take up too much time, but the jury can

12   review that if they want later.

13   *BY MS. COVELL:*

14   *Q.*   Did all three of you end up going to the hospital for

15   treatment for your injuries?

16   *A.*   Yes, we did.

17   *Q.*   And could you describe the injuries you suffered?

18   *A.*   I had -- my left thumbnail was split up the middle.  I had

19   three stitches in my right index finger.  And they did an x-ray

20   of my hand because they thought he broke my hand, but he did

21   not.

22   *Q.*   I am showing you what's been marked for identification as

23   Government Exhibit 11, which is a document that shows four

24   smaller photographs.  Do you recognize what these photographs

25   depict?

Dee Dee McEvoy – Direct

1    A.   A picture of my injuries.

2    Q.   On the day of the assault?

3    A.   Yes, ma'am.

4    Q.   Where were those pictures taken?

5    A.   That was in Delta unit before we left the unit.

6    Q.   And do they fairly and accurately reflect how your injuries

7    looked at that time?

8    A.   Yes.

9         MS. COVELL:  Your Honor, at this time I would move in

10   Government Exhibit 11.

11        THE COURT:  Any objection to the admission of

12   Government Exhibit 11?

13        MR. VARHOLAK:  No, Your Honor.

14        THE COURT:  Exhibit 11 will be admitted.

15   BY MS. COVELL:

16   Q.   And subsequent -- that was taken, obviously, right after

17   the assault.  Did you encounter any swelling as a result of

18   your injuries?

19   A.   Yeah.  I had swelling on my first and second knuckle on my

20   right hand.  I had swelling on my arm and swelling on my right

21   leg and my back.

22   Q.   And I notice you are wearing rings in those -- on both

23   hands.  Did anything happen to those rings as a result?

24   A.   Yeah.  The one on my right hand had to be cut off because

25   by the time we got to health services, it was swelling up and

1    they had to cut it off my finger.

2    *Q.*  Do you have any lasting results from that injury?

3    *A.*  Yeah.  On my left hand I normally try not to shake hands

4    because when people squeeze my hand, if they squeeze it too

5    tight, it causes me pain.

6    *Q.*  On your left hand or your right hand?

7    *A.*  On my right hand, I am sorry.

8    *Q.*  So typically when you shake with somebody, what hand do you

9    extend out?

10   *A.*  My left.

11        MS. COVELL:  That's all the questions I have at this

12   point, Your Honor.

13        THE COURT:  Thank you.

14        Cross-examination?

15                        **CROSS-EXAMINATION**

16   *BY MR. VARHOLAK:*

17   *Q.*  Good afternoon again, Ms. McEvoy.  I want to talk a little

18   bit about ADX.  We have heard it referred to both as ADX and

19   Super Max; is that accurate?

20   *A.*  Yes.

21   *Q.*  And Super Max, it's called that because it's the most

22   secure Bureau of Prisons facility in this country, correct?

23   *A.*  Yes, it is.

24   *Q.*  Houses amongst others the most serious individuals

25   convicted of federal crime in this country, correct?

Dee Dee McEvoy – Cross

1    A.   Correct.

2    Q.   So I believe at least at one time Ted Kaczynski was in

3    there?

4    A.   Correct.

5    Q.   And people convicted of attempting to blow up the World

6    Trade Center have been housed there, correct?

7    A.   Correct.

8    Q.   Really people charged with the most heinous crimes, if

9    convicted, this is where they are sent?

10   A.   Correct.

11   Q.   And the reason they are sent there again is because the

12   security levels within this facility are so high, right?

13   A.   Correct.

14   Q.   So indeed when you first walk in to Super Max, there is a

15   little desk there with I don't know if it's a guard or a

16   receptionist of some kind sitting at the front there, right?

17   A.   Correct.

18   Q.   And then in order to get past that guard's desk, you have

19   to first either be a Bureau of Prisons employee or have an

20   appointment set up in advance with an inmate?

21   A.   All of the institutions have someone at the front desk.

22   Q.   Correct.  But at Super Max I can't just walk in without an

23   appointment, can I?

24   A.   And nor can you at any of the other facilities.

25   Q.   At even, say, Federal Detention Center down the street, I

Dee Dee McEvoy – Cross

1    can't go in without a preexisting appointment?

2    A.   You have to have approval.

3    Q.   Really.  Okay.  Once I go to this desk and I make -- have

4    my appointment, I give them some sort of identification,

5    correct?

6    A.   Correct.

7    Q.   Have to fill out a form that goes through things I have,

8    gun, whether I have guns, explosives, et cetera, on me?

9    A.   Correct.

10   Q.   Then they run some kind of background check to make sure I

11   don't have any criminal background or anything like that?

12   A.   Correct.

13   Q.   And then go through a metal detector?

14   A.   Correct.

15   Q.   Once I am through that metal detector, then I go either

16   down a flight of stairs or to an elevator that takes me down

17   one to two floors, something along those lines, right?

18   A.   Correct.

19   Q.   And then I get to the first meeting room there and I have

20   to -- step back a minute.  At that first desk they would have

21   stamped something on my hand that would have shown that I have

22   the ability to go in that's shown through a blue light; is that

23   accurate?

24   A.   Right.

25   Q.   Then I get to that first meeting desk or first set of doors

Dee Dee McEvoy – Cross

1    there, and I have to show whatever has been stamped on my hand.

2    And then they make sure that matches what it's supposed to be

3    matched with?

4    A.   Correct.

5    Q.   And I am at this point going down?

6    A.   Correct.

7    Q.   Then I go through that first set of double doors, and I am

8    put into a middle area where there is another set of double

9    doors on the other side?

10   A.   Right, correct.

11   Q.   Then I have to go through yet another set of double doors

12   in order to begin to get access to where the inmates at ADX are

13   located?

14   A.   Correct.

15   Q.   Then I go down and down not a hill, but a downward slant in

16   order to get to that area, correct?

17   A.   In order to get to what area?

18   Q.   To an area where I could meet with the inmates.

19   A.   That's one of the corridors, yes.

20   Q.   Now, I am assuming given the nature of this facility, the

21   security levels and the individuals housed there, that they

22   don't put first-time guards within Super Max; is that accurate?

23   A.   No, that's not correct.

24   Q.   So you mentioned that you had had 13 years of training

25   before you went into Super Max.

Dee Dee McEvoy – Cross

1   A.   No, sir.

2   Q.   I am sorry, excuse me, 13 years of experience.

3   A.   No.  I said that I started at the ADX as an officer.

4   Q.   So you began right in ADX, right in Super Max?

5   A.   Yes.

6   Q.   Without any training at either the camp facility or the

7   medium security or the high facility, they put you right into

8   Super Max?

9   A.   No.  We have training before you begin at the facility.

10  Q.   And how much training would that entail?

11  A.   At that time it was two weeks, I believe.

12  Q.   So you have two weeks of training somewhere, and then you

13  might go right into Super Max at that point?

14  A.   Correct.

15  Q.   Without any prior experience at -- you mentioned a camp,

16  which is minimal security, right?

17  A.   Correct.

18  Q.   And that's going to house maybe people charged or have been

19  convicted of white collar offenses or low level drug offenses;

20  is that accurate?

21  A.   Or inmates that have progressed down through USPs, FCIs.

22  Q.   So people who started at a higher security level and

23  because they behave themselves, essentially they got stepped

24  down to a lower security level, correct?

25  A.   Yes.

Dee Dee McEvoy – Cross

1    *Q.*  And you mentioned medium security.  That's going to be

2    maybe people who had gun offenses or midrange-type offenses?

3    *A.*  No.  They have people who commit murders and violent crimes

4    at medium facilities as well.

5    *Q.*  But again those would have been stepped down from a higher

6    facility?

7    *A.*  Some of them.

8    *Q.*  And then the high is again the next level of security,

9    right?

10   *A.*  Correct.

11   *Q.*  And then the highest is the Super Max that we are

12   discussing?

13   *A.*  Yes.

14   *Q.*  But they put you -- can put you with two weeks of training

15   right into that highest level of security?

16   *A.*  Correct.

17           MR. VARHOLAK:  Now, if I can have Government's Exhibit

18   15 put up, please.

19   *BY MR. VARHOLAK:*

20   *Q.*  Now, this is the cell that we had discussed earlier, right?

21   *A.*  Yes.

22   *Q.*  Okay.  And this is a typical ADX Florence cell?

23   *A.*  Correct.

24   *Q.*  And if you look, the dimensions on it are approximately

25   12 feet, 12-1/2 feet in one direction by 7-1/2 feet.  Does that

Dee Dee McEvoy – Cross

1   look accurate?

2   A.   Correct.

3   Q.   And within that you are going to have the inmate's shower

4   facility?

5   A.   Yes.

6   Q.   Bedding?

7   A.   Yes.

8   Q.   It looks like a little desk with a seat?

9   A.   Yes.

10  Q.   And a toilet?

11  A.   Yes.

12  Q.   And then you have here, can you see the circle that I made

13  on there?

14  A.   Yes, I can.

15  Q.   This is that grate that we are talking about that's the one

16  that's not the steel door, but sort of the metal grate; is that

17  accurate?

18  A.   Yeah.

19  Q.   And within that metal grate facility there is a

20  pass-through that you can pass a tray or some sort of food

21  through; is that accurate?

22  A.   The food slot.

23  Q.   The food slot, correct.

24       Now, right here I am going to circle, that's the

25  second door that closes into the cell, correct?

Dee Dee McEvoy – Cross

1   A.   Yeah, the full metal door.

2   Q.   This one is steel all the ways on the outside?

3   A.   With the window, yes.

4   Q.   And you mentioned a window.  We saw that a little on the

5   video.  It looks like the window is, I don't know, maybe 4 feet

6   tall.  Does that sound about accurate?  Why don't you tell me

7   how tall.

8   A.   I don't know the dimensions of the window.

9   Q.   Can you give a rough estimate?

10  A.   I have no idea, sir.

11  Q.   What's the purpose of having the window there?

12  A.   To look in and see the inmates.

13  Q.   Right.  So to make sure that there is not an inmate

14  sitting, for example, in the sallyport who shouldn't be in the

15  sallyport?

16  A.   Correct.

17  Q.   And how this is supposed to work is that when the inmate is

18  in this section here, his cell section, he is allowed to not be

19  cuffed up during that time, correct?

20  A.   Correct.

21  Q.   Because he sleeps in there.  He reads in there.  He does

22  all of his activities in that area.  And so he is allowed the

23  freedom of movement without being cuffed up, right?

24  A.   Right.

25  Q.   When the inmate is in this sallyport area, as long as this

1  door, this outside steel door is open, he is supposed to be

2  cuffed up in that area, right?

3  A.  Unless they were moving the inmate out of his cell.  They

4  could use the food slot to cuff the inmate and move him out.

5  Q.  Right.  So they have two options essentially.  If they are

6  moving the inmate, the inmate could be in this area here and

7  the guards could go into the sallyport area and cuff him up

8  through the food slot, right, or the inmate could be in this

9  area here.  The steel door should be closed and they could cuff

10  him up in that area.

11  A.  Correct.

12  Q.  Right?  But at no point is he supposed to be in this area

13  with the steel door open and no cuffs on, correct?

14  A.  Well, at that time when they had the procedure, they would

15  open the inner grill, feed the inmate, and then he would go

16  back in his cell.

17  Q.  So let me understand.  Would he be in this area here and

18  they would feed him -- I will mark that as 1 or in this area

19  here which I will mark as 2 -- and feed him?

20  A.  Yeah.  At that time the inmate would be in 2 and that inner

21  grill would be open and they would feed him through the outer

22  steel door.

23  Q.  Okay.  But only the inner grill would be open, not the

24  entire steel door.

25  A.  Correct.

Dee Dee McEvoy – Cross

1   Q.  And as you discussed, part of the purpose of having the

2   window here, whatever size that window is, is to make sure that

3   you are not opening the steel door while the inmate is in that

4   area, correct?

5   A.  Correct.

6   Q.  And so under this procedure -- and step back a second.  The

7   person opening this door here which is called the steel door,

8   that's main control, correct?  I mean not main control, but the

9   person in the bubble?

10  A.  The bubble officer, yes.

11  Q.  And that person has I am assuming some sort of camera so

12  that he can see what's going on in there or access to a video

13  so he can see what's going on in there?

14  A.  No.  That's when they are supposed to be observing through

15  the range.

16  Q.  So they are relying solely on the officer who is in the

17  range as to whether to open that bubble door or not open that

18  bubble door.

19  A.  Correct.

20  Q.  And this door here, the grate I will call it for lack of a

21  better word, that grate is also controlled by the bubble

22  officer?

23  A.  Right.

24  Q.  And again, there is no camera pointing into this area that

25  the bubble officer relies upon.  It's solely the bubble officer

1    relying on the person in the hallway area, correct?

2    A.   Well, I am sorry.  That's a little incorrect.  In the

3    bubble office they have lights that turn on green if it's

4    closed and red if it's open.

5    Q.   If which?

6    A.   Either one of them.

7    Q.   If either one of them are open, it should turn on green if

8    it's open and red if it's closed?

9    A.   No, red if it's open and green if it's closed.  I believe

10   that's correct.

11   Q.   And so I am a little confused here.  If both of them are

12   open, will it show -- again, say red is open.  Will it require

13   both of them to be open or only one of them?

14   A.   I'm sorry?

15   Q.   That wasn't a very good question.  You said it flashes red

16   if it's open, green if it's closed, correct?  And by it, do we

17   mean both doors have to be open for it to flash red or only one

18   door?

19   A.   Either door.

20   Q.   So in theory if this door is open, the gated door, the

21   bubble officer should have some signal flashing red, correct?

22   A.   Correct.

23   Q.   And so again in theory the bubble officer when it's red is

24   never going to open that door because now we have got both

25   doors open going into the cell, correct?

1    A.  Well, you can't say never because if they are pulling an

2    inmate out, both doors would be open.

3    Q.  Right.  But if they are pulling the inmate out, they would

4    first either cuff the inmate up in this section or cuff the

5    inmate up in that section, correct?

6    A.  Correct.

7    Q.  But other than that scenario, if it's showing red, the

8    bubble officer shouldn't be pressing the button to open up both

9    doors.

10   A.  No.

11   Q.  Because the danger of that is it lets the inmate into the

12   main area, the hallway area, correct?

13   A.  Correct.

14        MR. VARHOLAK:  Now, if you could put Exhibit 1 back up

15   for me, please.  If you can take it to 6:59:51, please.

16   BY MR. VARHOLAK:

17   Q.  Now, I think you testified that right here Officers Smith

18   and Smith are in front of what you said was Mr. Petty's cell;

19   is that right?

20   A.  They stopped at one cell first and then they stopped at

21   Petty's cell second.

22   Q.  So would this be the first cell or Mr. Petty's cell, do you

23   recall?

24   A.  It looks like that's the first cell, 107.

25        MR. VARHOLAK:  If you could play it forwards until 7

Dee Dee McEvoy – Cross

1  minutes and 3 seconds, please.

2  *BY MR. VARHOLAK:*

3  *Q.*  You see that door opening.  You are saying that you believe

4  to be the first cell, not Mr. Petty's cell.

5  *A.*  Yes.

6  *Q.*  Now, if you go back, and there that's giving that all clear

7  sign, correct?

8  *A.*  Correct.

9  *Q.*  Now if you could keep playing it.

10        Now, right here if you pause, you can see now they are

11  both at Inmate Petty's cell.

12  *A.*  Yes.

13  *Q.*  And you can see here it appears that at least one, maybe

14  both, are looking through that window area that they are

15  supposed to look through, correct?

16  *A.*  I can't tell what they are looking at, sir.

17  *Q.*  It's too -- you can't see whether they are looking through

18  that window or not from there?

19  *A.*  From the position of the video, I can't see their eyes.  I

20  don't know what they are looking at.

21  *Q.*  But in reality what they should have been doing is looking

22  through there to make sure the individual in that cell is not

23  in the sallyport area, correct?

24  *A.*  Correct.

25              MR. VARHOLAK:  Can you play it for two more seconds.

Dee Dee McEvoy – Cross

1    Pause it right there.

2    BY MR. VARHOLAK:

3    Q.  Can you tell right there if Mr. Smith is, in fact, looking

4    through that window area?

5    A.  Again, I cannot see where his eyes are.

6    Q.  But it appears he is looking at something in that

7    direction?

8    A.  It appears, yes.

9    Q.  And so there should have been no way that he would look

10   through there and see Inmate Petty in the sallyport area,

11   correct?

12   A.  Could you repeat the question?

13   Q.  Sure.  It wasn't a very good question.  If he had looked

14   through there and seen Inmate Petty in the sallyport area, he

15   should have never said "All Clear" and had that door open,

16   correct?

17   A.  Well, no, I don't believe he would have done that.

18   Q.  So presumably he didn't see Inmate Petty in the sallyport.

19           MS. COVELL:  Objection.  It calls for speculation.

20           MR. VARHOLAK:  I will withdraw.

21           THE COURT:  That will be sustained.

22           MR. VARHOLAK:  If we could go back to Government

23   Exhibit 15 one more time.

24   BY MR. VARHOLAK:

25   Q.  This sallyport area, what we are talking about is an area

Dee Dee McEvoy – Cross

1   of it looks like maybe 7 feet by -- I can't tell if that's

2   four -- 32-inches, so maybe 7 feet by 3 feet.  Does that sound

3   right or does that sound --

4   A.  Well, it says 70 inches by 36 inches.

5   Q.  70 inches, okay.  So 6 feet by 4 feet or so, 3 feet or so;

6   is that accurate?

7   A.  Sure.

8   Q.  Now, how long is it that you have been working at Super

9   Max?

10  A.  Well, as I stated earlier, I worked there for almost three

11  years.  I left, came back for four months.  And now I have been

12  back again for about nine months.

13  Q.  So a total of a little over four years maybe?

14  A.  Yeah.

15  Q.  In that time have you ever observed tours of Super Max

16  with, say, Washington DC officials?

17  A.  I have not specifically, no.

18  Q.  Are you aware of that taking place?

19  A.  No.

20  Q.  So you are not aware of ever showing tours to individuals

21  to show how secure Super Max is?

22  A.  No.  I said I have never seen specifically Washington state

23  come through.  I mean, they do do tours, but I don't know

24  specifically who does tours.  We have judges come and do tours

25  and we have college interns do tours.

Dee Dee McEvoy – Redirect

1  Q.  And the tours are designed to show just how secure this

2  facility, in fact, is.

3            MS. COVELL:  Objection, lack of foundation.

4            THE COURT:  Overruled.

5  BY MR. VARHOLAK:

6  Q.  If you know.

7  A.  I don't know what the tours are for, sir.

8  Q.  But you have seen judges come through and interns come

9  through, other government officials come through.

10  A.  Yes.

11  Q.  And finally, you mentioned that prior to this incident you

12  don't believe you had ever spoken to Mr. Petty?

13  A.  I did not, no.

14  Q.  So Mr. Petty had never made any threats towards you prior

15  to this?

16  A.  No.

17  Q.  Demonstrate any animosity towards you, anything of that

18  nature?

19  A.  No, sir, not that I was aware.

20            MR. VARHOLAK:  Thank you.  Nothing further.

21            THE COURT:  Thank you.

22            Redirect?

23            MS. COVELL:  Very briefly, Your Honor.

24                   **REDIRECT EXAMINATION**

25  BY MS. COVELL:

Dee Dee McEvoy – Redirect

1   Q.  Ms. McEvoy, Mr. Varholak asked you some questions about

2   when you are in the ADX that you have to wait and there is

3   grill doors that open before you can move.  Is that the same in

4   all the prisons on the complex except for the camp?

5   A.  Certain doors you would have to wait to go through at all

6   of the facilities, but there are more grills that you have to

7   open and go through at the ADX.

8   Q.  And when Mr. Varholak went and explained how he shows up

9   and shows his ID and gets stamped and moves down, that only

10  applies to a lawyer coming down to visit his client.  Mr. Petty

11  isn't free to move around that way, correct?

12  A.  No, not at all.

13  Q.  And you have worked at the USP, correct, U.S. Penitentiary?

14  A.  No, I have not.

15  Q.  You are familiar with it from your 18 years on the complex?

16  A.  Yes, I am.

17  Q.  And would it be fair to say that there are more frequent

18  staff assaults that occur at the USP, the high security, than

19  occur at the ADX?

20  A.  Yes.

21  Q.  And, in fact, some would say that the USP is a more

22  dangerous place in terms of potential to be harmed because of

23  it's less secure.

24          MR. VARHOLAK:  Objection, speculation.

25          THE COURT:  Sustained.

Dee Dee McEvoy – Redirect

1        MS. COVELL:  I will rephrase, Your Honor.

2    BY MS. COVELL:

3    Q.  You are familiar with staff that had been assaulted over

4    the course of your tenure at the USP by other inmates, correct?

5    A.  Yes.

6        MR. VARHOLAK:  Objection, basis.  She said she never

7    worked at the USP.

8        THE COURT:  The question was whether she was familiar

9    with other people, so that will be overruled.

10   BY MS. COVELL:

11   Q.  You can answer that question.

12   A.  Yes, ma'am.  Staff have been seriously assaulted at the

13   USP.

14   Q.  And that's -- at the USP there is much more movement and

15   contact between inmates than there is at the ADX, correct?

16       MR. VARHOLAK:  Objection, basis.  Again, she has never

17   worked at USP.

18       THE COURT:  Sustained.

19   BY MS. COVELL:

20   Q.  Are you familiar with how the USP is operated?

21   A.  Yes.  I have been over to the USP.

22   Q.  Do the inmates have significantly more freedom at the USP

23   than they do at the ADX?

24   A.  Yes, ma'am.

25   Q.  Do they have cellmates?

Dee Dee McEvoy – Redirect

1  A.  Yes, ma'am.

2  Q.  Do they have free time when they are actually on a range

3  milling about with other inmates?

4  A.  Yes, ma'am.

5  Q.  And sometimes 30, 40 inmates at a time, correct?

6  A.  I would say hundreds at a time, yes.

7  Q.  Mr. Varholak asked you several questions about the

8  sallyport and how they could have access and whether Mr. Ralph

9  Smith saw Mr. Petty when he looked in.

10       Did you have any responsibility for how Inmate Petty

11  was able to hide in the sallyport that morning?

12  A.  No, ma'am.

13  Q.  And are you aware whether anybody was disciplined for their

14  role in that?

15  A.  I believe so, yes.

16       MS. COVELL:  That's all I have, Your Honor.

17       THE COURT:  Any recross, Mr. Varholak?

18       MR. VARHOLAK:  No, Your Honor.

19       THE COURT:  All right.  Then Ms. McEvoy, you may be

20  excused.  Thank you.

21       The United States may call its next witness.

22       MS. WEBER:  The government calls Brianne Smith.

23  (**Brianne Smith** was sworn.)

24       THE WITNESS:  I do.

25       THE COURT DEPUTY:  Please state your full name and

Brianne Smith - Direct

 1   spell your last name for the record.

 2           *THE WITNESS:*  Brianne Smith.  Smith is S-M-I-T-H.

 3                      **DIRECT EXAMINATION**

 4   *BY MS. WEBER:*

 5   *Q.*  Good afternoon, Ms. Smith.

 6           How are you currently employed?

 7   *A.*  I am an SIS technician at ADX in Florence.

 8   *Q.*  What is SIS?

 9   *A.*  It's special investigative support technician.

10   *Q.*  When did you start working at the Bureau of Prisons?

11   *A.*  I started in June of 2010.

12   *Q.*  What did you do before you started at the Bureau of

13   Prisons?

14   *A.*  I was four years active duty Air Force.

15   *Q.*  What was your job in the Air Force?

16   *A.*  I was security forces, which is the equivalent of a police

17   officer.

18   *Q.*  Turning back to your time at the Bureau of Prisons, what

19   was your position on September 11th, 2013?

20   *A.*  I was an education technician.

21   *Q.*  When did you start in that role as an educational

22   technician at the Bureau of Prisons?

23   *A.*  September of 2012.

24   *Q.*  What were your duties as an educational technician?

25   *A.*  At the time I ran the AE program, which is adult education,

Brianne Smith - Direct

1   and the REP, which was re-entry preparation, as well as

2   delivering books and educational materials.

3   Q.   How often did you deliver educational materials to inmates?

4   A.   Once a week when we delivered books.

5   Q.   What day of the week did you usually deliver those books?

6   A.   At that time it was Wednesdays.

7   Q.   Let's turn now to the incident on September 11th, 2013.

8        Are you familiar with the defendant, Ishmael Petty?

9   A.   Yes, ma'am.

10  Q.   Do you see him in the courtroom today?

11  A.   I do.

12  Q.   Can you identify him by an item of clothing he is wearing?

13  A.   He is wearing a blue button-up shirt.

14       MS. WEBER:  May the record reflect the witness has

15  identified the defendant?

16       THE COURT:  It shall.

17  BY MS. WEBER:

18  Q.   Directing your attention to September 11th, 2013, what time

19  did you report for work that day?

20  A.   6:30.

21  Q.   What shift were you working that day?

22  A.   6:30 to 2:30.

23  Q.   What happened after you reported for work?

24  A.   I went down to my office and me and Mr. Smith proceeded to

25  get ready to deliver books.

Brianne Smith - Direct

1    Q.   Where did you go to deliver those books?

2    A.   We went down to Delta unit.

3    Q.   What happened next?

4    A.   We entered Delta unit and proceeded to grab the books for

5    Range 1, which is where we were starting with the deliveries.

6    Q.   What did you do when you got to that range?

7    A.   We delivered a book to Cell 107 and then we got to 106.

8    Q.   And what happened when you got to Cell 106?

9    A.   When we got to 106, we called for the door to open.  I

10   looked inside.  The light was off.  It appeared that Inmate

11   Petty was laying in his bed.  And as the door slid open and I

12   went to put the books on the bars, I saw Inmate Petty in the

13   corner.  He was down when I saw him.  And I backed up.  The

14   first thought I had was inmate and I yelled, "Inmate."  And

15   instantly I had some liquid in my face and eyes that burned,

16   and from that point I couldn't see any further.

17   Q.  You said the inmate was in the corner.  What were you

18   referring to?

19   A.   The sallyport, the two doors, he was on the right.  The

20   door opened from left to right.  He was in that corner between

21   the sallyport.

22   Q.  So after you said that you -- that some liquid was sprayed

23   in your face; is that correct?

24   A.   Yes.

25   Q.  What happened after that liquid was sprayed in your face?

Brianne Smith – Direct

1    *A.*   I yelled, "Inmate," and I couldn't see anything.  I backed

2    up and I could hear a lot of commotion, a lot of yelling.  I

3    proceeded to yell commands, "Get down.  Get back.  Cuff up."

4    And I could hear Ms. McEvoy and Mr. Smith in some kind of

5    ruckus.  Ms. McEvoy was yelling commands as well and it felt

6    like an eternity that I couldn't see.

7            I slowly began to be able to see, at which point I saw

8    Mr. Smith on the ground up against the wall.  And I saw

9    Ms. McEvoy proceeding to strike Inmate Petty with her baton

10   around the middle.  It didn't seem to be having much effect.

11   She was telling him to get down, to get back.

12           I noticed that Inmate Petty at that point had a baton

13   and he had proceeded to hit Mr. Smith with it.  Ms. McEvoy

14   ended up next to me the next thing I remember and Inmate Petty

15   was in front of us.  She had grabbed my radio and radioed for

16   assistance, and we continued to instruct Inmate Petty to

17   comply.  He didn't heed any of our commands.  And we proceeded

18   to try to keep him away from Mr. Smith, who was on the ground.

19           He had moved past us.  And Mr. Smith was up against

20   the wall on my right, and I noticed he was bleeding profusely

21   from his head.  And my only thought was that if Inmate Petty

22   were to hit him again, he would die.

23           So I proceeded to kneel down on my right knee taking

24   my right hand and holding his wound, at which point I heard

25   something behind me.  And I looked up and held my left arm up

Brianne Smith – Direct

1   above my head and was struck with a baton and it glanced off my

2   arm.  At that point responding staff had got to the end of the

3   range and Inmate Petty went back into his cell.  And we yelled

4   for the door to close and staff came down and stood in front of

5   the door as it closed.

6          And then I had yelled for them to get something for

7   Mr. Smith's head, and they brought me some cloth and I am not

8   sure what it was, but it was a cloth of some sort.  And I held

9   it over the wound on his head until responding staff relieved

10  me.

11  Q.  Could you describe Mr. Smith's condition at this point?

12  A.  At this point he was unconscious.  I feared he was dead.  I

13  grabbed his hand and I was just holding it and kept saying over

14  and over, "Ralph, are you okay?  Ralph?"  And I kept squeezing

15  his hand trying to get a response and he was completely

16  unresponsive.

17  Q.  I am going to direct your attention to Government Exhibit

18  1, which is on the screen in front of you.  Do you know what

19  this is?

20  A.  This appears to be Range 1 of Delta unit.

21          MS. WEBER:  If I could have you play the first 30

22  seconds or so of this video.  You can pause it there.  Thank

23  you.

24  BY MS. WEBER:

25  Q.  Can you tell us what happened in that portion of the video

Brianne Smith – Direct

1   you just saw?

2   A.   In that portion we had proceeded down the range with

3   Ms. McEvoy and we had delivered books to Cell 107.  And we had

4   called for 106 to be opened, at which point Inmate Petty had

5   thrown the substance in my face and come out of his cell.

6   Q.   Did that video fairly and accurately represent what

7   happened to you that morning, September 11th, 2013?

8   A.   Yes, ma'am.

9        MS. WEBER:  The government now moves to admit

10  Exhibit 1 into evidence.

11       THE COURT:  It's already been admitted.

12       MS. WEBER:  Okay.

13  BY MS. WEBER:

14  Q.   Turning back to the incident, you were describing Ralph's

15  condition.  I believe you said you were sitting next to him

16  holding a towel to his head; is that correct?

17  A.   I was kneeling on my right knee with my right hand holding

18  his wound.  And I am unaware of the cloth that was brought to

19  me by one of the staff.  I just placed it over his head to try

20  to stop the bleeding.

21  Q.   What did you do next?

22  A.   Next I stayed with Mr. Smith until responding staff had

23  relieved me, at which point I went to go wash my eyes out and

24  report to medical to be assessed.

25  Q.   What happened when you went to medical?

Brianne Smith - Cross

1    *A.*  They provided me with a medical assessment and instructed

2    me to go see outside medical to make sure I got x-rays and my

3    arm was not broken and that my blood was tested to make sure

4    that there was no communicable diseases.

5    *Q.*  What was the result of that x-ray?

6    *A.*  My arm was not broken.  It was bruised, but not broken.

7    *Q.*  And why did they draw your blood?

8    *A.*  They were unaware of what the liquid was or made up of at

9    the time.  And they wanted to make sure that there was nothing

10   in it that could have been dangerous or otherwise.

11   *Q.*  You are referring to the liquid that the defendant sprayed

12   in your face?

13   *A.*  Yes.

14   *Q.*  Did you know the defendant before that day, September 11th,

15   2013?

16   *A.*  No, ma'am.

17   *Q.*  Were you a member of the staff responsible for delivering

18   meals to the inmate that morning, September 11th, 2013?

19   *A.*  No, ma'am.

20          *MS. WEBER:*  Nothing further.

21          *THE COURT:*  Thank you.

22          Cross-examination?

23                    **CROSS-EXAMINATION**

24   *BY MR. VARHOLAK:*

25   *Q.*  Good afternoon, Ms. Smith.

Brianne Smith - Cross

1        Ms. Smith, I am showing you what's been previously

2   marked as Government's Exhibit 15 and admitted.  Does this to

3   your knowledge accurately reflect what a typical ADX cell looks

4   like?

5   A.  It appears so, yes.

6   Q.  You are familiar with the ADX cells, I assume?

7   A.  Yes.

8   Q.  Now, you had mentioned that you had initially looked in and

9   you believe that you had seen Mr. Petty lying on his bed,

10  correct?

11  A.  Correct.

12  Q.  Now, as you can see, and, of course, possibly the beds are

13  flipped or something along those lines, but to your

14  recollection would this have been where Mr. Petty's bed was

15  located in his cell?

16  A.  I believe that is where it would be located.

17  Q.  So along the right back corner essentially.

18  A.  Yes, sir.

19  Q.  And this right here circling the metal gate, that's a gate

20  that you can actually see through, correct?

21  A.  Yes.

22  Q.  So I am assuming that the bars are fairly close together so

23  that an individual of Mr. Petty's size can't fit in between

24  there, correct?

25  A.  That's correct.

Brianne Smith – Cross

1   Q.  But you could see through them to see what's on the other

2   side inside the cell?

3   A.  Yes.

4   Q.  Now, when you first looked through, and I will circle this

5   right here, what I have circled is the steel gate that is the

6   outer entrance of the cell going into the sallyport, correct?

7   A.  The steel door has a window in it.

8   Q.  And that's what I was going to ask you.  There is –– is

9   there a window essentially right where I have put that arrow on

10  the door itself?

11  A.  In that general area, yes.

12  Q.  And so when you are looking through, was that the window

13  that you looked through to see Mr. Petty lying on his bed or

14  what you believed to be lying on his bed?

15  A.  I believe so, yes.

16  Q.  And through that window you would be able to get a clear

17  view into the bed area to see what the bed looks like, correct?

18  A.  Yes.

19  Q.  Now, you had mentioned, I think, that you next see

20  Mr. Petty in I think you said this area, which is the right

21  side of the sallyport, hunched down; is that correct?

22  A.  It was that right side close to the bars you can see

23  through.

24  Q.  So close to these back bars here?

25  A.  Yes, in that back right corner.

Brianne Smith – Cross

1   Q.  So in other words, making lots of arrows but not clearing

2   it, in other words, essentially right there is where you saw

3   him next, correct?

4   A.  Yes, with the door opened.

5   Q.  Now, is there a window here that can be seen through?

6   A.  There is.

7   Q.  And between the window on the door that you had mentioned

8   and this separate window here, can you see the entire

9   sallyport?

10  A.  Yes.

11  Q.  And you had said you looked through this door right here,

12  correct?

13  A.  Yes, sir.

14  Q.  And you believe that you saw Mr. Petty lying on his bed.

15  A.  Yes.

16  Q.  You didn't see through that door, through that window,

17  Mr. Petty here in this green area here, did you?

18  A.  I did not.  You can see into that portion, but I did not

19  see him.

20  Q.  Because certainly had you seen him there, you would not

21  have ordered for the door to be open, correct?

22  A.  No, I would not have ordered it opened.

23  Q.  When you ordered the door to be open, was this gated area

24  here closed or open?

25  A.  As far as I recall, it was closed.

Brianne Smith - Cross

1    Q.  So in other words, this gated area was closed, yet somehow

2    Mr. Petty was in this area of the sallyport, correct?

3    A.  Yes.

4         MR. VARHOLAK:  And if you could please show

5    Government's Exhibit 1, please.  And if you could play it to --

6    if you could just play it and I will tell you where to stop.

7    If you could fast-forward to about 7 minutes and 1 second or

8    so, yeah.

9    BY MR. VARHOLAK:

10   Q.  Now, if you watch, that's where you were at 107 and you are

11   ordering 107 closed, correct?

12        Pause it right there, please.

13   A.  Yes.

14        MR. VARHOLAK:  And if you can go back about a second

15   or two.

16   BY MR. VARHOLAK:

17   Q.  So you ordered that portion closed.  And then you could see

18   here -- pause it right there.

19        You saw Mr. Smith.  It looks like he looks through

20   that second window you were talking about, correct?

21   A.  It appears so, yes.

22   Q.  So he would have been checking to make sure that there was

23   nobody in that second area, correct, in that second half of the

24   sallyport that you might not have the best view of, correct?

25   A.  Yes.

1    *Q.*  And I think you mentioned before this incident you had

2    never even met Mr. Petty?

3    *A.*  It's my recollection I had never spoke with him, no.

4    *Q.*  Certainly no animosity towards him in any way?

5    *A.*  No.

6    *Q.*  He had never expressed any animosity towards you?

7    *A.*  No.

8    *Q.*  Never threatened you in any way?

9    *A.*  No.

10          *MR. VARHOLAK:*  Thank you.  Nothing further.

11          *THE COURT:*  Thank you.

12          Redirect?

13          *MS. WEBER:*  Nothing from the government, Your Honor.

14          *THE COURT:*  Ms. Smith, you may step-down.  Thank you.

15          Ladies and gentlemen, it's not quite 3:00 yet, but

16   because we are between witnesses, why don't we go ahead and

17   take our mid-afternoon break at this time.  Why don't we plan

18   on reconvening at 3:15.

19          Keep the admonitions in mind, of course.  Don't talk

20   amongst yourselves about the case.  You can talk about anything

21   else, but don't talk about the case since you haven't been

22   released to begin your deliberations yet.  And let's be back

23   here at 3:15.  The jury is excused.

24          (Jury excused.)

25          Please be seated.

1          Ms. Covell, anything to take up at this time by the

2     United States?

3          MS. COVELL:  No, Your Honor.

4          THE COURT:  Mr. Varholak?

5          MR. VARHOLAK:  No, thank you.

6          THE COURT:  We will be in recess, then, until 3:15.

7     (Recess at 3:00 p.m.)

8     (Reconvened at 3:20 p.m.)

9          THE COURT:  We are back on the record in the Petty

10    matter.

11         Ms. Covell, based upon how things have been going so

12    far, what time do you anticipate the government resting its

13    case?

14         MS. COVELL:  If we start in the next five minutes, I

15    would say probably within 30 minutes.

16         THE COURT:  And Mr. Varholak, would you like to take

17    up at the end of the government's case issues about whether we

18    need a voluntariness hearing?

19         MR. VARHOLAK:  I can tell you unless Mr. Petty changes

20    his mind, I think at this point -- things could change with the

21    next witness or two -- but trying to keep things on track, I

22    don't anticipate Mr. Petty testifying, so I don't anticipate we

23    will -- I don't think we would need that.  I would probably ask

24    for a brief recess so I could talk to Mr. Petty outside the

25    presence of the jury, and then I anticipate we will close

Ralph Smith – Direct

1    without calling any witnesses and then I guess probably excuse

2    the jury at that point and deal with the last charging

3    conference, which I don't think will take that long, and we may

4    all get out of here before 5:00 o'clock today.

5            THE COURT:  Yeah, I was just trying to estimate.  I

6    think that that would be at least a possibility, but we will

7    certainly give you an opportunity to talk with Mr. Petty.

8            Okay.  Let's bring the jury back in.

9            (Jury present.)

10           The United States may call its next witness.

11           MS. COVELL:  Thank you, Your Honor.  The United States

12   calls Ralph Smith.

13       (**Ralph Smith** was sworn.)

14           THE WITNESS:  I do.

15           THE COURT DEPUTY:  Please state your full name and

16   spell your last name for the record.

17           THE WITNESS:  Ralph Smith, R-A-L-P-H, S-M-I-T-H.

18                        **DIRECT EXAMINATION**

19   BY MS. COVELL:

20   Q.  Good afternoon, Mr. Smith.

21           How old are you?

22   A.  47.

23   Q.  And how are you employed?

24   A.  With the U.S. Department of Justice, Federal Bureau of

25   Prisons.

Ralph Smith – Direct

1    Q.   How long have you been employed with the Bureau of Prisons?

2    A.   19 years, 10 months.

3    Q.   And what's your current title within the Bureau of Prisons?

4    A.   Education technician.

5    Q.   How long have you been an educational technician within the

6    Bureau of Prisons?

7    A.   17 years.

8    Q.   Could you describe for us what your job duties are as an

9    educational tech?

10   A.   I am responsible for doing the GED testing and the intake

11   testing at the institution.

12   Q.   And are you responsible for providing reading materials to

13   the inmates?

14   A.   Yes, ma'am.

15   Q.   And are you located at the ADX in the complex down in

16   Florence?

17   A.   Yes, at the ADX.

18   Q.   Are part of your job duties ever to serve meals to the

19   inmates as an educational tech?

20   A.   No, ma'am.

21   Q.   Now I would like to turn your attention to the events of

22   September 11th, 2013.

23        Were you assaulted that day?

24   A.   Yes, ma'am.

25   Q.   Do you have any memory of that assault?

1    A.   No, ma'am.

2    Q.   As a result of that assault, did you suffer any injuries?

3    A.   Yes.  I had a concussion and I had injuries to my wrist and

4    hand and forearm.

5    Q.   Were you hospitalized as a result of those injuries?

6    A.   Yes, ma'am, for three days.

7    Q.   As a result of those injuries, did you miss any work?

8    A.   One year and eight months.

9    Q.   Have you had any lasting physical injury from that assault?

10   A.   Yes.  I had two surgeries on my hand.  The first surgery

11   was on February the 13th, 2014 for reconstructive surgery of my

12   wrist and my hand.  The second surgery was on March 5th, 2015

13   for a total reconstruction of my wrist again, a CMC total

14   reconstruction of my thumb and an ECU reconstruction of the

15   upper wrist, which is the reconstruction of the ligaments and

16   reattachment of the ligaments of my wrist.

17   Q.   Now, I notice on your right hand you are wearing some sort

18   of brace and an Ace bandage.  Is that the hand that you had the

19   surgeries on?

20   A.   Yes, ma'am.

21   Q.   And that was the result of the injuries you received on the

22   assault on September 11th, 2013?

23   A.   Yes, ma'am.

24   Q.   I notice you also have a device in your pocket that is

25   attached.  Is that a type of treatment device for your injury?

Ralph Smith - Cross

1   A.   Yes.   It's called a TENS unit.   It's an electrical

2   stimulation unit.

3   Q.   Is that TENS for the court reporter's benefits, T-E-N-S?

4   A.   Yes, T-E-N-S.

5   Q.   What does it do for you, Mr. Smith?

6   A.   It sends an electrical impulse to my hand through some --

7   it has it my hand to stop the pain response from the hand to

8   the brain.

9   Q.   As a result of the assault on September 11th, 2013, have

10  you suffered any psychological injuries?

11  A.   Yes.   I have PTSD.

12  Q.   And is that short for posttraumatic stress disorder?

13  A.   Yes.   I have posttraumatic stress disorder.

14  Q.   And did you suffer any cognitive injury?

15  A.   Yes.   I have cognitive memory problems.

16  Q.   And prior to the assault on September 11th, 2013, had you

17  had any sort of negative interaction with Inmate Petty or any

18  dispute with him?

19  A.   No, ma'am.

20          MS. COVELL:   Thank you, Mr. Smith.

21          THE COURT:   Thank you.

22          Cross-examination?

23          MR. VARHOLAK:   Very briefly, Your Honor.

24                        **CROSS-EXAMINATION**

25  BY MR. VARHOLAK:

Gyniferr Sandusky – Direct

1    *Q.*  Good afternoon, Mr. Smith.

2            Mr. Smith, prior to this September 11 of 2013, did you

3    know Mr. Petty at all?  Had you met him prior to that?

4    *A.*  No, sir.

5    *Q.*  And so obviously no prior threats from Mr. Petty to you?

6    *A.*  No, sir.

7    *Q.*  As Ms. Covell asked, no negative interactions whatsoever

8    with him?

9    *A.*  No.

10   *Q.*  In fact, no interactions whatsoever?

11   *A.*  I did not know him, sir?

12           *MR. VARHOLAK:*  Nothing further.

13           *THE COURT:*  Any redirect?

14           *MS. COVELL:*  No, Your Honor.

15           *THE COURT:*  Mr. Smith, thank you very much.  You are

16   excused.

17           United States may call its next witness.

18           *MS. WEBER:*  The government calls Jennifer Sandusky.

19      (**Gyniferr** Sandusky was sworn.)

20           *THE WITNESS:*  Yes.

21           *THE COURT DEPUTY:*  State your full name and spell your

22   last name for the record.

23           *THE WITNESS:*  Gyniferr Sandusky, S-A-N-D-U-S-K-Y.

24                          **DIRECT EXAMINATION**

25   *BY MS. WEBER:*

Gyniferr Sandusky – Direct

1   *Q.*  Good morning.

2         Could you spell your first name as well?

3   *A.*  Sure.  It's G-Y-N-I-F-E-R-R.

4   *Q.*  How are you currently employed, Ms. Sandusky?

5   *A.*  I am a correctional officer at the United States

6   Penitentiary in Florence, Colorado.

7   *Q.*  On September 11th, 2013, how were you employed?

8   *A.*  I was reporting to work as a correctional officer that day

9   when I got a call for evidence recovery team.

10  *Q.*  Was that your particular role on September 11th, 2013?

11  *A.*  Yes.

12  *Q.*  What specifically was your role on that evidence recovery

13  team?

14  *A.*  I helped -- or I collected the evidence that day.

15  *Q.*  Did you do anything else that day as part of your role as

16  the evidence -- on the evidence recovery team?

17  *A.*  Just collected evidence.

18  *Q.*  Did you process a crime scene outside of Cell 106 in the

19  Delta unit?

20  *A.*  Yes, ma'am.

21  *Q.*  Directing your attention to what's previously been marked

22  Government Exhibit 8, you should see this on the screen in

23  front of you.

24  *A.*  Okay.

25  *Q.*  Do you recognize this?

Gyniferr Sandusky – Direct

1   A.   Yes, ma'am.  It's Cell 106 in the Delta unit.

2   Q.   What specifically does it depict?

3   A.   It depicts a picture of the outside sliding door entering

4   into the cell.

5   Q.   Does this fairly and accurately represent the outer door of

6   Cell 106?

7   A.   Yes, it does.

8         MS. WEBER:   The government moves to admit Exhibit 8

9   into evidence.

10         THE COURT:   Any objection to the admission of

11   Exhibit 8?

12         MR. VARHOLAK:   No, Your Honor.

13         THE COURT:   Exhibit 8 will be admitted.

14         MS. WEBER:   May we display that to the jury?

15         THE COURT:   You may.

16   BY MS. WEBER:

17   Q.   Turning your attention now to Government's Exhibit 14, do

18   you recognize this?

19   A.   Yes, ma'am.

20   Q.   What does this depict?

21   A.   It depicts how the inner cell is laid out and it also has

22   some evidence that was collected that day.

23   Q.   When you say the inner cell, are you referring to Cell 106?

24   A.   Yes, ma'am.

25   Q.   Does this fairly and accurately represent the inner door of

Gyniferr Sandusky – Direct

1   Cell 106 as you found it on September 11th, 2013 when you

2   arrived to collect evidence?

3   A.  Yes, it does.

4           MS. WEBER:  Government moves to admit Government

5   Exhibit 14 into evidence.

6           THE COURT:  Any objection to the admission of Exhibit

7   14?

8           MR. VARHOLAK:  No, Your Honor.

9           THE COURT:  Exhibit 14 will be admitted.

10          MS. WEBER:  May we publish that to the jury?

11          THE COURT:  You may.

12  BY MS. WEBER:

13  Q.  Turning now to the -- one moment, please.

14          Turning now to the physical evidence.  If you could

15  retrieve what's previously been marked Government's Exhibit 3

16  from the physical evidence.  Is that what's previously been

17  marked Government's Exhibit 3?

18  A.  Yes, ma'am.

19  Q.  Have you seen that before?

20  A.  Yes.

21  Q.  What is that?

22  A.  This would be a homemade shank, weapon.

23  Q.  You can go ahead and open the packaging on that.

24          Where did you find that?

25  A.  It was -- when I arrived, it was located on the inner

Gyniferr Sandusky – Direct

1    sallyport bars, the picture you have on the Exhibit 14.

2    Q.  Does it look the same or similar as to how it looked when

3    you recovered it on September 11th, 2013?

4    A.  Yes, it does.

5           MS. WEBER:  We move to admit Exhibit 3.

6           THE COURT:  Any objection to the admission of

7    Exhibit 3?

8           MR. VARHOLAK:  No.

9           THE COURT:  Exhibit 3 will be admitted.

10          MS. WEBER:  May we publish that?

11          THE COURT:  In what regard?

12          MS. WEBER:  May she hold it up and show the jury?

13          THE COURT:  She may.

14   BY MS. WEBER:

15   Q.  Thank you.  If you could retrieve what's been marked as

16   Exhibit 4, please.  You can go ahead and remove that from the

17   packaging.

18          Do you recognize that?

19   A.  Yes, ma'am.

20   Q.  What is that?

21   A.  It's a homemade body armor type shield.

22   Q.  Where did you find that?

23   A.  It was also located on the inside bars of Cell 106.

24   Q.  Does it look the same or similar to how it looked on --

25   when you recovered it on the morning of September 11th, 2013?

Gyniferr Sandusky – Direct

1    A.  Yes, ma'am.

2            MS. WEBER:  Move to admit Exhibit 4.

3            THE COURT:  Any objection to the admission of

4    Exhibit 4?

5            MR. VARHOLAK:  No, Your Honor.

6            THE COURT:  Exhibit 4 will be admitted.

7    BY MS. WEBER:

8    Q.  I know you already held that up, but if you can just show

9    the jury again.  Thank you.

10   A.  You are welcome.

11   Q.  Could you retrieve -- when you are finished putting that

12   away, if you could retrieve Exhibit 5.

13   A.  Yes.

14   Q.  You can remove that from the packaging as well.

15           Do you recognize Exhibit 5?

16   A.  Yes, ma'am.

17   Q.  What is it?

18   A.  It was a pair of khaki pants with a homemade attached

19   sheath or something to hold a weapon in.

20   Q.  Where did you find that?

21   A.  They were located inside the Cell 106.

22   Q.  Does that item look the same or similar to how it looked

23   when you recovered it on September 11th, 2013?

24   A.  Yes, ma'am.

25           MS. WEBER:  Government moves to admit Exhibit 5.

Gyniferr Sandusky - Direct

1          THE COURT:  Any objection to the admission of

2    Exhibit 5?

3               MR. VARHOLAK:  No, Your Honor.

4          THE COURT:  Exhibit 5 will be admitted.

5    BY MS. WEBER:

6    Q.  If you could hold those up and show the jury.  Thank you.

7    A.  You are welcome.

8    Q.  Could you retrieve Exhibit 6?  And again, you can remove

9    that from the packaging.

10         Do you recognize Exhibit 6?

11   A.  Yes, ma'am.

12   Q.  What is it?

13   A.  It was a t-shirt that was used as a -- typically like a

14   pillow case.

15   Q.  And where did you find that?

16   A.  It was located inside the cell.

17   Q.  Does it look the same or similar to how it looked when you

18   recovered it on September 11th, 2013?

19   A.  Yes, it does.

20              MS. WEBER:  Move to admit Exhibit 6.

21              THE COURT:  Any objection to the admission of

22   Exhibit 6?

23              MR. VARHOLAK:  No, Your Honor.

24              THE COURT:  Exhibit 6 will be admitted.

25   BY MS. WEBER:

Gyniferr Sandusky – Direct

1   Q.   Could you hold that up to show the jury and also describe

2   it?

3   A.   Here is the pillow that it was on the outside of.  And then

4   the t-shirt was actually turned wrong side out.  And when I

5   turned it to the right side, it had a drawing of the lungs and

6   the heart, as well as drawn on the outside of it.

7   Q.   Thank you.

8        And turning now to Exhibit 7, please.  And again, you

9   can take that out of the packaging.

10       What is Exhibit 7?

11  A.   It's a plastic bottle with the word Mace written on the

12  outside of it.

13  Q.   Where did you find that?

14  A.   I located it outside the cell.

15  Q.   On the morning of September 11th, 2013?

16  A.   Yes, ma'am.

17  Q.   Does it look the same or similar to how it looked that

18  morning when you recovered it?

19  A.   Actually, it was kind of more of a red liquid inside of it.

20  Q.   What color is it now?

21  A.   It's more kind of like a brown color now.

22       MS. WEBER:  We move to admit Exhibit 7.

23       THE COURT:  Any objection to the admission of

24  Exhibit 7?

25       MR. VARHOLAK:  No, Your Honor.

1          THE COURT:  Exhibit 7 will be admitted.

2     BY MS. WEBER:

3     Q.  Could you hold that up and show that to the jury, please?

4     Thank you.

5     A.  You are welcome.

6     Q.  Next we have Exhibit 9.  Do you recognize Exhibit 9?

7     A.  Yes, ma'am.

8     Q.  What is it?

9     A.  It's a rapid rotation baton that officers carry when they

10    are inside the housing units.

11    Q.  Where did you recover that item from?

12    A.  It was also hanging inside the inner bars of Cell 106 that

13    day.

14    Q.  Does it look the same or similar to how it looked when you

15    recovered it on September 11th, 2013?

16    A.  Yes, ma'am.

17         MS. WEBER:  Move to admit Exhibit 9.

18         THE COURT:  Any objection to the admission of

19    Exhibit 9?

20         MR. VARHOLAK:  No, Your Honor.

21         THE COURT:  Exhibit 9 will be admitted.

22    BY MS. WEBER:

23    Q.  If you can hold that up and show the jury, please.  Thank

24    you.

25         Next we have Exhibit 12.  Could you recognize

Gyniferr Sandusky – Direct

1   Exhibit 12?

2   *A.*   Yes, ma'am.

3   *Q.*   What is it?

4   *A.*   It's another plastic container marked with the word Mace on

5   it.

6   *Q.*   Where did you find this?

7   *A.*   It was located outside Cell 106.

8   *Q.*   Does it look the same or similar to how it looked when you

9   recovered it on September 11th, 2013?

10  *A.*   Yes.

11              *MS. WEBER:*   Move to admit Exhibit 12.

12              *THE COURT:*   Any objection to the admission of Exhibit

13  12?

14              *MR. VARHOLAK:*   No, Your Honor.

15              *THE COURT:*   Exhibit 12 will be admitted.

16  *BY MS. WEBER:*

17  *Q.*   Could you hold that up for the jury?   Thank you.

18              Last, I believe, we have Exhibit 13.   Do you recognize

19  Exhibit 13?

20  *A.*   Yes.

21  *Q.*   What is it?

22  *A.*   It's a second rapid rotation baton that officers carry when

23  inside the units.

24  *Q.*   Where did you find that?

25  *A.*   It was also located inside, on the bars inside of Cell 106.

Gyniferr Sandusky – Cross

1  Q.  And does it look the same or similar to how it looked when

2  you recovered it on September 11th, 2013?

3  A.  Yes, it does.

4         MS. WEBER:  Move to admit Exhibit 13.

5         THE COURT:  Any objection to Exhibit 13?

6         MR. VARHOLAK:  No objection.

7         THE COURT:  Exhibit 13 will be admitted.

8  BY MS. WEBER:

9  Q.  If you could hold that up and show the jury, please.  Thank

10  you.

11         And I just want to turn your attention back to

12  Exhibit 14.  Now that we have seen the evidence, could you just

13  describe in more detail what's pictured in Exhibit 14?

14  A.  The item that is marked No. 5 is actually the homemade

15  metal weapon or shank.  Right next to picture card No. 9 is the

16  body armor that was made out of the sheet and kind of got the

17  cardboard inside of it.  Seven and eight are the rapid rotation

18  batons that correctional officers carry while working in the

19  units.  And 6, I am not sure what 6 is.

20         MS. WEBER:  That's fine.

21         Nothing further.  Thank you.

22         THE COURT:  Thank you.

23         Cross-examination?

24                    **CROSS-EXAMINATION**

25  BY MR. VARHOLAK:

Gyniferr Sandusky - Cross

1    Q.   Good afternoon, Ms. Sandusky.

2         I want to begin with where we left off at Exhibit 14.

3    This is a picture of the gate that essentially leads into the

4    cell, correct?

5    A.   Correct.

6    Q.   So this would be -- if I were standing looking into this, I

7    probably would be standing in the sallyport area of this; is

8    that accurate?

9    A.   Yes.

10   Q.   And behind me would be that steel gate that is the second

11   gate going into the cell, correct?

12   A.   I am sorry, could you repeat that?

13   Q.   Sure.  So if I was standing in the sallyport area looking

14   this direction, behind me would be a steel gate that's the

15   second gated area to lead into a cell, correct?

16   A.   Correct.

17   Q.   And you said this, whatever that is there, you are not sure

18   what that was?

19   A.   I am not sure what that is.

20   Q.   And this picture is an exact replication exactly of what

21   this looked like when you got there?

22   A.   Yes, when I got there.

23   Q.   And there is nobody in the cell at this point?

24   A.   No, there is not.

25   Q.   So by the time you get there, there is nobody left in the

Gyniferr Sandusky – Cross

1   cell.

2   *A.*   No.

3        *MR. VARHOLAK:*   Now would you mind putting up Exhibit

4   No. 8 for me.

5   *BY MR. VARHOLAK:*

6   *Q.*   This here is that metal gate that we talked about, the

7   outside metal gate that would lead into the sallyport, correct?

8   *A.*   Correct.

9   *Q.*   And this here, I am going to circle the smallest circle

10  inside.   That's one of the windows you can look through in

11  order to look into the sallyport and then into the cell,

12  correct?

13  *A.*   Correct.

14  *Q.*   And this, we don't have a full picture, but we have about a

15  half picture of it.   That right there.   That's another window

16  that can be used to look into that sallyport area?

17  *A.*   That is correct.

18  *Q.*   So there is essentially two ways to look in.   The first is

19  the first circle up there and the second is the second circle,

20  correct?

21  *A.*   Yes.

22  *Q.*   Now, you mentioned that at least as of 2013 you are a

23  member of the evidence recover team?

24  *A.*   Correct.

25  *Q.*   How much training did you have in order to become a member

Gyniferr Sandusky - Cross

1  of the evidence recovery team?

2  A.  We did three days of training with FBI, and then we go

3  through quarterly training, so every -- well, every three

4  months.  And then we went to monthly training, so . . .

5  Q.  So initially the FBI comes in for three days and you have

6  federally trained agents teaching you how to recover and mark

7  exhibits and those other type things?

8  A.  Correct.

9  Q.  And then after that you said you have quarterly training?

10  A.  Correct.

11  Q.  Is that also with the FBI?

12  A.  It can be sometimes.  And then other times it would just be

13  we have lead instructors that come in and teach the class.

14  Q.  Are those lead instructors through the Bureau of Prisons or

15  through --

16  A.  Through the Bureau of Prisons.

17  Q.  So if I am accurate, you initially have three days with the

18  FBI and then quarterly with either the FBI or somebody within

19  the Bureau of Prisons with skills and training in how to

20  collect evidence and preserve evidence?

21  A.  Correct.

22  Q.  And, of course, the reason you are preserving evidence is

23  either to use in some internal disciplinary procedure or

24  potentially a court case like this where somebody is being

25  prosecuted for something they did within the Bureau of Prisons,

1  right?

2  *A.*  Correct.

3  *Q.*  And how long had you been doing this job before September

4  11th, 2013?

5  *A.*  At that point I believe close to three years.

6  *Q.*  And are you still in that job now?

7  *A.*  No, I am not.

8  *Q.*  But at least at this point you had had three years of

9  experience working in this evidence recovery?

10  *A.*  Correct.

11  *Q.*  And presumably not only the three days of training, but we

12  are talking quarterly somewhere along 12 training periods in

13  that three-year period?

14  *A.*  Correct.

15  *Q.*  And, in fact, one of the things that you do, I noticed that

16  here, I noticed it when you were showing me the exhibits

17  earlier, is you wear gloves while you are going through this

18  process.

19  *A.*  Yes.

20  *Q.*  And that's so that your -- you don't leave any materials or

21  skin or DNA or fingerprints or something like that of yours on

22  the evidence, correct?

23  *A.*  Yes.

24  *Q.*  And the reason for that is so if the evidence were to be

25  sent out to a lab somewhere, it's not going to come back with

Gyniferr Sandusky – Cross

1   an extra set of fingerprints or extra set of DNA and it's going

2   to be yours, correct?

3   A.   Correct.

4   Q.   It's essentially so evidence is not contaminated?

5   A.   Yes.

6   Q.   So on September 11th, 2013 when you went in, I am assuming

7   you were wearing those gloves or some sort of gloves, correct?

8   A.   Yes.

9   Q.   Again, so that you don't contaminate the evidence?

10  A.   Yes.

11  Q.   And then you took the evidence as you saw it, photographed

12  it, correct?

13  A.   Yes.

14  Q.   And then you put it inside the evidence containers that we

15  saw here today.

16  A.   Yes.

17  Q.   And then it sat there from September 11th, 2013 until

18  earlier today when you removed them to mark them all up,

19  correct?

20  A.   Correct.

21  Q.   So let's talk about the various exhibits.

22          The first one, Exhibit 3, this was the homemade shank,

23  correct?

24  A.   Yes.

25  Q.   The end of that, could you hold up sort of the end, not the

Gyniferr Sandusky - Cross

1    pointed end, but the other end of that?  And again for the

2    record, I note you are putting on the gloves again to avoid the

3    contamination.

4    A.   So you would like it taken out of the box?

5    Q.   Please.

6              Now, it's hard for me to see here, but can you

7    describe what is wrapped around the bottom of that?  Is that

8    some sort of cloth or what is that?

9    A.   It looks like it could be from like a torn sheet.

10   Q.   And then is tape wrapped around that or is it just a torn

11   sheet wrapped around?

12   A.   You know, it kind of looks like lined paper underneath the

13   wrapping of the sheet.

14   Q.   So the sheet looks like a sheet that was in some sort of

15   bed cloth you indicated, correct?

16   A.   Correct.

17   Q.   Was that exhibit ever sent off to an FBI lab or any other

18   lab for DNA testing --

19   A.   As far as I know, no.

20   Q.   -- to see if any hair fibers or anything like that might

21   have been on that exhibit?  You don't think that was done.

22   A.   In honesty, I don't know because it goes to the SIS shop

23   and it's retained in their evidence locker.

24   Q.   But I think you had said that to the best of your

25   knowledge, it's remained inside these evidence bags ever since

Gyniferr Sandusky - Cross

1    the incident.

2    A.   Correct, so to the best of my knowledge.

3    Q.   Let's turn to Exhibit 4.

4         This is the homemade body armor, correct?

5    A.   Yes.

6    Q.   This is made out of it looks like some sort of t-shirt with

7    something underneath it; is that accurate?

8    A.   It looks more like a bed sheet.

9    Q.   A bed sheet with something underneath it.  Was that bed

10   sheet ever sent off for DNA testing?

11   A.   No.

12   Q.   Exhibit No. 5, these are pants with a knife holder in it,

13   correct?

14   A.   Yes.

15   Q.   And, in fact, the government is alleging these are pants

16   that Mr. Petty wore at the time of the alleged assault,

17   correct?

18   A.   Yes.

19   Q.   Were those ever sent off for DNA testing or hair fibers or

20   anything else?

21   A.   No.

22   Q.   No. 6, this was a t-shirt used as a pillow case, correct?

23   A.   Yes.

24   Q.   Presumably that somebody would have laid their head down on

25   because it's being used as a pillow case, right?

1   A.   Yes.

2   Q.   Was that ever sent off to a lab anywhere for hair fiber

3   testing or DNA testing or anything of that nature?

4   A.   No.

5   Q.   This is really the same for all these exhibits that were

6   introduced today.   These have never been sent off for DNA

7   testing, fingerprint testing, any other sort of testing that

8   could have been done; is that accurate?

9   A.   No.

10          MR. VARHOLAK:   The Court's indulgence for one moment.

11          THE COURT:   No problem.

12          MR. VARHOLAK:   Nothing further.

13          THE COURT:   Redirect?

14                      **REDIRECT EXAMINATION**

15  BY MS. WEBER:

16  Q.   To your knowledge, had anyone touched the evidence other

17  than the defendant before you arrived at his cell?

18  A.   No.

19          MS. WEBER:   Nothing further.

20          THE COURT:   All right.   Mr. Varholak, any recross?

21          MR. VARHOLAK:   No, Your Honor.   Thank you.

22          THE COURT:   Ms. Sandusky, you may step-down.   Thank

23  you.

24          All right.   The United States may call its next

25  witness.

1          MS. COVELL:  Your Honor, at this point the government

2   rests.

3          THE COURT:  Ladies and gentlemen, what that means is

4   that the government has concluded the evidentiary portion of

5   its case.  So at this time we need to take up a few matters

6   outside of your presence, so I am going to ask you if you could

7   go back to the jury room at this time.  And then when we are

8   ready to bring you back in, Ms. Preuitt-Parks will let you

9   know, all right?  So the jury is excused.

10         And also make sure that even though the government may

11  have rested, you are not free to deliberate, so just wait and

12  we will let you know when to come back in.

13         The jury is excused.

14         (Jury excused.)

15         Mr. Varholak, any motions on behalf of Mr. Petty?

16         MR. VARHOLAK:  With the Court's indulgence for one

17  moment, Your Honor.

18         THE COURT:  Sure.

19         MR. VARHOLAK:  Thank you, Your Honor.

20         Your Honor, at this time we would move for judgment of

21  acquittal under Rule 29.  We submit that given the evidence in

22  this case, frankly the lack of DNA testing, the lack of other

23  testing that could have been done on these items, that there is

24  insufficient evidence to sustain the conviction and we would

25  ask that the Court enter a judgment of acquittal.

1          *THE COURT:*  Understood.  Thank you.

2          Response by the United States?

3          *MS. COVELL:*  Your Honor, we oppose the motion.

4    Viewing the evidence in the light most favorable to the

5    government, we submit that the evidence proves beyond a

6    reasonable doubt that the defendant committed the crimes.

7          *THE COURT:*  Thank you.

8          The matter before the Court is Mr. Petty's Rule 29

9    motion.  The motion is being made at the close of the

10   government's case.  And given the fact that, as Ms. Covell

11   mentioned, the Court must view the evidence in a light most

12   favorable to the government, the Court may not weigh the

13   evidence or make credibility determinations.  And essentially

14   the standard is whether or not there is substantial evidence

15   from which a jury might properly find the defendant guilty

16   beyond a reasonable doubt as to each of the charges.

17         In looking at the elements of each of the three

18   charges in this case, the Court finds that a reasonable jury

19   could find that there is substantial evidence to find that

20   Mr. Petty is guilty of each of the elements of each of the

21   three offenses beyond a reasonable doubt, so as a result, the

22   Court will deny the defendant's Rule 29 motion.

23         All right.  Now let's talk about how to proceed.

24         Mr. Varholak, do you need some time with Mr. Petty to

25   discuss whether or not he wants to testify?

1          MR. VARHOLAK:  No, Your Honor.  We discussed this

2     previously and nothing has changed Mr. Petty's mind from

3     earlier, so he does not wish to testify.  With that we intend

4     to rest on the defense side.

5          THE COURT:  Okay.  Next question is this, and that is

6     would you prefer that we bring the jury back in just to hear

7     that you are not going to present any evidence, at which point

8     we need to send them out again, or would you prefer that we

9     just have Ms. Preuitt-Parks indicate that the break is going to

10    last a little bit longer and then we could -- I don't know if

11    anyone needs a break, but we could then go right into our final

12    jury instruction conference.

13         MR. VARHOLAK:  I think for expediency the second way

14    makes sense, Your Honor.

15         THE COURT:  Ms. Covell, any objection to that?

16         MS. COVELL:  No, Your Honor.

17         THE COURT:  That sounds fine, then.

18         Then let's do our jury instruction conference.

19         Ms. Covell indicated that she had looked over the

20    draft instructions as passed out this morning and that she did

21    not have any objection or did not want to discuss any of the

22    instructions.  In fact, she indicates that the packet looked

23    okay.  I take it that the government also has no further

24    instructions to tender to the Court; is that correct?

25         MS. COVELL:  That's correct, Your Honor.

1          THE COURT:  And is that still true, Ms. Covell?  In

2     other words, nothing has happened since the time that we last

3     spoke about instructions that causes the government to change

4     its mind?

5          MS. COVELL:  No, Your Honor, only that we believe some

6     of these --

7          THE COURT:  Some of them are not going to be

8     applicable.  We will go through that real quick.

9          Have you had a chance to look at the verdict form as

10    well, Ms. Covell?

11         MS. COVELL:  We have, and we have no objection to that

12    as well, Your Honor.

13         THE COURT:  Why don't we do this before we get to

14    Mr. Varholak's comments regarding Instruction No. 3, the burden

15    of proof instruction; namely, why don't we go through the

16    instructions and we will decide what instructions are not

17    applicable based upon the state of the evidence.  We will skip

18    over Instruction No. 3 for the time being.

19         Instruction No. 7, limited purpose, I don't believe

20    that there was any evidence that the Court required the jury to

21    consider only for a limited purpose, so I think that we should

22    eliminate Instruction No. 7.  Does the government agree?

23         MS. COVELL:  We do, Your Honor.

24         THE COURT:  Mr. Varholak?

25         MR. VARHOLAK:  Yes, Your Honor.

1          THE COURT:  Then Instruction No. 8, given the fact

2     that Mr. Petty is not going to testify and as a result no --

3     there won't be any statements of his coming in or for the jury

4     to consider, it would seem that Instruction No. 8 should be

5     removed as well.  Do you agree, Ms. Covell?

6          MS. COVELL:  I do, Your Honor.

7          THE COURT:  Mr. Varholak?

8          MR. VARHOLAK:  Yes, Your Honor.

9          THE COURT:  Now let's take a look at Instruction No. 9

10    as currently numbered.  This is credibility of witnesses.  You

11    will see in it that there are a couple of bracketed bolded

12    sections.  Those it would appear may be removed since Mr. Petty

13    is not intending to testify.  Does the government agree?

14         MS. COVELL:  Yes, Your Honor.

15         THE COURT:  Mr. Varholak?

16         MR. VARHOLAK:  Yes.

17         THE COURT:  Next, then, I don't believe anyone was

18    impeached with a prior inconsistent statement; and as a result,

19    it would appear that we can remove this instruction.  Does the

20    government agree?

21         MS. COVELL:  Yes, Your Honor.

22         MR. VARHOLAK:  Yes, Your Honor.

23         THE COURT:  Okay.  Instruction No. 11, this

24    instruction would apply if the defendant chooses not to

25    testify.  Therefore, we should leave this instruction in.  Do

1  you agree, Mr. Varholak?

2          *MR. VARHOLAK:*  Yes, Your Honor.

3          *THE COURT:*  All right.  And I was about to ask whether

4  you want that instruction.

5          *MR. VARHOLAK:*  I do want that instruction.

6          *THE COURT:*  And Instruction No. 12 is impeachment by a

7  prior conviction.  No one was impeached by a prior conviction

8  or will be; therefore, it would appear Instruction No. 12

9  should be omitted as well.  Do you agree, Ms. Covell?

10          *MS. COVELL:*  Yes, Your Honor.

11          *THE COURT:*  Mr. Varholak?

12          *MR. VARHOLAK:*  Yes, Your Honor.

13          *THE COURT:*  And it would appear that the rest of the

14  instructions following those instructions should remain in.  Do

15  you agree, Ms. Covell?

16          *MS. COVELL:*  Yes, Your Honor.

17          *THE COURT:*  Mr. Varholak?

18          *MR. VARHOLAK:*  Yes, Your Honor.

19          *THE COURT:*  Now, Mr. Varholak, based upon those

20  rulings, any objections to the instructions that will be part

21  of the instructions otherwise?

22          *MR. VARHOLAK:*  Only Instruction No. 3, Your Honor.

23          *THE COURT:*  Go ahead.

24          *MR. VARHOLAK:*  Thank you, Your Honor.

25          As indicated, I would ask the Court to use the

1    O'Malley instruction that is listed I think in my proposed

2    Instruction No. 4.  My concern with the 10th Circuit pattern

3    instruction is that it leaves out a lot.  For example, it

4    leaves out that the lack of evidence alone can cause a jury to

5    have reasonable doubt.  And that's an important part in this

6    case because one of the things that was evidenced from the

7    cross-examination of the various witnesses and, frankly, right

8    from my opening statement was the idea that we were going to be

9    relying in large part on the lack of evidence and the lack of

10   certain things that were introduced.

11        And I simply think that the O'Malley instruction

12   explains that better.  It also I believe gives a better

13   description of what reasonable doubt is.  The 10th Circuit says

14   it's a reasonable doubt based on reason and common sense after

15   careful and impartial consideration of all of the evidence in

16   the case.  Again, it doesn't say or lack thereof.  It just says

17   all the evidence in the case.

18        I think that the O'Malley instruction does a better

19   job.  It describes that that's the kind of doubt that would

20   make a reasonable person hesitate to act, be of such proof of a

21   convincing character that a reasonable person would not

22   hesitate to rely and act upon it.  It simply gives the jury a

23   more fuller discussion of what that term is.  And therefore, I

24   believe especially in this case where so much of what we are

25   doing is relying on the lack of evidence that was introduced in

1   this case, that the O'Malley instruction gives a better field

2   post to the jury as to what reasonable doubt is and what the

3   burden of proof is in this matter.  I think it's just a better

4   instruction than the 10th Circuit pattern.

5        THE COURT:  Thank you, Mr. Varholak.

6        Ms. Covell?

7        MS. COVELL:  We oppose that request.  As the Court is

8   aware, this issue gets raised frequently in this courthouse.

9   And the 10th Circuit has affirmed that the pattern jury

10  instruction is appropriate and is a apt definition of

11  reasonable doubt.  And Mr. Varholak only read one sentence of

12  the entire definition.  I think the actually more important

13  sentence is the first one of that paragraph which reads:  Proof

14  beyond a reasonable doubt is proof that leaves you firmly

15  convinced of the defendant's guilt, which is a well-documented

16  and upheld definition of reasonable doubt.

17        I also think that the basis on which Mr. Varholak is

18  suggesting O'Malley's would be more appropriate is not actually

19  included in the O'Malley definition as I have read it.  There

20  is nothing in there that says the lack of evidence is the --

21  can be the controlling factor in reasonable doubt, so I think

22  that rationale for O'Malley is actually not set forth in there.

23  We would submit that the 10th Circuit pattern instruction

24  should be applied instead.

25        THE COURT:  All right.  Mr. Varholak, anything else

1    from you?

2         MR. VARHOLAK:  Nothing, Your Honor.

3         THE COURT:  I am going to overrule the objection.  I

4    think that both of these instructions get used a lot and

5    neither one is error.  I don't think that this would be error

6    based upon Mr. Varholak's stated points about ruling out a lack

7    of evidence argument.  I am not really sure that that aspect of

8    the defense's proposed instruction, which is the O'Malley

9    instruction, comes through.

10         It is true, as Mr. Varholak indicates, that the

11   hesitation to act is something that's in the O'Malley

12   instruction, and I think in context that makes sense.

13   Actually, Justice Ginsburg has expressed in a dissent some

14   concerns with that term "hesitation" because it could

15   potentially be a cause of some confusion by the jury, but this

16   is a 10th Circuit pattern instruction.  I think that it

17   correctly explains the law.

18         And even in the unique path of this particular case

19   and the fact that Mr. Petty wants to emphasize the lack of

20   evidence, I don't see anything in the 10th Circuit pattern

21   instruction that would not enable Mr. Petty to argue the exact

22   same things because, of course, a reasonable doubt can be

23   raised by all sorts of things.  And nothing in the instruction

24   that I have included, which is the 10th Circuit pattern

25   instruction, would be misleading in that regard.  And nothing

1    in the O'Malley instruction, which Mr. Petty tendered, makes it

2    real clear that that would somehow be a significant or material

3    advantage to him, so I will deny that request.

4            Mr. Varholak, any other objections to any of the other

5    instructions?

6            MR. VARHOLAK:  No, Your Honor.  I do note one thing on

7    the proposed jury form.  There is just a typo.  The heading

8    says jury instructions, probably copied from the heading from

9    the actual --

10           THE COURT:  Is this on the verdict form?

11           MR. VARHOLAK:  Yes, at least the one that I think I

12   have.

13           THE COURT:  That's a good point.  Yeah, we will

14   correct that.  Thank you for catching that.

15           MR. VARHOLAK:  Other than that, I don't see anything.

16           THE COURT:  Nothing else on the verdict form?

17           MR. VARHOLAK:  No.

18           THE COURT:  Great.

19           All right.  Then I am not sure how long that will take

20   us to get those versions made and the copies produced.  It

21   takes a little bit longer than you might think, but we will try

22   to do that as fast as possible.

23           Ms. Covell, how much time does the United States

24   request for its closing?

25           MS. COVELL:  Your Honor, I would say no more than 15

1    to 20 minutes.

2           THE COURT:  Okay.  Mr. Varholak?

3           MR. VARHOLAK:  I could do it in 20 minutes, too.

4           THE COURT:  That means we might go a little bit past

5    5:00.  So I will inquire of the jury before we begin closings

6    whether anyone has a problem with staying later since I told

7    them that we would pretty much be ending at 5:00.  So we will

8    see how we are doing in that regard, all right?

9           And so as far as the marshals go, any problems with

10   that if we go a little bit after?

11          MARSHAL:  No, sir.

12          THE COURT:  Then we will be in recess until such time

13   as we have got those jury instructions ready to go.  And then

14   as I believe you know, I will read the instructions -- first of

15   all, I will ask Mr. Petty if he intends to introduce any

16   evidence.  And then after that, I will begin reading

17   instructions.  Once I am done with the instructions, then we

18   will have our closing argument, all right?

19          So we will be in recess.  Thank you.

20      (Recess at 4:13 p.m.)

21      (Reconvened at 4:38 p.m.)

22          THE COURT:  We are back on the record in the Petty

23   matter.  The jury is not present.  Have each of you received a

24   copy of the final instructions?

25          MS. COVELL:  Yes, Your Honor.

1          *MR. VARHOLAK:*  Yes, Your Honor.

2          *THE COURT:*  Take a look at Instruction No. 4.  If you

3    compare it to the previous version, you will see that the last

4    paragraph became obsolete, so it's been deleted.  Do you see

5    that, Ms. Covell?

6          *MS. COVELL:*  Yes, Your Honor.

7          *THE COURT:*  Any problem with that?

8          *MS. COVELL:*  No.

9          *THE COURT:*  Mr. Varholak, any problem with that?

10         *MR. VARHOLAK:*  No.  I agree with that.

11         *THE COURT:*  Ms. Covell, is the United States otherwise

12   ready to bring the jury back in?

13         *MS. COVELL:*  Yes, Your Honor.

14         *THE COURT:*  Mr. Varholak?

15         *MR. VARHOLAK:*  Yes, Your Honor.

16         *THE COURT:*  Okay.  Let's get the jury back in.

17         (Jury present.)

18         *THE COURT:*  Thank you, ladies and gentlemen, for your

19   patience.

20         All right.  Mr. Varholak, at this time does Mr. Petty

21   wish to present evidence or testimony?

22         *MR. VARHOLAK:*  We do not, Your Honor.  The defense

23   rests.  Thank you.

24         *THE COURT:*  Thank you.

25         So ladies and gentlemen, what that means is that the

1    evidentiary portion of this case is now over.  So what I am

2    going to do right after these comments is I am going to begin

3    reading the jury instructions to you.  At this time I am going

4    to have Ms. Preuitt-Parks pass out a copy of the jury

5    instructions to each of you.

6         All right.  It looks like each of you has a copy of

7    the instructions.  I am now going to read the instructions to

8    you.  That will probably take us up until about 5:00 o'clock.

9    The question then becomes, you know, I told you that we would

10   probably end right about on time.  The trial has gone a little

11   bit quicker than I expected.

12        So once I finish reading the instructions to you, we

13   could, if you are able to stay a little bit later, immediately

14   go into closing arguments which may last between 30 and 40

15   minutes.  Would you like to do that?  Would you like to go

16   ahead and hear the closings today?

17        The other option is that we could hear closing

18   arguments first thing tomorrow.  I will tell you this, though.

19   Whichever option you want to do, I am not going to have you

20   deliberate today, but instead I will have you come back and

21   commence your deliberations tomorrow in any event.  I know that

22   you haven't had a chance to huddle up.

23        Anyone want to get out pretty much on time, in other

24   words, around 5:00 today and would therefore prefer -- okay.

25   We have a number.  That's a sufficient number of people, then.

140

1    Okay.  So what we will do -- and let me ask the attorneys,

2    would you like me to instruct the jury tomorrow so the jury

3    instructions will be fresh in their mind before closings or

4    instead go ahead and instruct them tonight?

5         MS. COVELL:  Your Honor, especially in light of the

6    time, it might be better to instruct before closings tomorrow.

7         MR. VARHOLAK:  I agree.

8         THE COURT:  You might get a little break on the

9    traffic.  So what I will do, then, so Ms. Preuitt-Parks, she

10   will collect those jury instructions.  We will pass them out

11   again tomorrow.  And then why don't I have you come back at

12   8:30 tomorrow, same time that we otherwise would have been

13   coming back.  She will, as you come into the courtroom, pass

14   those instructions back out to you.  I will go ahead and

15   instruct you.  And then after that we will go right into

16   closing arguments, all right?  And then once we finish the

17   arguments, then at that time I will excuse you to begin your

18   deliberations, all right?

19        So tonight keep those admonitions in mind.  In

20   particular, keep the admonition about not telling your loved

21   ones or employers anything more than that small amount of

22   information, like I said, that you are a juror in federal

23   court, it's a criminal case, and the case will wrap up

24   tomorrow, but no time limit on the deliberations, all right?

25        In particular, keep in mind the admonition not to look

1    up any information whatsoever.  Don't expose yourself to

2    anything.  If for some reason there happens to be some radio

3    report or an article in the press that you even think might

4    relate to this case, avert your eyes, turn off the radio.  Turn

5    off the TV, change the channel, whatever.  Like I said, I don't

6    anticipate that, but just in case.  And then also while you are

7    waiting or even while you are walking out the door, make sure

8    not to discuss the case amongst yourselves.  We are getting

9    close to the point where you can deliberate, but we are not

10   there yet, all right?

11          Ladies and gentlemen, I hope you have a good evening.

12   I will see you back tomorrow at 8:30.  The jury is excused.

13          (Jury excused.)

14          Please be seated.  Let's talk over a couple of things.

15   First of all, we need to figure out whether we are going to

16   give the jury any instructions about handling the exhibits.  So

17   none of the packaging was admitted, so just the objects are

18   going to be given to the jury.

19          Should the jurors, as they observed Ms. Sandusky do,

20   only handle the exhibits while wearing gloves; and if so, does

21   the government have a supply of gloves?

22          *MS. COVELL:*  We do have a supply of gloves, Your

23   Honor, and I would offer to make those available.  I always

24   handle that kind of evidence with gloves just because germs, so

25   I think --

1       *THE COURT:*  Actually, the only reason that the jurors

2   heard to handle items with gloves was to avoid them getting

3   their DNA on it.  Should they be instructed that they should or

4   must handle the physical exhibits with gloves; and if so, to

5   avoid them getting germs or for some reason?

6       *MS. COVELL:*  I will defer to Mr. Varholak because I

7   think it sort of impacts his case a little more than mine, Your

8   Honor.

9       *MR. VARHOLAK:*  I think I would like them instructed

10  they must handle them with gloves to avoid -- we can put it as

11  contamination of evidence, and I would like that instruction.

12      *THE COURT:*  I think that's what I will tell them

13  because that's consistent with what they heard from

14  Ms. Sandusky, so we will provide that admonition to them.

15          The other thing is have the parties talked about

16  Exhibits 1 and 2, the two videos?

17      *MS. COVELL:*  We have, Your Honor.  We do have a clean

18  laptop prepared and Mr. Varholak has reviewed that at the

19  break.

20      *MR. VARHOLAK:*  I looked at it.  It looks clean.  I

21  can't say I went through the entire hard drive, but it looks

22  clean to me.  I will take the government's representation.  I

23  looked at the two videos that are clear and it's the same

24  videos that were introduced.

25      *THE COURT:*  Okay.  And so I take it, then,

 1   Mr. Varholak, that you have no objection to the jury's

 2   unsupervised access to those two videos and armed with the

 3   laptop the ability to play those videos as much as they want

 4   during deliberations?

 5          MR. VARHOLAK:  Nothing beyond my objection to the

 6   admission originally which was overruled, so --

 7          THE COURT:  So that sounds good.  So I will also tell

 8   the jury about that.

 9          Why don't we take a look at the government's exhibit

10   list at this time just so that we are all in agreement as to

11   what has been admitted.

12          MR. VARHOLAK:  I have been keeping track.  I think all

13   have been admitted, 1 through 15.

14          THE COURT:  That's what I show as well.

15          MR. VARHOLAK:  I don't have a witness on each one that

16   was admitted, but I have each one was admitted.

17          THE COURT:  It doesn't matter, but my list shows the

18   same thing.

19          Do you agree, Ms. Covell?

20          MS. COVELL:  I agree, Your Honor.

21          THE COURT:  So if you would tomorrow when the jury has

22   been released to commence its deliberations stick around long

23   enough to make sure that what is going back includes just what

24   has been admitted.  For instance, none of the packaging should

25   go back because none of it was admitted, so we will have to

1    make sure on that.

2              And am I presuming that the t-shirt with the heart on

3    it includes the pillow or what's the state --

4              *MS. COVELL:*  It does, Your Honor.  What I probably

5    should do is I actually only put a exhibit sticker on the heart

6    lung drawing, and I need to put a similar one on the pillow, I

7    think, the same number.

8              *THE COURT:*  Is the exhibit sticker on that side of the

9    cloth or t-shirt or whatever it is that has the heart, lungs?

10             *MS. COVELL:*  Yes.

11             *THE COURT:*  Is it too fragile to --

12             *MS. COVELL:*  To put it over.

13             *THE COURT:*  Could it be put over the pillow?  That

14   would be one way to keep them together.  I don't know.

15             *MS. COVELL:*  Yes, I think we could.  The only issue

16   with that is the way they found it, the drawing was not visible

17   unless you took it off.

18             *THE COURT:*  That's fine.  Why don't you mark the

19   pillow the same way that the outer cloth is marked.  Any

20   objection to that, Mr. Varholak?

21             *MR. VARHOLAK:*  No objections, Your Honor.

22             *THE COURT:*  Those are the issues that I thought of in

23   terms of the exhibits that were introduced.

24             Okay.  Anything else that we should take up at this

25   time, Ms. Covell?

1          MS. COVELL:  No, Your Honor.

2          THE COURT:  Mr. Varholak?

3          MR. VARHOLAK:  I don't think so.  It was the fastest

4    federal trial I have ever been through, but --

5          THE COURT:  I think this is the fastest trial that I

6    have had, too.

7          MR. VARHOLAK:  Maybe back in state court a little bit.

8          THE COURT:  But everyone is very efficient and I

9    appreciate that.  We will plan on reconvening tomorrow at

10   8:30 a.m.

11         The Court will be in recess.  Thank you.

12      (Recess at  4:53 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                   INDEX

2      OPENING STATEMENTS

3           By Ms. Weber                                        20

4           By Mr. Varholak                                     23

5      WITNESSES

6           Dee Dee McEvoy

7                Direct Examination By Ms. Covell               27

8                Cross-examination By Mr. Varholak              72

9                Redirect Examination By Ms. Covell            87

10          Brianne Smith

11               Direct Examination By Ms. Weber                91

12               Cross-examination By Mr. Varholak              97

13          Ralph Smith

14               Direct Examination By Ms. Covell              104

15               Cross-examination By Mr. Varholak             107

16          Gyniferr Sandusky

17               Direct Examination By Ms. Weber               108

18               Cross-examination By Mr. Varholak             118

19               Redirect Examination By Ms. Weber             126

20

21

22

23

24

25

1                          INDEX (Continued)

2                             EXHIBITS

3     Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4     1                          61

5     2                          69

6     3                         112

7     4                         113

8     5                         114

9     6                         114

10    7                         116

11    8                         110

12    9                         116

13    10                         31

14    11                         71

15    12                        117

16    13                        118

17    14                        111

18    15                         37

19                      REPORTER'S CERTIFICATE

20        I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above-entitled matter.   Dated

22   at Denver, Colorado, this 4th day of January, 2016.

23

24                              S/Janet M. Coppock____

25

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 15-CR-00029-PAB
3

UNITED STATES OF AMERICA,
4

       Plaintiff,
5

vs.
6

ISHMAEL PETTY,
7

       Defendant.
8  _____

9                      REPORTER'S TRANSCRIPT
                       Trial to Jury, Vol. 2
10 _____

11         Proceedings before the HONORABLE PHILIP A. BRIMMER,

12 Judge, United States District Court for the District of

13 Colorado, commencing at 8:33 a.m., on the 14th day of July,

14 2015, in Courtroom A701, United States Courthouse, Denver,

15 Colorado.

16                          APPEARANCES

17         Colleen Covell and Rebecca Weber, U.S. Attorney's

18 Office, 1225 17th Street East, Suite 700, Denver, CO 80202,

19 appearing for the plaintiff.

20         Scott Varholak, Office of the Federal Public Defender,

21 633 17th Street, Suite 1000, Denver, CO 80202, appearing for

22 the defendant.

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                              PROCEEDINGS
2              THE COURT:  We are back on the record in the Petty
3    matter.  The jury is not present.
4              Is the United States ready to bring the jury in?
5              MS. COVELL:  We are, Your Honor.
6              THE COURT:  Mr. Varholak?
7              MR. VARHOLAK:  Yes.
8              THE COURT:  Let's go ahead and bring the jury in, and
9    we will at the time they enter hand out the instructions to
10   them.
11             (Jury present.)
12             THE COURT:  All right.  Good morning, ladies and
13   gentlemen.  It looks like you each have a copy of the
14   instructions.  As I indicated yesterday, what I am going to do
15   now is I am going to read those to you.  What I would like for
16   you to do is the following, and that is either follow along as
17   I read the instructions to you or not even look at your copy,
18   but simply listen to my reading of the instructions.  What I
19   don't want you to do is while I am reading them you are reading
20   ahead, so that's the only thing that I would ask.
21             Also, while I think of it now, do the parties waive
22   the recording of my reading of the instructions?
23             MS. COVELL:  We do, Your Honor.
24             MR. VARHOLAK:  Yes.
25             THE COURT:  Ladies and gentlemen, that simply means
```

1    that Ms. Coppock, our court reporter, doesn't have to take down

2    my reading of the instructions since the instructions

3    themselves will provide the record of that.

4              (Jury instructions were read to the jury.)

5              THE COURT:  First of all, we will hear the closing

6    argument on behalf of the United States.

7              Ms. Covell?

8                          **CLOSING ARGUMENT**

9              MS. COVELL:  Thank you, Your Honor.

10             Sometime before September 11, 2013, this man, Ishmael

11   Petty, decided to carry out a brutal, vicious attack in the

12   Super Max prison in Florence, Colorado that he calls home.

13   This wasn't a spur of the moment idea or some sort of act on a

14   moment of rage.  No, this was a premeditated meticulously

15   planned attack that he thought about, that he planned, that he

16   plotted.

17             He made a knife, what we call in prison a shank, from

18   a piece of metal that he sharpened to a point, to a deadly

19   point, and wrapped a handle around.  He fashioned body armor

20   for himself from cloth.  He made a sheath that he could attach

21   to his pants that would hold his knife.  He even drew a diagram

22   on his pillow case of the heart and lungs of a chest presumably

23   to practice his aim.  And then he lied in wait, waiting for the

24   right opportunity to carry out his attack.  He then decided

25   that Wednesday, September 11th, 2013 was the day that he would

1    carry out that attack.

2          So who had the defendant, this 6-foot-4, big, strong

3    maximum security inmate decide to attack?  Was he going to

4    attack another brutal, vicious inmate in Super Max?  Was he

5    going to attack some rogue correctional officer who had been

6    abusing him or harassing him?  Was he going to attack some

7    high-up management official in the prison like the warden?  No.

8          Ladies and gentlemen, that day the defendant decided

9    to attack two young women half his size and a mild-mannered

10   middle-aged librarian who he had never even had a conversation

11   with.  And that, ladies and gentlemen, is the definition of

12   cowardice.  But lucky for us, those three victims that day

13   acted with anything but cowardice.  They acted with bravery and

14   courage and perseverance.

15         And thanks to them Inmate Petty now stands before you

16   facing three counts of assault on a federal officer instead of

17   murder.  And thanks to the testimony of those three victims and

18   the videotapes that you have seen in evidence, you know exactly

19   how this man attacks those three unsuspecting victims, Dee Dee

20   McEvoy, Brianne Smith and Ralph Smith.

21         You know that that morning before they made their

22   rounds at 7:00 a.m., he dawned his body armor and he put on his

23   pants that had the sheath and he had the shank in the sheath.

24   And you know that he somehow was able to trick probably the

25   guards who delivered the morning meal earlier and didn't check

1   when he went into the sallyport to get his meal, they didn't

2   make sure that he went back in his cell before that inner grill

3   closed, so he was able to hide in that sallyport uncuffed,

4   crouched down in the right-hand corner with his weapon and with

5   his armor.

6        And you know that around 7:00 a.m. the two

7   unsuspecting educational techs came to his door to give him

8   books, things to educate him, things to occupy his mind.  And

9   they called for the outer door to be open, thinking they would

10  step into the sallyport to hand him those books.  But you know

11  from the testimony and you know from the video that what

12  happened was that the defendant leaped up at Brianne Smith and

13  threw hot sauce in her eyes.

14       And you will have that hot sauce back and you will see

15  that he labeled it Mace.  And it blinded Brianne Smith and she

16  fell back.  And he wanted her out of the way so he could carry

17  out his brutal attack on Ralph Smith.  And that's what he did.

18  And in that video you see him, he is attacking him, he is

19  attacking him, he is attacking him.  I submit to you, ladies

20  and gentlemen, that he probably had that shank in his hand when

21  he was doing it.

22       And brave little Dee Dee McEvoy comes running up, all

23  5-foot-3 of her, to try to stop this 6-foot-4 inmate from

24  killing Ralph Smith.  And watch the video.  Watch how she goes

25  in and tries to get him and watch how he knocks her to the

1   ground and Ralph Smith to the ground and grabs both of their

2   batons.  And you will have the batons back in the evidence

3   room, in the jury room, and you can see how heavy they are.

4   And he proceeded to start whacking and whacking on Dee Dee, on

5   Ralph.

6          And then you heard Brianne Smith testify that the hot

7   sauce started to clear and she could see and she too tried to

8   interrupt the assault.  And she testified that she thought one

9   more blow to Ralph Smith and he would die, so she got down and

10  she tried to protect his head.  And she turned over and she saw

11  him coming at her swinging that baton.  And she held up her

12  left hand and he whacked her on the left hand, this young

13  female.

14         It was only when Officer Cox you heard, a big, young

15  officer, a physical match for the defendant, started yelling

16  "Get in your cell, get down, get down," that the defendant

17  relented on his attack and he ran back in his cell.  And then

18  you will see on the video big, strong, young Officer Cox comes

19  and stands in front of the smirking Inmate Petty who didn't

20  carry out an attack on him.

21         And ladies and gentlemen, all of this evidence proves

22  beyond any reasonable doubt that the defendant is guilty of the

23  three counts that he is charged with.

24         Now, you just heard Judge Brimmer read the

25  instructions to you and you will have those back with you in

1     the jury room.  And I direct your attention to Instruction

2     No. 12, which is the elements of the crimes with which he is

3     charged, assault on a federal officer.  And they are relatively

4     self-explanatory, but I want to highlight just two things in

5     there.

6            The last element indicates that the government has to

7     prove beyond a reasonable doubt either that the defendant

8     possessed a dangerous or deadly weapon and/or that as a result

9     of the assault the victim suffered bodily injury.  And the

10    instruction after that, No. 13, explains that you have to be

11    unanimous on either one of those or both of those.  And I

12    submit to you that the evidence is clear that both of those are

13    satisfied.  Even though you don't have to find both, I submit

14    that you can.

15           First, let's look at the dangerous weapon issue.  You

16    know he had a shank.  You will have the shank back with you.

17    That's a dangerous weapon.  And I submit you know he used it

18    because you will see on the video and Ms. McEvoy testified that

19    when the defendant ran back in his cell when Officer Cox was

20    coming down the range, he briefly popped back out and grabbed

21    something off the floor and brought it back in.  That, ladies

22    and gentlemen, was the shank I submit to you.

23           And when he got back into his cell, the sallyport

24    door, the inner grill was closed still.  It's only the outer

25    door that's open.  And remember the picture you saw of that

1   with the evidence, the body armor, the two batons and the shank

2   hanging in the grill.   Remember Officer Sandusky's testimony

3   nobody had touched that other than the defendant.   So that's

4   where he put -- you will see where he put the shank right on

5   the grill because he couldn't go back in his cell.

6         But he also used two other weapons, the batons.   Those

7   are dangerous weapons and you clearly see him using those on

8   all three victims in the video.   He also used hot sauce as mace

9   to blind Brianne Smith.   That, too, is a dangerous weapon.   So

10  on that prong of the element I submit you can find he used a

11  dangerous or deadly weapon.

12        The second prong, bodily injury, you can also find

13  that.   Ralph Smith's bodily injury was apparent even today two

14  years after the attack.   You saw him walk in.   You saw that he

15  was wearing a brace.   He has had two surgeries reconstructive

16  on his hand.   He has mild brain damage.   He has to wear a TENS

17  machine to deal with the pain.   He had a concussion.   He was in

18  the hospital for three days.

19        Dee Dee McEvoy you heard also suffered bodily injury.

20  You saw the photograph of her injuries right after the attack.

21  She had to get stitches, get her ring cut off because her hand

22  swelled up.   She doesn't even shake with her right hand anymore

23  because of her pain.

24        And you heard from Brianne Smith.   They thought her

25  arm was broken from the attack that she took with the baton and

1    she was sent for x-rays.  And luckily for her, it wasn't

2    broken, but she suffered pain and bruising and swelling, as

3    well as the pain to her eyes.  And that constitutes bodily

4    injury.  So for both of those prongs you can find beyond a

5    reasonable doubt that we have satisfied that element.

6            So I urge you to go back and watch that video one more

7    time.  Watch him carry out this brutal assault on three

8    innocent, unsuspecting victims for no reason.  Then come back

9    in here and convict him.

10           *THE COURT:*  Thank you.

11           Closing on behalf of the defendant?

12                        **CLOSING ARGUMENT**

13           *MR. VARHOLAK:*  Thank you, Your Honor.

14           May it please the Court, counsel, members of the jury.

15   In the government's opening statement they told you they were

16   going to prove beyond all doubt that Mr. Petty assaulted these

17   three guards.  Well, let's talk about the evidence that they

18   have on that.

19           First, Ms. McEvoy.  She said Mr. Petty committed this,

20   but she acknowledged that this happened very quickly.  She

21   acknowledged that she didn't see the beginning of how this

22   happened.  And most importantly, she has never seen him before.

23   She had never once seen Mr. Petty before this incident.  So we

24   have someone making an ID on a quick basis on somebody who had

25   never seen Mr. Petty before.

1          Ms. Smith, again she says it happened quickly.  She

2     acknowledged she couldn't see for most of it.  And she

3     acknowledged, like Ms. McEvoy, she had never seen Mr. Petty

4     before.  So we have two individuals making identifications on a

5     very quick basis on somebody they had never seen before.

6     Mr. Smith can't identify anybody.

7          And then we have the video.  Look at it.  It's a

8     grainy video.  You can see an assault.  You can see it's a

9     large man doing it, large African-American man, but you heard

10    there is 400-plus inmates within Super Max, 400-plus.  What

11    don't we have in this case, because remember when I spoke to

12    you in the very beginning of this case, I told you there is a

13    presumption.  He is sitting here presumed innocent.  And the

14    burden rests upon the government to prove beyond a reasonable

15    doubt that he committed these crimes.

16         Now, this is the Federal Government with all the

17    resources that they are handed and an assault that occurred

18    within Super Max.  We heard a lot about that, the most secure

19    facility in the country being prosecuted by the Federal

20    Government with all of its resources, and let's talk about what

21    we don't have.

22         Officer Cox, you have heard about him.  We see him in

23    the video.  He comes in.  I don't know his familiarity with

24    Mr. Petty, but this is somebody who comes in after the incident

25    is over who looks inside the cell, who is seen talking to an

1    individual inside the cell.  Where is he?  Why doesn't he take

2    the stand and say, oh, I know this person.  I know this

3    individual.  This is the person who did it.  I have seen him.

4    I know him.  Certainly he could come up.  This is a federal

5    trial.  This man's liberty is at stake.  No, he doesn't

6    testify.

7         Warden Berkebile, you heard a little about him.  This

8    is the warden of the Super Max at least at that time.  This is

9    the person who presumably knows every single inmate in that

10   place, knows all of the procedures that take place within ADX.

11   He is there.  We know that.  That was asked when -- I believe

12   it was Ms. Covell was asking Ms. McEvoy to identify the various

13   people involved there.  She said, yeah, that's warden -- that's

14   the warden of the facility right there.  So he is there

15   immediately afterwards.  He certainly could come in and say,

16   hey -- presumably he knows all the inmates.  He could say this

17   is the person who did this.  No, he doesn't come in to testify.

18        We have 20 or so other guards who come in.  We see it

19   on the video, this swarm of witnesses who could all come in who

20   surely somebody in that whole entire group, somebody knows the

21   inmates in this facility.  But did one of them come in?  No,

22   not one.

23        How about a record keeper?  How about somebody who

24   could say I keep records of who is in each cell in this

25   facility, and on September 11th, 2013, Inmate Petty was

1    assigned to Cell 106.  And I know it because I have got a

2    record of it.  It's right here.  This proves it.  No, we don't

3    have that.

4         So we don't have a clear identification from anybody

5    who knows this man despite the fact that we have 20-some

6    possible witnesses who could put him there if it were him, but

7    no, we don't have that.  Okay.  We don't have those witnesses.

8    Certainly we have got some sort of physical evidence, right?  I

9    mean, we saw all of these pieces of evidence that the

10   government brought in.

11        We saw them bring in batons and jars.  Take a look at

12   them when you are back there.  These are smooth surfaces.

13   These are things that could clearly take and absorb a

14   fingerprint.  The same way as this table as I am touching this

15   table, these are batons and jars.  Do we have fingerprints?

16   No, those were never sent out.

17        We have the knife guard.  Now, that's not as smooth as

18   something that could be clearly grabbed and you might get a

19   good fingerprint off of, but it's cloth.  It would have fibers,

20   hair fibers, DNA.  No, never sent out.  The pants that the

21   government is saying he wore at the time of this assault,

22   clearly that's got to have some sort of hair fiber or something

23   on it, some sort of DNA.  Was that ever sent out?  No.

24        The pillow case that they are claiming he laid his

25   head on, was that sent out for hair fiber testing or DNA

1    testing to show, yup, this is the person who drew that picture?

2    It was him.  We know it because it was his pillow case because

3    it's tested with DNA.  No, never done.

4        Now, you observed Officer Sandusky on the stand.  She

5    was still wearing the gloves to assure that evidence was not

6    contaminated, still wearing them up there.  It's going to --

7    the evidence is going to go back to you and the judge is going

8    to need to instruct you to wear gloves when you see it to

9    preserve the integrity of the evidence.  Well, what integrity?

10   Nothing was done with it.

11       That's why we preserve the integrity.  She did a great

12   job preserving the integrity all the way through this trial

13   here yesterday and today.  And the Federal Government didn't

14   bother to send any of this out so that you could sit there and

15   they could show you, yeah, this is the person who did it

16   because we have got hair fibers.  We have got a print.  We have

17   got all of this.  This proves that this is the person who

18   grabbed those batons, who grabbed that knife, who created

19   that -- the pillow case with the drawing on it.  But it was --

20   none of that was ever done.

21       What else is missing in this case?  We are missing a

22   clear identification.  We are missing analysis of the physical

23   evidence.  We are missing a plausible explanation.  This could

24   not have happened as the government has presented it.  It

25   couldn't have.  We had a lengthy discussion of the security

1   measures at ADX.  Remember, this is the most secure facility in

2   the country, and there are procedures to ensure that an inmate

3   cannot simply get out.

4         Now, the government speculated here in their closing

5   argument that, well, it must have been that the people

6   beforehand accidentally left the door open or didn't watch to

7   see if the door was closed, and therefore that's how somebody

8   got out.  But that doesn't explain the next step.  It doesn't

9   explain what we see on the video and what Ms. Smith testified

10  to.

11        Ms. Smith said she did follow the procedures that were

12  required.  Remember, she said she looked through the little

13  glass window of the door and she said she saw what she believed

14  to be Mr. Petty lying in bed behind the closed gated gate.

15  Remember, there is two gates.  There is the outside steel gate

16  and then there is the inside gated gate.  And his bed is behind

17  that.  And she said she observed him lying in bed, which would

18  have been behind that gate.

19        And we heard about the lights, that if either of those

20  gates were open, if that gated gate was open that would allow

21  somebody to get from the bed into the sallyport area, the light

22  would have been red.  There is no testimony that the light was

23  red.  And they said there is no way that the guard who is in

24  charge of moving those doors would have ever allowed those

25  doors to open if the light was red.

1          So we know she followed procedures.  We know Mr. Smith

2    followed procedures.  Look at the video.  I showed it to you

3    when I was going through it with I believe Ms. Smith.  He looks

4    through the other window.  Remember, there is the little window

5    in the door and then there is the big window that's right next

6    to the door.  He looks through the big window to ensure that

7    nobody is in that sallyport area.  Had he seen -- this is a

8    70-inch.  It's under 6 feet wide.  He is 6-foot-4.  Had he seen

9    a 6-foot-4 man standing in the sallyport area, he wouldn't have

10   given the all clear to open it up.

11         Now, I don't know what happened inside there.  I have

12   no idea how this incident happened and that's the problem.

13   That's reasonable doubt.  We have no idea how this happened.

14         Finally, what else are we missing?  We are missing a

15   motive.  You heard each and every one of these individuals

16   testify and all three of them said they had never met him

17   before.  He hadn't threatened them.  He didn't have some

18   animosity towards them.  They hadn't done him wrong.  He didn't

19   know them.  That's what all of them testified to.

20         Now, the instructions say that reasonable doubt

21   requires you to be firmly convinced.  I would like to say this

22   is the type of convincing that you would need in making the

23   most important decision, choosing who to marry for those of you

24   who are married, deciding whether to purchase a house or to not

25   purchase a house, those types of decisions, because for someone

1    charged with a crime, you are making that type of

2    life-altering, life-changing decision for that individual.

3    That's what the jury does.

4         So if you were making that decision for yourself, if

5    you were going out today to go purchase a house, you would want

6    to see an inspection certainly.  You would want to go out and

7    have an appraisal done.  You can't rely on just the prior owner

8    saying it's in great shape.  You are going to make sure it's in

9    great shape.  You certainly are not going to rely on people who

10   aren't familiar with the house, who don't know the house, to

11   say, oh, it looks good to me.  No, you are going to hire a

12   professional inspector to go out and make sure this is correct,

13   hire a professional appraisal to make sure that the house is

14   worth what you are saying it's worth.

15        You are not going to purchase that if you are missing

16   too much information, if they say, you know what, we are not

17   selling you this house if you go get an inspection.  We are not

18   going to present you with an inspection.  You are not allowed

19   to.  We are not going to present you with an appraisal.  You

20   are not allowed to.  You're not going to purchase that house.

21        Well, it's the same thing here.  You are missing too

22   much information.  You're missing an identity from someone

23   familiar with Mr. Petty.  You're missing a record keeper or

24   someone who could say it was him inside that cell.  You're

25   missing fingerprints.  You're missing DNA from somebody who

1   touched those items.  You're missing a plausible explanation

2   for any of these events and you are missing a motive.

3          With all that you're missing in this case, the verdict

4   is clear.  The government has not met its burden.  They have

5   not proved this case beyond a reasonable doubt and I ask you to

6   come back with a verdict of not guilty.

7          Thank you.

8          *THE COURT:*  Thank you, Mr. Varholak.

9          Now the United States has a rebuttal argument if it

10  chooses to give one.

11                      **REBUTTAL ARGUMENT**

12         *MS. COVELL:*  Thank you.

13         Missing an identification?  Perhaps Mr. Varholak

14  wasn't paying attention when both Dee Dee McEvoy and Brianne

15  Smith pointed to the defendant in the courtroom, identified him

16  by his clothing and said, that's the man who attacked us.

17  Maybe he wasn't paying attention when they -- Ms. McEvoy and

18  Ms. Smith and Ms. Sandusky identified the cell, Cell 106, as

19  Mr. Petty's cell and Mr. Petty's cell alone.  And that's the

20  cell he ran out of.

21         And consider their testimony.  Did they seem to have

22  any doubt about the 6-foot-4 inmate who attacked them?  And

23  think about all those staff who ran down on the range,

24  including the warden.  And if Dee Dee McEvoy and Brianne Smith

25  had misidentified and said, oh, Ishmael Petty just attacked us,

1    he came out of that cell, don't you think they would be like,

2    what are you talking about?  That's not Ishmael Petty.  That's

3    Ted Kaczynski or Terry Nichols.  Consider their testimony and

4    then look at that video and ask yourselves if that is not the

5    man that's sitting in front of you in that video.

6            Fingerprint evidence?  DNA testing?  Ladies and

7    gentlemen, this is not a who-done-it.  This is not a case based

8    on circumstantial evidence out in a free world where the police

9    are just picking up evidence and don't know who it is.  This is

10   a crime that was caught on videotape in a maximum security

11   prison in a single-celled unit.

12           And you know what would happen if we had sent that out

13   for DNA testing because all of that was recovered from the

14   defendant's cell, so of course his DNA will be on it because

15   that's his house.  And if we had sent that out for DNA testing

16   and came back in and said, guess what, we took this pillow and

17   we sent it out for DNA testing, and guess what, it comes back

18   and it matches Mr. Petty here.  Guess what the defense would

19   stand up and say.  That doesn't mean anything.  DNA only shows

20   he lives there.  We all know he lives there, so it doesn't make

21   any sense to send it out for DNA testing because it's not a

22   who-done-it.  It's not a circumstantial evidence case.  This is

23   a direct evidence case.

24           You have the video.  You have the victims who are

25   competent, cognizant.  They weren't drunk.  They were at work.

1   And they saw who attacked them.

2          Now, Mr. Varholak also said you are missing motive.

3   You don't know why he did this.  Well, look back at Instruction

4   No. 12, and I want you to look in there and see where it says

5   that we have to prove motive.  You are not going to see it

6   because it's not an element.  The government does not have to

7   prove motive and that's for a very important reason, because

8   the only person who knows why he carried out this heinous,

9   unprovoked attack is the defendant.  We can't read into his

10   criminal mind.  And he has a constitutional right not to tell

11   us why he did it, so that's why we don't have to prove it and

12   you don't have to find it.

13          Mr. Varholak also said, well, you don't know how he

14   was able to get in that sallyport to carry out that attack and

15   that's reasonable doubt.  Look again at Instruction No. 12 and

16   tell me where in there it says we have to prove how he was able

17   to get into that sallyport.  It's not in there because it's not

18   an element.  It's not a part of reasonable doubt.

19          And I submit to you as the judge instructed, you can

20   draw inferences that are reasonable from the facts that have

21   been presented to you.  And I submit to you that the reasonable

22   inference of how this defendant was able to get into that

23   sallyport was this.  You heard Ms. McEvoy testify that the way

24   they delivered the breakfast meals, the procedure in opening

25   the doors was the reverse of what the educational techs did

1   when they were delivering books.

2           Earlier that morning when they came by to deliver the

3   breakfast, they called for the inner grill to open with the

4   outer steel door closed so that the inmate can come out of the

5   cell into the sallyport, reach through the food slot in the

6   steel door and take the tray.  And then what's supposed to

7   happen and has happened thousands of other times in that prison

8   is that the inmate then walks back into his cell, the grill

9   closes and the sallyport is secured.

10          But you know that he was premeditating this attack

11  that morning.  You know that because he put the body armor on.

12  He put his sheath on.  He put his shank in the sheath.  So you

13  know he was trying to trick those breakfast officers who

14  delivered that meal.  And so I submit to you what happened is

15  that he crouched down and the officers who delivered the

16  breakfast meal, just like Brianne Smith when she looked in the

17  window, thought he was back in bed and called for the inner

18  grill door to close, essentially locking him uncuffed in the

19  sallyport area.

20          So when an hour later the educational techs arrived to

21  deliver the books, what their procedure is, they call for the

22  outer door, the steel door to open so that they can step

23  forward into the sallyport and hand the inmate through the

24  grill, the food slot in that grill, his books.  And that's what

25  Brianne Smith testified.  She looked in.  She thought he was in

1    bed.  And she called for the door to be open to step in and

2    deliver him his books.  And that's when he realized his

3    opportunity from this premeditated attack to carry it out.

4         You don't have to know exactly how he got in there

5    because that's not an element.  The elements that you do know

6    are that he attacked each of those victims, that he did it with

7    a deadly weapon, that he caused bodily injury and that he did

8    it intentionally.

9         Now, I assume you have heard the term red herring and

10   that means -- a red herring is something that misleads or

11   directs you away from an important or relevant issue.  What

12   Mr. Varholak is asking you to do is look at the red herring.

13   He wants you to look at things that aren't required by law

14   or -- such as motive and how he was able to get in the

15   sallyport, things that weren't presented to you.

16        And do you know why he is doing that?  He is doing

17   that because he knows that if you focus on the evidence that

18   has been presented to you, that you will have back in your jury

19   room to review, you can reach only one conclusion and that is

20   that the defendant is guilty beyond any reasonable doubt.  Give

21   Inmate Petty what the evidence compels and what he deserves, a

22   verdict of guilty on all three counts.

23        *THE COURT:*  Thank you, Ms. Covell.

24        Ladies and Gentlemen of the Jury, let's now turn our

25   attention to Instruction No. 16 which I will read at this time.

1              (Instruction 16 was read to the jury.)

2              (The verdict form was read to the jury.)

3              Ladies and gentlemen, also let me give you some

4    information about your deliberations.  I just mentioned in

5    Instruction No. 16 the court security officer.  A court

6    security officer is going to be posted outside of the jury room

7    during the course of your deliberations.  That's not to keep

8    you in.  Rather, that's to keep you from being interrupted

9    during the course of your deliberations.  At any point in time

10   if you decide, you can take a break.

11             The court security officer will, however, gather up

12   your cellphones.  Once again, the purpose of that is so you

13   aren't interrupted by a call or something of that nature.  On

14   the other hand, if someone wants to make a phone call, all you

15   have to do is agree to take a break and then you can go out and

16   get your cellphone and make whatever call you need to make.

17             Also, you can essentially set your own schedule and

18   take breaks as all of you decide you want to take a break.

19   Make sure, though, that you don't deliberate unless all of you

20   are present, so all 12 of you must be present in order for you

21   to commence your deliberations.  If one of you leaves the room,

22   then you have to stop deliberating and wait until all of you

23   are together before you commence your deliberations.

24             Please, also, other than my admonition not to talk

25   about the case until you have been given the permission to

1    begin your deliberations, otherwise keep all those admonitions

2    in mind.   In other words, you can't look up information.   You

3    can't make phone calls to people to ask them to look up

4    information, nothing of that nature.   Instead, you have to rely

5    upon the evidence that you heard in court and also the exhibits

6    that have been admitted and which will be brought back to you.

7        In terms of that evidence, Mr. Varholak is right, if

8    you do examine some of the evidence, please use some gloves

9    that have been provided and that's just so that evidence

10   doesn't get contaminated.   But feel free to examine the

11   evidence.   Don't try to take something apart, but rather you

12   are certainly free to take a look at things and pick them up

13   and look at them from different angles if you want to do that.

14       If, as I just mentioned in Instruction 16, if you do

15   reach a verdict, then you should notify the court security

16   officer that the jury has reached a verdict.   The foreperson

17   will keep the verdict form with him or her, and then when you

18   are brought into court, the court security officer will take

19   that from the foreperson and then hand it up to me and then I

20   will announce the verdict in court.

21       One other thing about the evidence and that is there

22   was a reference to the videos.   So what you are going to be

23   given in addition to I think Exhibits 1 and 2, which are the

24   two videos, is a computer.   And that computer will enable you

25   to look at the videos, if you wish to do so, and you can look

1   at them multiple times if you want.

2          That computer, as far as we know, doesn't have any

3   other information in it, but don't try to look through the

4   computer to double-check on that.  Rather, just use the

5   computer for purposes of playing the video.  And while I don't

6   think that that computer is internet enabled also, don't try to

7   use the computer to access the internet to look up anything.

8          All right.  At this time could the court security

9   officer come forward?  And we will have two.  And

10  Ms. Preuitt-Parks will administer an oath to the court security

11  officers.

12          (Court security officers were sworn:)

13          *COURT SECURITY OFFICER:*  I do.

14          *COURT SECURITY OFFICER:*  I do.

15          *THE COURT:*  Ladies and gentlemen, there is one

16  additional piece of business and that is the fact that one of

17  you is an alternate and that person has to be Ms. Carper.  I

18  always hate to let you know that fact because after you have

19  sat and gone through the whole process and been so attentive

20  throughout the proceedings, then all of the sudden you don't

21  get to participate in deliberations.  However, I am going to

22  give you some additional instructions, if you don't mind

23  waiting behind.  Do you have anything in the jury room you need

24  to collect?

25          *ALTERNATE JUROR:*  Yes.

1          THE COURT:  Why don't you at this point in time go and

2    get that.  Actually, I will let the rest of you all go out,

3    too.  If you could gather up your things and come back to the

4    courtroom, I will give you some additional instructions.  And

5    the rest of you I am going to dismiss at this time to commence

6    your deliberations.

7          (Jury excused.)

8          Thank you.  Please be seated and we will wait for

9    Ms. Carper.

10          Go ahead and have a seat.

11          All right.  Ms. Carper, somewhat by way of

12    explanation, we picked a random seat and that was a seat that

13    you happened to be sitting in, so that's why it turns out that

14    you are the alternate.  We didn't single you out in any

15    respect.

16          Even though it's unlikely that a member -- one of the

17    12 members of the jury would somehow not be able to continue

18    with jury service, it could happen.  Who knows, someone could

19    be feeling ill today or something of that nature, so let me ask

20    if you would be willing to do the following, and that is to

21    follow all the admonitions that I gave you at the close of the

22    day, in other words, not talk to anyone, not look up any

23    information until such time as Ms. Preuitt-Parks contacts you

24    to let you know that your service is needed or that the jury

25    did reach a verdict and, as a result, you are excused as well.

1              Would you be willing to do that?

2              *ALTERNATE JUROR:*  Yup.

3              *THE COURT:*  Great.  We really appreciate that.  If you

4    can just make sure that Ms. Preuitt-Parks has a cellphone

5    number, a telephone number that you can be -- that you have on

6    you and you can be reached conveniently, all right?

7              *ALTERNATE JUROR:*  Sounds good.

8              *THE COURT:*  Thanks on behalf of the parties and also

9    the Court.  We really appreciate your service in this case and

10   at this point you are excused.  Thank you.

11             *ALTERNATE JUROR:*  Thank you as well.

12             *THE COURT:*  Please be seated.

13             So please make sure that Ms. Preuitt-Parks has cell

14   numbers for the attorneys.  And if you intend to go back to

15   your respective offices, which is fine, make sure you are about

16   10 minutes away in the event there is a question or a verdict.

17             *MS. COVELL:*  Yes, Your Honor.

18             *MR. VARHOLAK:*  Yes, Your Honor.

19             *THE COURT:*  Anything else on behalf of the United

20   States?

21             *MS. COVELL:*  No, Your Honor.  Thank you.

22             *THE COURT:*  Mr. Varholak, anything else on behalf of

23   Mr. Petty?

24             *MR. VARHOLAK:*  No, Your Honor.

25             *THE COURT:*  We will be in recess until we have a

1    question or a verdict.  Thank you.

2        (Recess at 9:35 a.m.)

3        (Reconvened at 10:55 a.m.)

4        THE COURT:  We are back on the record in the Petty

5    matter.  The jury is not present.  The jury has sent a note

6    out.  Did you each get a copy of the note?

7        MR. VARHOLAK:  Yes, Your Honor.

8        MS. COVELL:  Yes, Your Honor.

9        THE COURT:  The note says:  Can we get a magnifying

10   glass?

11       Ms. Preuitt-Parks, have you obtained a magnifying

12   glass?

13       THE COURT DEPUTY:  I did, Your Honor.

14       THE COURT:  There it is.  So the question is whether

15   we should provide a magnifying glass; and if so, whether the

16   one that Ms. Preuitt-Parks displayed would be an appropriate

17   one to provide.

18       Ms. Covell, the government's position?

19       MS. COVELL:  Your Honor, we don't have an objection to

20   providing a magnifying glass or that magnifying glass.

21       THE COURT:  Mr. Varholak?

22       MR. VARHOLAK:  I am thinking of the response because I

23   have never had this one before.  This is a new one for me.

24       THE COURT:  Apparently, according to

25   Ms. Preuitt-Parks, there may have been such a request once upon

1    a time in one of Judge Miller's cases.

2            MR. VARHOLAK:  So that's the magnifying glass that

3    exists?

4            THE COURT:  No.  This is one Ms. Preuitt-Parks had to

5    go hunt down at procurement, wherever that is, but maybe I will

6    just keep it.

7            MR. VARHOLAK:  I think I am going to object on the

8    grounds that if it wasn't magnified in the testimony and

9    evidence that was presented, I don't think it should be

10   magnified now.  I am honestly not certain if that's the right

11   answer or not, Your Honor.  I have never had this question

12   before.

13           THE COURT:  Obviously, if someone wanted like an

14   electron microscope or something that would kind of go beyond,

15   they are trying to be CSI types, that would seem beyond the

16   bounds.  I think a magnifying glass, because it's inherently

17   not that, it makes things maybe a little bit bigger, it doesn't

18   seem to me like it would give the jurors insight substantially

19   beyond what they are able to do just by examining something.

20   So I am going to overrule the objection and allow them to

21   utilize the magnifying glass, but that's not to say that if the

22   next request is for something else, that we may not draw the

23   line.

24           But I will respond -- actually, I am not going to

25   respond to them.  I am just going to have Ms. Preuitt-Parks

1    bring the magnifying glass back and we will await further word

2    from the jury.

3              Anything else on behalf of the United States?

4              MS. COVELL:  No, Your Honor.

5              THE COURT:  Mr. Varholak?

6              MR. VARHOLAK:  No, Your Honor.

7              THE COURT:  Then we will be in recess until we get a

8    question or a verdict.  Thank you.

9        (Recess at 11:00 a.m.)

10       (Reconvened at 11:30 a.m.)

11             THE COURT:  We are back on the record in the Petty

12   case.  The jury has sent out a note indicating that they have

13   reached a verdict.

14             Is the United States prepared to receive the verdict

15   at this time?

16             MS. COVELL:  Yes, Your Honor.

17             THE COURT:  Mr. Varholak, is Mr. Petty prepared to

18   receive the verdict?

19             MR. VARHOLAK:  Yes.

20             THE COURT:  Then Ms. Preuitt-Parks, let's get the jury

21   back in.

22             (Jury present.)

23             THE COURT:  Has the jury reached a verdict?

24             THE FOREPERSON:  Yes, Your Honor, we have.

25             THE COURT:  And Mr. Martin, if you could please hand

1    the court security officer a copy of the verdict form which you

2    appear to have.  Thank you.

3              All right.  At this time I will read the verdict.

4              Count 1, We, the jury, upon our oaths, unanimously

5    find the defendant, Ishmael Petty, in Count One of the

6    indictment:  Guilty.

7              Count 2, We, the jury, upon our oaths, unanimously

8    find the defendant, Ishmael Petty, in Count Two of the

9    indictment:  Guilty.

10             Count 3, We, the jury, upon our oaths, unanimously

11   find the defendant, Ishmael Petty, in Count Three of the

12   indictment:  Guilty.

13             It's dated July 14th and each of the different spaces

14   in the -- on the jury verdict form for signatures has and bears

15   a signature of the members of the jury.

16             All right.  Any request of the parties to poll the

17   jury on behalf of the United States?

18             MS. COVELL:  No, Your Honor.

19             THE COURT:  Mr. Varholak?

20             MR. VARHOLAK:  Yes, please.

21             THE COURT:  Ladies and gentlemen, polling of the jury

22   simply means that the Court will ask each of you whether this

23   is your verdict.

24             Ms. Maes, is this your verdict?

25             JUROR:  Yes, it is.

```
1          THE COURT:  Mr. Collier, is this your verdict?

2          JUROR:  Yes.

3          THE COURT:  Ms. Archer, is this your verdict?

4          JUROR:  Yes.

5          THE COURT:  Mr. Capper, is this your verdict?

6          JUROR:  Yes.

7          THE COURT:  Mr. Martin, is this your verdict?

8          JUROR:  Yes, Your Honor.

9          THE COURT:  Ms. Gruben, is this your verdict?

10         JUROR:  Yes.

11         THE COURT:  Ms. Cordovano, is this your verdict?

12         JUROR:  Yes.

13         THE COURT:  Ms. Golden, is this your verdict?

14         JUROR:  Yes.

15         THE COURT:  Mr. Neumeyer, is this your verdict?

16         JUROR:  Yes, it is.

17         THE COURT:  Ms. Cronin, is this your verdict?

18         JUROR:  It is.

19         THE COURT:  Ms. Dixon, is this your verdict?

20         JUROR:  It is.

21         THE COURT:  And Ms. Dickehage, is this your verdict?

22         JUROR:  Yes.

23         THE COURT:  The jury has been polled.

24         Ladies and Gentlemen of the Jury, your jury service is

25   now completed.  And let me give you my thanks and also the
```

1    thanks of the parties for your service in this case.  You have

2    been very attentive.  It hasn't been a long trial, but I really

3    appreciate the time that you have taken to devote to this

4    particular case.

5            The question -- I am going to release from you all

6    those admonitions that we had talked about, so what that means

7    is that as I said earlier, you can talk to people as much or as

8    little as you wish.  There is a local rule of this court, Local

9    Rule 24.1, that prohibits the parties or any of their

10   representatives from trying to contact you about your verdict

11   unless there has been a written request to be excused from

12   that.  And no one has asked that, so none of the attorneys or

13   the parties will be contacting you about your service.

14           And if someone, if one of them should do that and you

15   object, obviously you can let my chambers know about that

16   particular thing.  But who knows, other people may ask you

17   about it.  And as I said, it's completely up to you as to

18   whether or not you tell them anything about your deliberations

19   or tell them nothing at all, all right?

20           Ladies and gentlemen, I know that you are busy people

21   and you are probably going off to do things.  However, if some

22   or all of you wish to remain behind in the jury room for just a

23   few minutes, I would like to swing by the jury room and thank

24   you personally.  Otherwise -- and if you don't have time,

25   that's fine -- otherwise you are completely free to leave and,

1    once again, with the thanks of the Court.

2              All right.  At this time the jury is excused.

3              (Jury excused.)

4              Please be seated.

5              And by the way, if either side wishes a copy of the

6    verdict form, Ms. Preuitt-Parks will make a copy of that for

7    you.

8              Let's go ahead and choose a sentencing date.

9              THE COURT DEPUTY:  October the 30th at 11:00 a.m.

10             THE COURT:  How does that work for you?

11             MS. COVELL:  That works for the government, Your

12   Honor.

13             MR. VARHOLAK:  It works for the defense too, Your

14   Honor.

15             THE COURT:  So we will do October 30th at 11:00 a.m.

16             Also, if the government would make sure to --

17   Ms. Preuitt-Parks will bring the evidence back out -- make sure

18   it's all properly accounted for and then if the government

19   would take custody of that evidence.

20             MS. COVELL:  I will, Your Honor.

21             THE COURT:  And Ms. Preuitt-Parks will have a form for

22   you to fill out as well, I believe.

23             Anything else on behalf of the United States?

24             MS. COVELL:  No, Your Honor.  Thank you very much.

25             THE COURT:  And Mr. Varholak, anything else on behalf

1    of Mr. Petty?

2              *MR. VARHOLAK:*  Not at this time, no.

3              *THE COURT:*  Then Mr. Petty will be remanded to the

4    custody of the United States Marshals and the Court will be in

5    recess.  Thank you.

6         (Recess at 11:38 a.m.)

7                         REPORTER'S CERTIFICATE

8         I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.  Dated

10   at Denver, Colorado, this 5th day of January, 2016.

11

12                              S/Janet M. Coppock____

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 15-CR-00029-PAB
 3
    UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
    vs.
 6
    ISHMAEL PETTY,
 7
         Defendant.
 8   _____

 9                  REPORTER'S TRANSCRIPT
                        Sentencing
10   _____

11          Proceedings before the HONORABLE PHILIP A. BRIMMER,

12   Judge, United States District Court for the District of

13   Colorado, commencing at 11:07 a.m., on the 30th day of October,

14   2015, in Courtroom A701, United States Courthouse, Denver,

15   Colorado.

16                        APPEARANCES

17          Colleen Covell and Rebecca Weber, U.S. Attorney's

18   Office, 1225 17th Street East, Suite 700, Denver, CO 80202,

19   appearing for the plaintiff.

20          Scott Varholak, Office of the Federal Public Defender,

21   633 17th Street, Suite 1000, Denver, CO 80202, appearing for

22   the defendant.

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
1                           PROCEEDINGS
2              THE COURT:  The matter before the Court is United
3    States of America versus Ishmael Petty.  This is Criminal Case
4    15-CR-29.
5              I will take entries of appearance, please.
6              MS. COVELL:  Good morning, Your Honor.  Colleen Covell
7    on behalf of the United States, and with me is my colleague,
8    Rebecca Weber.
9              THE COURT:  Good morning to you.
10             MR. VARHOLAK:  Good morning, Your Honor.  Scott
11   Varholak, Assistant Federal Public Defender, on behalf of
12   Mr. Petty.  He is present as well.
13             THE COURT:  Good morning to you as well.
14   Mr. Varholak, have you had a chance to review the Presentence
15   Investigation Report and review it with Mr. Petty?
16             MR. VARHOLAK:  Yes, Your Honor.
17             THE COURT:  And other than your objections to the
18   response and objection to the Presentence Investigation Report,
19   which is Docket No. 56, any additional pleadings or objections
20   on behalf of Mr. Petty?
21             MR. VARHOLAK:  No, Your Honor.
22             THE COURT:  Okay.  Thank you.
23             And Ms. Covell, in terms of the United States, the
24   government filed a sentencing statement, which is Docket
25   No. 54, and also filed a response to the defendant's objection,
```

1    which is Docket No. 59.  Other than those two pleadings, any

2    additional pleadings or any objections on behalf of the United

3    States?

4            MS. COVELL:  No, Your Honor.

5            THE COURT:  Thank you.

6            Then let's take up the objection at this time,

7    although let me bring one thing up.  This wasn't brought up by

8    anyone, but it would seem to me that in reviewing the testimony

9    regarding victim Brianne Smith, that she didn't testify -- her

10   testimony was that she was hit on the arm, it was bruised, not

11   broken, and didn't testify to any other types of injury, but

12   yet the Presentence Investigation Report applies a six-level

13   increase for that.

14           MR. VARHOLAK:  Your Honor, I can address that.  I had

15   noted that, too.  I think it's paragraph -- I think when I had

16   went through, I had noted in Paragraph 38 that I had thought it

17   should probably be a three-level instead of a six-level

18   increase.  In the end, it ends up not mattering because the

19   units, the difference between the units doesn't change

20   anything.  And so that's why I didn't file an objection because

21   in the end it doesn't make it more than four levels, so it

22   didn't affect it one way or the other.

23           THE COURT:  That's probably true.  Just not long ago I

24   sent an e-mail about that because I wasn't sure whether it

25   materially affected it.

1      MR. VARHOLAK:  I think the Court is absolutely right,

2  but it doesn't affect anything.  And part of the reason I

3  didn't file an objection is Mr. Petty -- he is going to address

4  the Court -- does sincerely regret his actions.  And I didn't

5  want anything I filed to act like we were minimizing the

6  injuries, so that's why I didn't file anything.

7      THE COURT:  Okay.  Ms. Covell, do you see that

8  calculation as to Count 3?

9      MS. COVELL:  Yes, Your Honor, and I agree.  When I had

10  run the guidelines -- to clarify the record, Ms. Smith also

11  testified that she had -- her eyes were -- when he threw the

12  hot sauce, she had temporarily blindness and stinging and had

13  to have her eyes washed out and that kind of thing.  But under

14  the law she only suffered bodily injury, not serious bodily

15  injury.  And I agree when I did the calculation, it doesn't

16  affect the overall outcome if you assign it a three or a six.

17      THE COURT:  Then I will then ask that the Presentence

18  Investigation Report be revised so that appropriately reflects

19  as to Ms. Smith's bodily injury a three-level, understanding

20  that it's going to come out the same.

21      All right.  Go ahead, Mr. Varholak.

22      MR. VARHOLAK:  Thank you, Your Honor.

23      And I am not going to take up too much time on this in

24  the end.  And I think this is the first case in years upon

25  years, probably since Booker came out, that I didn't -- haven't

1   filed a sentencing statement.  And I will preface all of this

2   with I am not going to address the Court on what the

3   recommended sentence is because Mr. Petty is going to ask the

4   Court to give him the maximum possible sentence.

5          I filed the objection because I think I still need to

6   do my job as a lawyer and I think it is an accurate objection,

7   but this is obviously a unique case in that he is already

8   serving in addition to a 40-year sentence a life sentence, so I

9   don't know how much all of that matters at the end of the day.

10  THE COURT:  The bottom line is that this sentence is

11  independent of the fact that he is serving two lengthy

12  sentences.  And because of *Johnson* coming out so recently, you

13  know, all the fallout from it has not been figured out yet.

14  MR. VARHOLAK:  That's right.  And I think it's an

15  important issue, and I think, you know, I need to continue to

16  do my job as a lawyer even if at the end of the day the net

17  effect of all of this is probably not much.  And I don't want

18  to repeat everything I said in my objection.

19         Obviously, the first question is does *Johnson* impact

20  the guidelines, the residual clause in the guidelines.  And I

21  think that the government in virtually every case across the

22  country has conceded that it does.  I note the one Eleventh

23  Circuit case that says it doesn't.  The 10th Circuit has not

24  said yet that it does, at least as of the time of my filing,

25  but in two unpublished opinions they accepted the government's

1    concession and then remanded with the idea that it impacts the

2    guidelines.

3         So then the second question is if the residual clause

4    is eliminated from the guidelines, does robbery meet the

5    definition of 4B1.2 and does second-degree murder meet the

6    definition in 4B1.2.  Obviously, they are not enumerated in

7    Paragraph 2, so the real question is do they require physical

8    force.  And --

9         *THE COURT:*  Well, the analysis may be a little bit

10   different because, as the government points out, you have

11   Application Note 1.  So what I have been trying to do is try to

12   see to what extent Application Note 1 is dispositive of that

13   issue.  And basically what it seems is that regardless of

14   whether or not Application Note 1 would appear to have a -- to

15   enumerate a crime that would match the conviction that you are

16   trying to figure out, the court, the 10th Circuit, applies the

17   categorical approach.

18        And what I wasn't able to figure out, because I just

19   ran out of time, but to the extent that the 10th Circuit took a

20   look at a robbery conviction, that would be somewhere -- and

21   federal second-degree murder and decided, yup, categorically

22   that's a crime of violence, then I think that that's probably

23   dispositive.  Otherwise, just in terms of the government's

24   argument that, hey, the application note, you know, forecloses

25   it, it's not quite that easy because you still have to do the

1    categorical approach to figure out whether they match up.

2         *MR. VARHOLAK:*  I think that's right.  And I think

3    where this gets really confusing -- and I don't think in the 25

4    years we have been around the guidelines there has probably

5    ever been a situation exactly like this where what the 10th

6    Circuit has held, and I cite the cases in here, is the

7    application note is binding on the Court unless it is

8    contradictory to the language of the guideline or violates the

9    Constitution or federal statute.

10        And listing robbery and second-degree murder I don't

11   think -- certainly there might be case law on this in fact --

12   but I don't think would have been contradictory to the

13   guideline when the guideline claim became the residual clause.

14   The question is once the residual clause is gone, is the

15   inclusion of those in there contradicted.  And I think that it

16   is because both of those crimes, they are obviously not

17   enumerated in 4B1.2 itself, so therefore if they don't require

18   force, attempted force or threatened use of force, and by force

19   we are talking about the violent force, then it's a crime that

20   doesn't meet the definition of the newly modified by *Johnson*

21   4B1.2 definition.

22        *THE COURT:*  See, I am not quite so sure of that

23   because if you look at the application note, it doesn't appear

24   that the enumerated offenses are an attempt to define those

25   that are included within the residual clause because if you

1   look at the -- where it has the definition of crime of

2   violence, and then it says, second sentence, "Other offenses

3   are included as crimes of violence if," and then it sets forth

4   a definition other than the residual clause.

5          You wouldn't expect that.  I mean, if the first

6   sentence was defining crimes that the Sentencing Commission

7   thought, you know, these, no question here, these fall within

8   the residual clause, I don't know if you would then follow it

9   up with a statutory definition.  It would seem more likely, a

10  more natural reading that the first sentence defines crimes

11  which regardless of the definition are, in fact, crimes of

12  violence regardless of the, you know, nonresidual clause

13  definition for crimes of violence.  And, in fact, there are

14  cases in the 10th Circuit, but not reading this clause, reading

15  the one under 2L that say exactly that.

16         MR. VARHOLAK:  Well, except that I think the other way

17  of reading that is that it's an attempt to guide on the

18  residual clause because obviously the residual clause, which is

19  why it was held unconstitutional, is so difficult to read and

20  so difficult to understand as to what fell within there, that

21  it's their attempt to say these are what we are talking about

22  by the residual clause.  And that's why you have the sentence

23  of -- includes extortion, extortionate extension of credit, et

24  cetera, et cetera, robbery, murder, et cetera, et cetera, so

25  that they are trying to guide courts that this is what we are

 1   talking about by the residual clause.

 2          Because I think to then include crimes in an app note

 3   that extend beyond what the definition is gets them into

 4   trouble of going beyond what the definition itself is defined.

 5   Because if -- for example, let's take crime of violence means

 6   and 4B1.2 lists it all.  And then if they were to put in there

 7   crime of violence includes jaywalking or theft, something that

 8   clearly isn't a -- doesn't meet the 4B1.2 crime of violence

 9   definition, then I think they get in trouble where it

10   contradicts the plain meaning of 4B1.2, which the 10th Circuit

11   has said they can't do in an app note.  They can explain it,

12   but they can't make it inconsistent with the guideline it

13   interprets.

14          So if they were to be doing it, to be expanding beyond

15   the 4B1.2 definition to something that has nothing to do with

16   what 4B1.2 is talking about -- the jaywalking might not even be

17   a good example because I guess in theory that could cause

18   problems, could cause a risk of injury by accident or

19   something, but I think maybe theft is a good example because I

20   can't see how that would fall under any of the definitions of

21   4B1.2.  So if they said in an app note it includes theft, it's

22   then clearly contradictory to what 4B1.2 is saying.  So I think

23   that all the Commission can do to maintain the app note as

24   being binding on the Court is to list offenses that meet

25   4B1.2's definition.  Now, they can clarify it in an app note,

1    but they can't completely contradict it.

2         *THE COURT:*  You might think that, but -- so here is a

3    case, *United States v. Hernandez-Castillo.*  This is under

4    2L1.2.  That has a definition of crime of violence as well.

5         *MR. VARHOLAK:*  Right.

6         *THE COURT:*  So anyway, then it cites the application

7    note.

8         *MR. VARHOLAK:*  If I can with the Court's indulgence, I

9    think I can probably pull the case up.  I can probably pull it

10   up on my phone if that's okay.  If the Court can give me a

11   citation, it's the wonder of technology today.

12        *THE COURT:*  Okay, so here is the citation, 449 F.3d

13   1127.  I am looking at Headnote 3, the very end of Section 2 of

14   that opinion.  And I can let you take a look at my copy.

15        *MR. VARHOLAK:*  I think I have it here.  Yes, I do.

16        *THE COURT:*  Okay.  So right after the court -- this is

17   a 10th Circuit case -- cites the application note defining a

18   crime of violence, which like the application note that we are

19   talking about here lists a number of enumerated offenses, it

20   says:  The offenses listed in the application note to

21   Section 2L1.2 "are always classified as 'crimes of violence'

22   regardless of whether the prior offense expressly has as an

23   element the use, attempted use, or threatened use of physical

24   force against a person of another," citing United States v.

25   *Munguia-Sanchez.*  So what that is saying is that regardless of

1   whether or not it would otherwise meet the definition, if the

2   application note lists it, case closed.

3          Now, I haven't found an equivalent case under the

4   application or the application note that we are talking about

5   here, but my guess is that it probably exists.  I just didn't

6   have enough time to find it or figure out, in fact, whether for

7   some reason it doesn't exist.

8          MR. VARHOLAK:  Well, I think the difference between

9   the two is in 2L1.2 -- I am just making sure I am right on

10   this.  I think I am right on this.  In 2L1.2 the crime of

11   violence definition is itself found in the app note.

12          THE COURT:  In the what?

13          MR. VARHOLAK:  In the application note.  So 4B1.2

14   defines crime of violence in the guideline itself, and then the

15   application note explains the guideline.  2L1.2 just says if

16   you are convicted of a crime of violence, you get 12 or 16

17   levels, depending on the age of it, and then the application

18   note is where it defines crime of violence.

19          So that expanding crime of violence, you are not

20   changing the definition of -- they are only expanding an

21   application note.  It's an application note expanding that

22   application note, which means that the application note itself

23   isn't contradicting the plain language of the guideline because

24   the guideline, 2L1.2 itself, the guideline doesn't mention

25   crime of violence, doesn't define crime of violence.  So in

1  there there is no problem because the entire definition of

2  crime of violence is found in the application note; whereas

3  4B1.2, the definition itself is found in the guidelines.

4          THE COURT:  That could be.

5          MR. VARHOLAK:  So I think that that's the difference

6  here.  So I think that's why -- there is no problem in 2L1.2 to

7  say crime of violence includes force, attempted, whatever, and

8  includes in my example theft because they are not contradicting

9  anything in the guideline itself.  4B1.2, it is a problem

10  because it runs afoul of *Wilks* and *Farnsworth* that say you

11  can't contradict what's in the guideline itself.

12          THE COURT:  Yeah, that's a possible distinction.

13          MR. VARHOLAK:  So that's why I think in the end what

14  the Court has to determine in this meeting the -- just because

15  robbery is listed or murder is listed in the application note,

16  I think the Court -- and again this is a unique case where the

17  Commission thought the definition was one thing and now the

18  Supreme Court says no, that's not the definition anymore.

19          So I think what the Court has to do is say does crime

20  of violence -- excuse me, does robbery or second-degree murder

21  necessarily involve the use, attempted use or threatened use of

22  force, because if it doesn't, the mere listing of it in the

23  application note would contradict the plain language of the

24  guideline and you can't do that.

25          So therefore, the Court has to look at does it involve

1    that.  And the answer to that, as I outlined in my brief, is

2    no.  Murder is the easiest one because you can murder somebody

3    by poisoning them and that obviously involves no force

4    whatsoever.

5         THE COURT:  See, that's the one thing.  I mean, I

6    still think based upon 10th Circuit cases that I have looked at

7    that regardless of your argument about the application note,

8    you would have to look to the definition of crime of violence

9    within the guideline itself first.  You can't obviously

10   contradict it regardless of any *Johnson* issue, but I still

11   think that the first step in the analysis is to apply the

12   categorical approach to determine whether or not the enumerated

13   offenses in Application Note 1 encompass the particular

14   conviction that we are talking about.

15        So the question then becomes has the 10th Circuit

16   categorically found that second-degree murder under federal law

17   constitutes a crime of violence.  And I don't know the answer

18   to that yet.

19        MR. VARHOLAK:  And I don't know the answer to that

20   post-*Johnson*.  My guess is pre-*Johnson* it said it did because

21   it obviously involves the risk of bodily injury, serious

22   potential risk of bodily injury, murder.

23        THE COURT:  Yeah, but we are not --

24        MR. VARHOLAK:  And maybe I am confused.

25        THE COURT:  So taking out -- you have to take out the

 1   residual clause, so it would have to be -- because I think that

 2   what the court does, without going through the residual clause,

 3   you know, just determines whether or not it's categorically, in

 4   other words, if it's meant by the application note.  And I

 5   think that in that respect, while there could be some

 6   imprecision in some of the cases, you would have to look for a

 7   case that did not involve the residual clause at all, that just

 8   categorized second-degree murder under federal law as murder

 9   under the application note.

10        MR. VARHOLAK:  I understand what the Court is saying

11   now.  I think the Court is right, and maybe the Court said

12   this, it's a two-step analysis; that if it doesn't meet that,

13   that if second degree-murder doesn't categorically meet murder,

14   then it doesn't matter if it's listed in the application note

15   because it doesn't categorically qualify.  I agree with the

16   Court on that.

17        I guess where I am going is even if it does

18   categorically meet the definition of murder, my position is

19   murder has to now be stricken from the application note because

20   the application note now contradicts the guideline itself

21   because the guideline itself now no longer has the residual

22   clause.  In other words, my position is murder only became part

23   of the application note because of the residual clause because

24   it doesn't meet either of the other two components.

25        If we take three components of 4B1.2, you've got the

1    force component, the enumerated component and the residual

2    component.  The residual component is gone.  As I have argued,

3    it doesn't meet the enumerating component and it doesn't meet

4    the force component; and so therefore it contradicts the plain

5    language of 4B1.2.

6         So even if -- and I agree with the Court, the first

7    question is, does second-degree murder categorically qualify,

8    and I don't know the answer to that either.  But my position is

9    even if it does meet what the Commission means by murder or a

10   50-state analysis of what murder means, it doesn't matter

11   because murder will no longer qualify.

12        THE COURT:  Yeah, I probably disagree with you just

13   looking at the text of the application note, but we don't need

14   to get to the step of the analysis if I am right that first of

15   all you have to figure out -- you've got to find the

16   categorical approach whether it falls within one of those

17   enumerated offenses in the application note.

18        So here is the upshot of all this, and I will let

19   Ms. Covell address this as well, and that is because I think

20   that that's the analysis and because I don't think that anyone

21   in this room has done the research necessary to figure this

22   out, I think we probably are going to need to continue this

23   hearing, but I will let Ms. Covell go first.

24        MS. COVELL:  Thank you, Your Honor.

25        I think the fallacy in the defense argument is that

1    it's all -- his entire argument derives from *Johnson*'s

2    definition of force.  *Johnson*'s analysis of the use of force of

3    whether that constitutes a crime of violence is in conjunction,

4    as the Court has recognized, with a different guideline, the

5    illegal alien guideline.  That guideline is very different.

6          They are interpreting, as the Court has -- or I

7    believe Mr. Varholak pointed out, that guideline note

8    enumerates numerous crimes that constitute crimes of violence,

9    including the two Mr. Petty is charged with.  Importantly, at

10   the very end of that application note it then says "or any

11   other offense under federal, state, or local law that has as an

12   element the use, attempted use, or threatened use of physical

13   force."  So their analysis is looking -- and I am on Page 267

14   of the current guidelines, Subparagraph (iii).  Their whole

15   analysis about force and crime of violence is analyzing crimes

16   other than the ones that are enumerated.

17         So everything they say about that doesn't apply to

18   murder and robbery.  I think the Court is right that we use a

19   categorical approach and I think in this case --

20         THE COURT:  To do what?

21         MS. COVELL:  To figure out whether the crime, the

22   prior convictions, would count under our guideline 2B1.2 as a

23   crime of violence.

24         THE COURT:  You need to do that in one of two

25   instances, I think.  First of all, if the government claims,

1   which it does, that the application note forecloses any inquiry

2   into exactly whether 4B1.2(a)(1) has been met, then you need to

3   apply the categorical approach to the crimes at issue and

4   decide whether or not that crime actually meets the enumerated

5   offense in the application note.

6          MS. COVELL:  Correct.

7          THE COURT:  But then assuming that the answer to that

8   is no, then you are -- and actually, to tell you the truth,

9   under the case law it's pretty much the same inquiry, but then

10  you would apply the categorical approach to figure out, in

11  fact, whether regardless of the application note it fits (a)(1)

12  as well.

13         MS. COVELL:  I think that's right, Your Honor.  I

14  think -- I have extensively researched to find the case that

15  you were talking about, and I think it doesn't exist in the

16  10th Circuit as far as my research goes because this issue

17  wouldn't have come up pre-*Johnson*.  And I think the only reason

18  it's coming up post-*Johnson* is -- and I give props to

19  Mr. Varholak for a creative argument that is actually a red

20  herring.  Because *Johnson* was not focused on that issue, is

21  murder a crime of violence and does it have to have an element

22  of use of force?  They weren't analyzing that issue.  They were

23  analyzing the sort of residual clause of that application note.

24         One important factual issue is the prior convictions

25  as the Court knows that are at issue here are armed bank

1    robbery and second-degree murder.  In the defense argument they

2    talk about, oh, the armed bank robbery, you don't have to use

3    force.  It can be by intimidation.  That's incorrect because

4    that's not the statute he was charged under.  That's Subsection

5    (a).  He was charged under Subsection (b), which is a 25-year

6    offense, not a 20-year offense.

7         THE COURT:  Yeah, my guess is there probably is a case

8    out there, maybe not in the 10th Circuit, but there probably is

9    too, that would say armed bank robbery under federal law is

10   categorically a crime of violence.

11        MS. COVELL:  I would assume that is true since he also

12   got a 924(c) conviction for that, which you would have to be

13   committing a crime of violence in order to get that.  So that I

14   think is factually important to know.

15        I do believe that as I -- I won't reiterate the

16   arguments I made in my response, but that the *Stinson* court

17   said that this commentary in the application note would be

18   persuasive on the interpretation of the actual guideline.  And

19   I think the application note in the illegal alien guideline is

20   also persuasive that the Commission, when it was formulating

21   what is a crime of violence, clearly considered when you take

22   someone's life, that's a crime of violence.

23        And I respectfully disagree with Mr. Varholak that

24   poison is not a use of force.  Of course, it is.  It forces

25   your heart to shut down.  I don't think force is so narrow to

1    mean only you fire a bullet into someone's head or you stomp

2    them to death.  I don't think the Court needs to get into the

3    argument about whether those constitute use of force because I

4    think, as I said before, it's a red herring.

5          The case that Mr. Varholak cites, the only one from

6    the 10th Circuit, dealt with the interpretation of a

7    third-degree -- a Class 3 misdemeanor of assault.  And as we

8    all know and learned in law school, you can carry on an assault

9    without ever touching another human being or using force.  And

10    that's why they were in that analysis.

11          I submit you cannot carry out an armed bank robbery or

12    a murder without some sort of use of force.  You can't kill

13    somebody by blinking at them.  You can't.  And so I think

14    that's -- but I don't think the Court needs to get there

15    because of the *Stinson* principles set forth by the Supreme

16    Court in 1993.

17          *THE COURT:*  Well, I suppose.  Once again, there are

18    cases that say you can't use the most vile hypothetical to come

19    up with something, but I suppose that perhaps you could kill

20    someone without using force.  You could lock them in a room or

21    let them starve to death or something.  That's why I am just

22    not comfortable at this point in time and no one has cited any

23    cases, because you'd think that certainly there has got to be

24    some cases on second-degree murder, maybe not under federal

25    law, but second-degree murder.

1          The problem, of course, is that the federal *mens rea*

2    definitions are completely out of whack with most state laws

3    defining second-degree murder, so it's difficult to compare,

4    but you would at least -- I would at least want to see some

5    type of analysis of that because I think to use the categorical

6    approach you have got to go through the steps.

7          MS. COVELL:  Your Honor, your example, I think you are

8    forcibly locking someone in a room and depriving them of

9    sustenance, so there is an element of force there.  I think in

10   almost every example -- I can't think of an example that I

11   couldn't come up with an interpretation of force because you

12   are taking the life out of a human being.

13         THE COURT:  You know, from a common sense perspective

14   you may say it's laughable, but courts of appeal have applied

15   the same thing, including the Second Circuit in looking at a

16   second-degree assault statute that is almost identical to

17   Colorado law.  So it's not -- the poisoning example, for

18   instance, while you may think it's ridiculous, courts of appeal

19   haven't thought it was ridiculous.  So that's why I don't think

20   that the proposition that the way that the Supreme Court

21   analyzes -- performs any analysis now under the categorical

22   approach would, you know, necessarily without us looking at a

23   case make second-degree murder a crime of violence.

24         MS. COVELL:  And I understand what you are saying

25   about the Second Circuit, but I do think there is a fundamental

1    difference in the analysis when you are dealing with assault

2    cases because of the nature of the crime as opposed to the

3    nature of a murder, whether it be second-degree manslaughter or

4    first-degree.

5         THE COURT:  We are not dealing with an assault case.

6         MS. COVELL:  Well, the Second Circuit case you

7    mentioned I think was an assault case.

8         THE COURT:  That was, yeah.  That was a second-degree

9    assault.

10        MS. COVELL:  So unless the Court has any other

11   questions, I do think the fact as I have put in my brief that

12   the Commission is now proposing to move all of the enumerated

13   offenses up into the guideline makes it a moot point if we were

14   in 2016 and that guideline goes forward.

15        THE COURT:  If, that's the problem.  There are cases

16   out there that say that a post-sentencing adoption of a new

17   application note or new guideline can be used as an

18   interpretive tool for purposes of figuring out what the one

19   meant at the time of the sentencing, but I haven't seen any

20   case that would suggest that a court could use a proposed

21   guideline or a proposed application note as an interpretive

22   aid.  So that's why while that may very well be true, I am not

23   sure that in and of itself it would have too much weight.

24        MS. COVELL:  Well, I think it does reflect the intent

25   of the Commission when they were drafting this guideline and

1    application note.  And I am not saying it should be persuasive

2    in the way that a future guideline would be, but I think

3    it's -- the Court can consider it as reflective of the intent

4    of the Commission in promulgating this guideline because now

5    that it's being questioned by astute public defenders

6    post-*Johnson*, I think they have considered that issue because

7    they directly refer to *Johnson* in the proposed guideline and

8    say we have considered this and this is what we are going to

9    do.

10            *THE COURT:*  Okay.

11            *MS. COVELL:*  Thank you, Your Honor.

12            *THE COURT:*  Mr. Varholak?

13            *MR. VARHOLAK:*  Your Honor, if I may, two points.  I

14   will begin this by stating that Mr. Petty has informed me he

15   does not wish to continue the sentencing even to the point of

16   he would ask me to withdraw the objection if it may continue

17   the sentencing.

18            The second point is I don't know that continuing it is

19   going to get us an answer for this reason.  I don't think we

20   are going to find a case on saying that second degree

21   categorically meets Application Note 1 because nobody --

22   pre-*Johnson* this argument never would have been made because

23   second-degree murder is the taking of another's life with

24   malice aforethought.  We never had to get to the application

25   note.

1          When the residual clause existed, it clearly meant the
2     residual clause.  It clearly contained conduct that caused a
3     substantial risk of bodily injury if you are intentionally
4     taking another individual's life.  So pre-*Johnson* nobody would
5     be making this argument and so you never had to get to the app
6     note because of course taking another's life with malice
7     aforethought meant the residual clause, so we didn't -- nobody
8     made this argument.

9          I don't expect to find any cases on this issue because
10    they never had to get to the application note.  It clearly
11    meant the residual clause, that nobody would ever look to the
12    application note.  So I don't think continuing it is going to
13    find us an answer to that question.

14         THE COURT:  Well, once again, I am hesitant to rule on
15    that, but if Mr. Petty wishes to withdraw the objection, then
16    we don't reach it, then we can just go forward without having
17    to figure it out.

18         MR. VARHOLAK:  If the Court is comfortable with this,
19    how about if -- again, I made a two-part objection.  The first
20    is what the Court said which is where it doesn't meet.  I am
21    not even sure I made this objection, the Court raised it, which
22    is does it necessarily meet the definition of Application Note
23    1's murder.  The second was even if it does, it doesn't matter.

24         If the Court is comfortable with me conceding that it
25    meets the -- that categorically it meets Application Note 1's

1    definition of murder and then the Court said it disagreed with

2    my further analysis that that doesn't matter because it doesn't

3    meet force, if the Court is comfortable with that concession, I

4    think we can move forward and you can overrule my objection on

5    the second point.

6          THE COURT:  I am not comfortable with that.  I still

7    think -- unfortunately, I have got a responsibility to

8    correctly determine the guidelines.

9          MR. VARHOLAK:  Then can I speak with Mr. Petty again?

10   Your Honor, at Mr. Petty's request, I will withdraw my

11   objection.

12         THE COURT:  Mr. Petty, let me just mention I

13   appreciate the fact that you came in today and you were

14   intending to apparently take responsibility and perhaps even

15   suggest that you get the maximum, and that it may seem to you

16   like a waste of time to have to come back just to kind of

17   figure out some of the legal stuff regarding the calculation of

18   the guideline, but on the other hand, you know, it's what we

19   do.  And if it has to be done, if we need to continue it, fine.

20   And you certainly have the right to have the guideline

21   calculated appropriately.

22         On the other hand, because you are the defendant, you

23   are the client, you have the right to withdraw an objection

24   too.  So I just want to make sure that you understand what your

25   options are.  And you can consult with Mr. Varholak on that

1  issue.

2          *THE DEFENDANT:*  Your Honor, no, I feel that I was

3  undercharged in this case.

4          *THE COURT:*  Okay.  So Mr. Petty, are you comfortable

5  then waiving the argument that we have been talking about?

6          *THE DEFENDANT:*  Yes, sir.

7          *THE COURT:*  Then I will deem that the objection that

8  was raised has been withdrawn.

9          Any other issues, then, regarding the calculation or

10  objection regarding the calculation of the guidelines?

11          *MR. VARHOLAK:*  None, Your Honor.

12          *THE COURT:*  Ms. Covell?

13          *MS. COVELL:*  No, Your Honor.

14          *THE COURT:*  Then we will proceed to the recommendation

15  of a sentence in this case.  First of all, I will hear from

16  Mr. Varholak.  Then I will hear from Ms. Covell.  Then finally

17  I will give Mr. Petty an opportunity to address the Court

18  regarding what he thinks the sentence in this case should be.

19          *MR. VARHOLAK:*  Your Honor, given the uniqueness of

20  this case, all I am going to say is I do believe that the

21  defense's recommendation comes best from Mr. Petty and that I

22  think that Mr. Petty does really regret what happened and what

23  happened to the three guards or the three BOP employees in this

24  case.  I am not going to say anything further because I think

25  it comes best from him.  And I have spoken with him enough and

1   have had enough time with him that I think Mr. Petty is the

2   best one to address the Court.

3          THE COURT:  Thank you, Mr. Varholak.

4          Ms. Covell, I know that Ms. McEvoy is here.  I can see

5   her.  And there may be other victims present.  Would any of

6   them wish to address the Court?

7          MS. COVELL:  Yes, Your Honor.

8          THE COURT:  If you want to go first and then have them

9   address the Court or if you want them to go first and then you,

10  whichever way you prefer.

11         MS. COVELL:  I will give a brief statement, then I

12  will introduce Ms. McEvoy.

13         THE COURT:  Okay.

14         MS. COVELL:  Your Honor, to give the Court some

15  background, I know in your prior life you were making intake

16  decisions regarding cases very similar to this.  And I will

17  tell the Court that when this case was first presented to our

18  office, we declined it because of the life sentence that

19  Mr. Petty was already serving for his prior murder.

20         Warden Berkebile, who was the complex warden at the

21  time, traveled up to our office and requested a meeting with my

22  supervisor to reconsider that decision because he felt it was

23  very important to staff morale and to send a message to other

24  inmates that such conduct could not go unpunished.  And based

25  on Warden Berkebile's pleas to us, we did agree to reverse our

1   decision and accept the case, and I am happy that we did.

2           Since we have taken the case, we have actually

3   received letters from other inmates at the ADX, some of whom

4   were on the same range at the time this assault was carried

5   out, and they have written thanking us for prosecuting

6   Mr. Petty and said they were appalled.  Some of them were

7   Muslim inmates who Mr. Petty aligns himself with, the faith he

8   aligns himself with, and said it was contrary to the Muslim

9   faith to do such a thing.  And these, as the Court knows, are

10  very dangerous inmates who are writing these kind of letters.

11          And I think it meant a lot to the victims that we went

12  forward, and I do think the sentence matters in that sense.

13  And I will clarify in our sentencing statement we ask for the

14  statutory maximum of 20 years, and to clarify what we mean by

15  that is for each count.  So we would be asking for a sentence

16  of 60 years or 720 months for the 20-year max on each count.

17          I do believe that he is a career offender.  I believe

18  that his criminal history is not represented accurately because

19  he has numerous incredibly violent prior offenses that were

20  given no points, including where he blew off a kneecap of an

21  innocent person when he was trying to steal their car with a

22  sawed-off shotgun, when he assaulted a pizza delivery man and

23  stole $25 from him and told him to run and he would count to 10

24  and fired the sawed-off shotgun into him hitting him numerous

25  times.

1          So this is a man who has absolutely no respect for

2     human beings and should be locked up in the ADX for the rest of

3     his life.

4          Ms. McEvoy has prepared a statement that she would

5     like to read to the Court, so at this point I will invite her

6     up.

7          THE COURT:  All right.  Ms. McEvoy, if you will please

8     come forward, then.  Go ahead.

9          MS. McEVOY:  On September 11, 2013, Inmate Petty

10    attempted to kill Mr. Smith.  His brutal attack on him that day

11    did not take Mr. Smith's life; however, it took away his life

12    as he knew it.  Mr. Smith will live the rest of his life in

13    pain and will never be the person he was before that day due to

14    Inmate Petty's actions.

15         Mrs. Smith and I did not receive the physical beating

16    that day Mr. Smith was subjected to.  However, we will also be

17    affected by that day for the rest of our lives in different

18    ways.  I believe Inmate Petty's intentions that day were to

19    kill Mr. Smith without regard to anyone involved for his own

20    personal gratification.

21         It was said he attacked innocent staff that day due to

22    being upset at other staff members and wanting to prove a

23    point.  I observed Inmate Petty as Mr. Smith walked up to the

24    stand to testify.  Inmate Petty had a grin on his face as

25    Mr. Smith limped up to the stand with a machine attached to his

1    hand to decrease the pain he feels every day as a result of

2    that attack.

3          While Mr. Smith testified, Inmate Petty turned his

4    body toward him and watched him the entire time.  I believe

5    Inmate Petty did this to try and intimidate Mr. Smith and make

6    him uncomfortable.  I also feel this proves he has no remorse

7    for his actions.  Rather, I feel that he got enjoyment out of

8    seeing the harm he caused him.

9          Staff are aware of the risks of working in a prison

10   just as police officers and firemen in their positions.

11   However, that does not excuse or give inmates the right to

12   carry out attacks on staff.  Inmates need to understand that

13   there are consequences for their actions.  This will help

14   protect the staff that work in these positions every day.

15         The sentence Inmate Petty will receive for these

16   crimes should not be influenced by the sentence he is now

17   serving, but rather a reflection of his actions that day.

18   Inmate Petty took the time to plan his attack, practiced his

19   attack, and followed it through with total disregard to us.

20   Inmate Petty should be facing a charge of attempted murder for

21   his attack that day on Mr. Smith.  I feel he should receive the

22   maximum sentence for his crime against Mr. Smith.

23         Thank you.

24         *THE COURT:*  Thank you, Ms. McEvoy.

25         *MS. COVELL:*  Thank you, Your Honor.

1          THE COURT:  Mr. Petty, would you like to address the

2     Court regarding what you think the sentence should be?  And I

3     will just have you sit there and you can address the Court from

4     there.

5          THE DEFENDANT:  Yes, sir.

6          First of all, I agree and disagree with some of the

7     things that Ms. McEvoy said.  And I would like to start by

8     saying that when I said I regret what I did, I am not talking

9     about the steps that I took.  I don't regret taking the steps

10    that I took that day in trying to get another staff member who

11    I had the beef with, which was the unit manager Patricia

12    Rangel.  That's who my initial target was.  That's who I had

13    this two-year beef with.  That's who I had told repeatedly to

14    go on with your life.  You are going to get somebody hurt.

15         That's why I came out of the cell the first time, to

16    give her a warning that you are going to get somebody hurt or

17    killed in this prison, to leave me alone.

18         So I came out of my cell the first time and gave them

19    a warning, which I wasn't allowed to talk to any of the staff

20    members, but I was just giving her a warning because I am

21    looking at the naiveness on her part working in a dangerous

22    environment and deciding you are going to use me for your

23    entertainment.  This is 2011, and so I am warning her.

24         So I came out of the cell the first time on the staff,

25    but I never hurt the staff.  And I just said look, you know,

1  you are going to get somebody hurt or killed through this

2  prison.  Go on with your life.

3          She reemerged in 2013 with these same tactics,

4  harassment, retaliation, because I am locked behind two doors

5  and feel that there is nothing I can do.  You know, what you

6  going to do, scream all day?  I am going to make you miserable.

7  Well, that's not going to happen with me.  And this is what I

8  am trying to make her aware of.  I tried to tell Warden

9  Berkebile about it.  He told me to send him a cop-out, which is

10  an inmate request slip to staff.

11          I seen him making rounds with Officer Rodriguez.  I

12  asked him, "Did you get my inmate request slip?"  He told me to

13  bring him up to speed.  I said, "The request that I wrote you

14  telling you about this beef me and Patricia Rangel is having

15  because somebody is going to get hurt."  And I am continuing to

16  warn them someone is going to get hurt or killed through this

17  prison.  And I am telling her to go on with your life.  I am

18  not your entertainment because I got a right to do my time on a

19  23-hour lockdown, one phone call a month to my family without

20  being harassed, without being retaliated against.  So I am

21  constantly saying go on with your life.

22          So the warden said that he did get it.  He was going

23  to bring it up at his next meeting.  But what he didn't know, I

24  never wrote him an inmate request slip, so that's how I knew he

25  was lying.  So I knew he wasn't taking the issue seriously, so

1    I decided I am just going to go ahead and kill this woman

2    because if I am telling you to go on with your life, you are

3    not going to go on with your life, I am telling you I am not

4    your entertainment, you are going to get somebody hurt.  So I

5    am going to make an example out of you.  You have a right to do

6    your job, but your job doesn't require you to use me as your

7    entertainment.

8           Now, as far as Ms. McEvoy, Mrs. Smith and Mr. Smith,

9    they are totally innocent in this situation.  They have nothing

10   to do with this beef.  They didn't deserve anything that

11   happened to them on that day.  Mrs. McEvoy never makes her

12   rounds in the morning with the education department.

13          The information I had based on, you know, the cop-outs

14   I've sent, the officers that I asked trying to get this person

15   down to the range -- because that's the only way you can get to

16   someone you're beefing with because I have to get through two

17   doors to get to the person I am beefing with because ADX is a

18   very secure environment, so I have to lure her to the range.

19   That's the only way.  I can't get through three doors, but, you

20   know, it's possible to get through two doors, which I had

21   proven that.  So the only way to do that is to lure this person

22   down to the range and then do what I have to do.

23          That's why I was dressed the way I was dressed.  I

24   mean, you don't put body armor on and get a knife and make mace

25   because you are going to assault someone.  You do that because

```
 1   you are planning on killing someone, and that's what was going
 2   to happen that morning if she would have showed up.
 3          But fortunately for her, unfortunately for Ms. McEvoy,
 4   they showed up.  Ms. McEvoy, for some reason that day she was
 5   walking with the education department.  I did not know it was
 6   her until she began walking down the steps and I heard two
 7   Caucasian female voices because Ms. Rangel, she is Latino.  She
 8   has an accent.  So when I heard the two Caucasian female
 9   voices, I looked out again.  That's when I seen it was
10   Mrs. McEvoy along with the education department and that's when
11   I changed my plans.
12          I said I am just going to go back to the control unit
13   because that's the only way I can change my unit manager
14   because one unit manager is over all four general population
15   units.  So Warden Davis, before he left he knew about this
16   issue.  He moved me to D unit, which is the last unit further
17   from her office, which is G unit -- it's like 100 yards away,
18   almost a football length -- to try to get some distance between
19   us.  And she wasn't, you know, allowed to be around me.  But
20   once Warden Davis left, Berkebile came, she reemerged and it
21   happened again.  Just this beef was going on.
22          And I didn't really know she was behind me not going
23   into the program until my case manager, Tina Sudlow, told me.
24   She said, "Petty, you got a beef."  She said, "I'm not going to
25   play games with you.  I'm not going to lie to you."  She said,
```

1   "I'm getting ready to go to the camp with my husband, but you

2   got a beef."  I said, "Beef with you?"  She said, "Rangel."

3   She said, "That's who you got a beef with."

4        I said, "All right."  So I said, "Thank you."  That's

5   when I decided I am going to kill this person because you

6   continue to poke at me and poke at me and play with me, and I

7   am giving you warnings to go on with your life.  This is for

8   two years I am giving you these warnings, you are going to get

9   somebody hurt and killed.  I am just not talking.  I am just

10  not wasting my time.  When I say something, I am serious about

11  what I say.

12       And so that morning, I just -- when I seen that I

13  didn't have the person that I was dressed for on that day --

14  now, the mace was for Mrs. Smith and Mr. Smith, so they was

15  part of that because I wasn't going to hurt them.  I was just

16  going to get them out of the way to get Rangel to drag in the

17  sallyport and deal, eliminate that problem.

18       But when I seen it was Mrs. McEvoy, then my plans

19  changed.  I just said I am going back to the control unit.  I

20  am just going to come out of the cell, take Mr. Smith to the

21  ground, take his baton, hit him a couple times, because that's

22  the only way you can get to the control unit.  You want to get

23  back to the control unit, which that's the only way I can

24  change my unit manager, is through extreme violence or murder.

25  That's the only way you can get back to the control unit and

1    that's the only way I could change my unit manager.  And that's

2    what I was planning on doing.

3         So my intention was to just take the baton, hit him a

4    couple times and go back into the cell, but that's not what it

5    turned into.  It went from a simple assault and it quickly

6    developed into a murder, attempted murder.  So Ms. McEvoy is

7    correct, but that wasn't my intention, but that's what it was

8    turned into because when I looked at the video, I am familiar

9    with the tactic that I used against the victims on that day.

10        I am just not out there on the range being reckless.

11   I know what I am doing.  And it's not something that I was

12   conscious of.  It's just instinct.  I have done this so many

13   times being locked up in a prison, but it had normally been

14   done against other inmates.

15        And that's why you see on the video when I take

16   Mr. Smith to the ground, his head was facing the front grill.

17   Did you notice I grabbed his leg, which is a tactic we use

18   against other inmates, and I turned his head from the front

19   grill to the back wall going back down the range and I started

20   striking him in his solar plex to force him to move, to keep

21   him pinned to the left side of the wall, which you want to

22   force Mrs. Smith to have to go backwards.  And then I am in

23   like a T formation which would force Ms. McEvoy to have to go

24   backwards.

25        So as I hit Mr. Smith, he has to go backwards.  I am

1    going backwards.  And the victims, Mrs. McEvoy and Mrs. Smith,

2    have to go backwards.  And the only reason why you would do

3    something like that, even though it's not my intention, is that

4    you plan on killing all three people because there is no reason

5    for me to contain everybody like that unless I was planning on

6    killing all three people because once we got to the back of the

7    range, Mr. Smith was pretty much exhausted from being struck in

8    the solar plex so many times.  He gave up.

9            So when I was going in for the kill shot, that's when

10   Mrs. Smith raised her arm and blocked the baton because I hit

11   her so hard, I thought I broke her arm.  And I heard a loud pop

12   and that's what brought me out of that zone and that's when I

13   became aware of what I did because, you know, I looked down and

14   Mr. Smith, I thought I killed him because he was bleeding so

15   bad and he wasn't moving.  And Mrs. Smith, she dropped one arm

16   and raised her other arm up, but she was blinking her eyes real

17   fast.  And I am assuming she was still suffering from the

18   effect of being sprayed with the homemade mace with hot sauce

19   as a base.

20           And she was trying to keep eye contact with me and she

21   said, "Stop."  And it wasn't a panic.  It wasn't a yell.  It

22   wasn't a scream.  It was just a calm, Stop.  You did enough.

23   Just go back in your cell.  And the image that came to my mind

24   because of the way she was resisting, she was like hovered over

25   Mr. Smith, was that of a girl trying to protect her father from

1    being murdered.  That was the image that came to my mind.

2           So I just turned around and went back to my cell and

3    was trying to get rid of the contraband that I had.  And I was

4    thinking -- no disrespect to the Court -- I was just saying I

5    fucked up.  I am probably going to be facing the death penalty

6    because I done killed someone that had nothing to do with this

7    situation, had nothing to do with this beef I was having.  And

8    I am getting ready to go to jail for murdering someone that had

9    nothing to do with any of my issues with Patricia Rangel and

10   that was my thought.

11          So then Officer Cox showed up at the door and said,

12   "Petty, what you doing," because I know Officer Cox.  And I

13   turned around, I said, "I made my point.  This don't have

14   anything to do with you."  He asked me could he have the baton.

15   I said, "No, you can't have the baton."  I said, "Cox, close

16   the door.  Don't get yourself hurt."  That's what he did.  That

17   was the end of it.  And later on I apologized to Officer Cox

18   for doing that on his shift, but the reality is that these

19   three victims did nothing to me.

20          I mean, when I mean nothing, I would never apologize

21   to anyone if they are guilty of doing anything.  If they was a

22   half of a percent guilty of doing anything to me, I would never

23   apologize to them.  I would never regret it.  But I sincerely

24   apologize to Mrs. McEvoy and her family, to Mrs. Smith and her

25   family and to Mr. Smith and his family for what I did to them

1  on that day because they was in a position to be killed that

2  day.

3  And that's why I say I was undercharged in this case.

4  And I believe I deserve another life sentence, but if not, I

5  don't deserve anything less than 720 months.  So I agree with

6  the U.S. Attorney 100 percent because that's what it was turned

7  into, Your Honor.  I know how to kill someone in prison.  I was

8  convicted of that.  So that wasn't my intention, but in looking

9  at the video, that's what that was turning into.

10  So Mrs. McEvoy is right, but she is wrong when she

11  said that was my intention.  That wasn't my intention.

12  However, that's what it was turned into.  And the only reason

13  why Mrs. McEvoy, Mrs. Smith and Mr. Smith is alive today is

14  because Mrs. Smith raised her arm because that's the only thing

15  that brought me out of that zone and made me aware of what I

16  was doing, and that's the truth.  That's the only reason they

17  are alive today.

18  If it wasn't for that -- because I can't say once I

19  killed Mr. Smith I wasn't going to kill them because there is

20  no reason for me to contain them.  I wouldn't even let

21  Ms. McEvoy escape.  She tried to run.  I cut her off and hit

22  her to make her get back over there with Mr. Smith.  There is

23  no reason for me to do that.  There is no reason for me to

24  contain all three victims unless I am planning on killing all

25  three people even though that wasn't my intentions, but there

1   is no reason for me to do that because I could have let her run

2   to the front, but I didn't.

3            I cut her off and I struck her, knocking the radio out

4   of her hand making her get back over there with Mrs. Smith even

5   though that wasn't my intention, but that's what that was

6   turning into.  And for that, I apologize to Mrs. Smith again,

7   Mrs. McEvoy and Mr. Smith.

8            And it's not that I am asking Mrs. McEvoy, Mrs. Smith

9   and Mr. Smith to accept my apology, but an apology is

10  warranted.  It helps with the healing process.  It gives the

11  victims an opportunity to say to their family, their friends, I

12  don't want no apology from him.  He can take that apology, put

13  it with his 60 years that the judge is about to give him, get

14  back in that transport van and go back to ADX and die with his

15  apology.  It gives the victim -- it helps with the healing

16  process.

17           But I am sincerely sorry for what I've done to them

18  because they are innocent.  They have nothing to do with this

19  beef I was having between me and the unit manager Patricia

20  Rangel.  This is not a beef that the staff doesn't know about.

21  Ms. McEvoy doesn't know about it because she was just coming to

22  the prison.  Ms. Smith doesn't know about it because she works

23  in the education.

24           But the officers in custody, Warden Berkebile, they

25  are aware of this beef.  But the officers in custody can't do

1  anything because the unit manager is over them.  The only

2  people that can say something to the unit manager is the AW and

3  the warden.  So once the warden didn't take it serious, okay, I

4  am going to murder on your watch, but I am not going to

5  continue sitting in my cell twiddling my thumb being harassed

6  and retaliated against.

7       I'm not going to do that because I got a right to do

8  my time.  I got a right to a program.  I got the right to do my

9  time without being harassed, disrespected; because I have a

10  responsibility, and that responsibility is not to interfere

11  with the officers doing their job, not to disrespect the

12  officers, not to harass the officers.

13       And 98 percent of the officers that works in ADX are

14  professional people, are respectful people, do a good job,

15  doesn't come there for anything other than to do their job,

16  treat you with respect and humane.  This was just a distinct

17  individual that I was dealing with that in my opinion should

18  never have been in that prison because people make mistakes in

19  ADX.

20       I mean, even after this case just last year an officer

21  accidentally opened the door up, opened my door up on

22  Lt. Murphy and Officer Cochran.  I never ran out my cell trying

23  to attack the staff.  This is not the first time my door came

24  open.  My door came open at least 10 times since being in ADX

25  since 2003, never tried to attack the staff.  Inmates doesn't

1    really operate like that because most of the staff that work

2    there are professional, respectful people.  They don't -- they

3    just come in to do their job.

4         So Ms. McEvoy is correct when she say that, but she is

5    not correct when she say my intention was to murder them.  But

6    she is correct, this was an attempt murder and I was

7    undercharged in that case.  And for that I do agree with her, I

8    deserve the maximum.

9         Now, as far as this inmate Ms. -- the U.S. Attorney is

10   talking about, you know, she is talking about the guy that was

11   convicted of terrorism.  That's the person she is talking

12   about.  He has no credibility, none whatsoever.  He was part of

13   the gehad.  That's the coward she was talking about.  That dude

14   don't have no credibility.  You know, who is he?

15        Thank you.

16        *THE COURT:*  Thank you, Mr. Petty.

17        Pursuant to the United States Supreme Court decisions

18   in the *Booker* and *FanFan* cases, the United States Sentencing

19   Commission Guidelines have become advisory.  The Court, while

20   not required to sentence within the guidelines, has taken them

21   into account in determining an appropriate sentence for

22   Mr. Petty.  The Court has also taken into account the statutory

23   factors which are set forth at 18, United States Code, 3553(a).

24        Mr. Petty has withdrawn his objection to the

25   Presentence Investigation Report.  The Court finds that --

1    because neither the United States nor Mr. Petty has challenged

2    any other aspect of the Presentence Report, the remaining

3    factual statements and guideline applications in the report are

4    adopted without objection as the Court's findings of fact

5    concerning sentencing other than that one recalculation

6    concerning bodily injury to Ms. Smith.

7           The Court finds that the total offense level is 37.

8    The defendant's criminal history category is six.  And that

9    results in an imprisonment range of 360 months to a lifetime of

10   imprisonment and a fine range of $20,000 to $200,000.  The

11   supervised release range is one to three years.  As was alluded

12   to, the statutory maximum for each count is 20 years.

13          The question is what the sentence should be.  And we

14   have an unusual circumstance in this particular case where

15   Mr. Petty is actually suggesting that the government's

16   recommendation of sentence, namely that he get 20 years on each

17   count for a total of -- consecutive for a total of 60 years is

18   the appropriate sentence in this particular case.

19          And Mr. Petty bases that on the fact that he actually

20   thinks he is undercharged.  He thinks that this is more like a

21   attempted murder case, not that, as he pointed out, it was his

22   intention to kill Mr. Smith, Ms. Smith or Ms. McEvoy because,

23   as he mentioned, he figured out as they were coming down the

24   range that they weren't who he anticipated or at least

25   Ms. Rangel wasn't among the group of people who were coming

1  down the range, Mr. Petty having hoped to lure Ms. Rangel whom

2  he had the beef with down the range.

3  　　　　But apparently Mr. Petty decided that as a way of

4  changing his unit, getting off that particular range, that

5  proceeding with an assault would have that effect.  But in the

6  course of committing the assault, he was -- he didn't use this

7  term, but I think perhaps this is what he meant, he was getting

8  carried away and it was heading towards him killing all three

9  of them but for Ms. Smith putting up her forearm, which was

10  described in the trial testimony, being struck then and that

11  triggered a memory in Mr. Petty that had caused him to come out

12  of that state and rethink, kind of come to his senses and

13  decide that he was not going to go ahead and actually kill all

14  of them, although I think Mr. Petty indicated that his intent

15  at the time he was going to strike Mr. Smith or at least the

16  effect of the blow had it not been blocked by Ms. Smith would

17  have been to strike Mr. Smith in the head and probably would

18  have killed him.

19  　　　　The government, of course, is absolutely right in this

20  case that Mr. Petty's criminal history is one where he has used

21  extreme and unnecessary violence against a number of different

22  people.  There was the one that was mentioned by the government

23  of a person's kneecap being shot off in the course of a

24  robbery; another robbery where the unopposed description in the

25  Presentence Investigation Report is the victim who was a pizza

1    delivery man was told to essentially leave, run, and was then

2    shot in the back by Mr. Petty as he did so.

3            Then we have the bank robbery.  And then we've got the

4    second-degree murder conviction where Mr. Petty made a

5    statement about what happened afterwards.  Once again, that's

6    not objected to.

7            Then that brings us to this offense, which Mr. Petty

8    has just described a quite vivid account of what happened.  And

9    as Mr. Petty himself acknowledges, these were totally innocent

10   people in every respect, not just from the perspective of them

11   not having a beef with Mr. Petty, but these were correctional

12   officers just doing their job.  And, of course, one poignant

13   aspect of this case is that Mr. Smith and Ms. Smith were just

14   delivering books to Mr. Petty's cell.  You know, they are

15   trying to within the scope of their duties provide something to

16   an inmate because apparently he has requested that type of

17   book.  You know, for someone who is locked down 23 hours a day,

18   that would be of help entertaining them or educate them.

19           And, you know, what they got from it was the shock of

20   Mr. Petty coming at them, the pain of the blows that he

21   inflicted on them.  And in the case of Ms. McEvoy who doesn't

22   shake with her right hand anymore because if someone squeezes a

23   little too hard when shaking her hand, she experiences pain or

24   even more particularly in the case of Mr. Smith, I mean, his

25   hand is pretty much beyond repair.  He has had to endure not

1    only the terrible pain that the event caused, but, you know,

2    all the different operations that he goes through, his hand is

3    never going to be the same.  He is probably going to have to

4    endure more operations, plus he has got memory problems.

5           Memory problems are a really bad thing when you have

6    got some type of a head injury that's affecting your function

7    because once you are not hitting on all cylinders or can't do

8    the same things that you used to, you just aren't employable in

9    the same way.  You can't fulfill, you know, the potential that

10   you otherwise had to go through life and to earn enough money,

11   fulfill what you think you should be able to in life, and

12   that's all because of Mr. Petty having assaulted him in the way

13   that he did.

14          I think it bears note by the Court of the fact that

15   Ms. McEvoy, much smaller than Mr. Petty, exhibited just really

16   extraordinary bravery on that particular day.  You know, the

17   fact that she didn't appear with any hesitation, tried to

18   defend, tried to protect the Smiths as best she could from this

19   particular assault even though she realized that Mr. Petty was

20   armed with those batons.  You know, it's quite extraordinary.

21          I know that the Bureau of Prisons has apparently

22   commended her for that, but certainly the videotape showed that

23   despite what you could call a very small chance of being able

24   to have any effect on Mr. Petty, she tried and got hurt because

25   of it, but she certainly exhibited an extreme amount of bravery

1   on that particular day.

2          I think that when you look at all of the different

3   factors in this case and when you look at Mr. Petty's criminal

4   history, and even taking into account the statement that he

5   made to the Court, he didn't mistakenly assault these two

6   people.  He purposefully assaulted these two people, and this

7   even knowing that they weren't -- at least the person who he

8   had the beef with was not among the group.

9          His plan, as Mr. Petty stated it, changed, but the

10  plan itself was to use violence against them and he did to a

11  huge extent, so much so that weren't it for Ms. Smith, and I

12  believe the testimony was that she was trying to ward off that

13  blow to Mr. Smith, not just to protect herself, she was trying

14  to ward off that blow to Mr. Smith, that it could very well be,

15  as Mr. Petty assumes, that Mr. Smith could be dead.

16         And if that happened, it could very well be that

17  Mr. Petty, as he said, would have just gone ahead and done his

18  best to kill all three of them.  So Ms. Smith deserves a lot of

19  credit for her acting trying to ward off that blow too because

20  it could very well be according to Mr. Petty a very, you know,

21  but for cause for this not ending up much, much worse.

22         I think that the sentence of 240 months as to each

23  count consecutive is the appropriate sentence in this case.

24         And therefore, pursuant to the Sentencing Reform Act

25  of 1984, it is the judgment of the Court that the defendant,

1   Ishmael Petty, is hereby committed to the custody of the Bureau

2   of Prisons to be imprisoned for a term of 240 months on each of

3   Counts 1, 2 and 3 to be served consecutively.

4          Moreover, the term of imprisonment imposed shall run

5   consecutively to the defendant's imprisonment pursuant to the

6   judgment in 98-CR-018 in the Northern District of Mississippi

7   and 02-10006-01 in the Western District of Louisiana.

8          Upon release from imprisonment, Mr. Petty shall be

9   placed on supervised release for a term of three years on each

10  of those counts, all such terms to run concurrently with each

11  other and also concurrently with any term of supervised release

12  imposed in 98-CR018 from the Northern District of Mississippi.

13         Within 72 hours of release from the custody of the

14  Bureau of Prisons, Mr. Petty shall report to the probation

15  office in the district to which the defendant is released.

16         While on supervised release, Mr. Petty shall not

17  commit another federal, state or local crime; shall not possess

18  a firearm as defined in 18, United States Code, Section 921;

19  and shall comply with the standard conditions that have been

20  adopted by the Court.

21         Mr. Petty shall not unlawfully possess a controlled

22  substance.  He shall refrain from any unlawful use of a

23  controlled substance.  And he shall submit to one drug test

24  within 15 days of placement on supervision and two periodic

25  tests thereafter.

1          Mr. Petty shall cooperate in the collection of DNA as

2     directed by the probation officer.  Restitution is not ordered

3     as no restitution has been requested by the victims, in all

4     likelihood because of the fact that the Bureau of Prisons has

5     addressed their restitution needs.

6          Mr. Petty shall pay a special assessment of $100 on

7     each of Counts 1, 2 and 3 for a total of $300 which is due and

8     payable immediately.  The Court finds that he does not have the

9     ability to pay a fine, so the Court will waive a fine in this

10    case.  It is ordered that the total monetary obligations shall

11    be paid immediately.

12         Mr. Petty is also advised of his right to appeal the

13    conviction and also the sentence in this case.  If he desires

14    to appeal, a notice of appeal must be filed with the Clerk of

15    the Court within 14 days after entry of judgment or the right

16    to appeal will be lost.

17         If Mr. Petty is unable to afford an attorney for an

18    appeal, the Court will appoint one to represent him.  And if he

19    so requests, the Clerk of the Court must immediately prepare

20    and file a notice of appeal on his behalf.

21         Ms. Covell, anything else on behalf of the United

22    States?

23         *MS. COVELL:*  No, Your Honor.  Thank you.

24         *THE COURT:*  Mr. Varholak, anything else on behalf of

25    Mr. Petty?

1          MR. VARHOLAK:  No, Your Honor.  Thank you.

2          THE COURT:  Then Mr. Petty shall be remanded to the

3    custody of the United States Marshals and the Court will be in

4    recess.

5          THE DEFENDANT:  Thank you.

6       (Recess at 12:26 p.m.)

7                      REPORTER'S CERTIFICATE

8       I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.  Dated

10   at Denver, Colorado, this 4th day of January, 2016.

11

12                           S/Janet M. Coppock____

13

14

15

16

17

18

19

20

21

22

23

24

25